# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO.: 02-14084-CR-MARRA/LYNCH

UNITED STATES OF AMERICA

v.

JOHN MACARI,

      Defendant.

_____/

**NIGHT BOX FILED**

MAY 1 9 2005

CLARENCE MADDOX
CLERK, USDC/SDFL/FTL

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

### INTRODUCTION

On November 6, 2002, the Defendant herein, John Macari, was charged by Information with one (1) Count of Mail Fraud, in violation of 18 USC 1341, a Class D felony.  The Defendant pleaded guilty to the Information on February 28, 2003, in accordance with the terms of a Plea Agreement executed by Mr. Macari and the government[1].

Pursuant to the Agreement, the Defendant agreed to provide the government with information and testimony that may be helpful to the government.  The government agreed to file a motion pursuant to §5k1.1 and/or 18 U.S.C. §3553(e) on the Defendant's behalf if the Defendant's cooperation rose to the level of substantial assistance. It was further agreed that the government would recommend the applicable reduction in the offense level (a 2 or 3 level adjustment), based on the Defendant's acceptance of responsibility and his level of assistance to authorities in the investigation of his own misconduct.[2]

---

[1] Please see Exhibit "A" which is annexed hereto and incorporated by reference.

[2] The PSR reflects a three-level reduction.



The parties further stipulated that the applicable Sentencing Guideline range given the facts herein was a level 15, and that the government would seek no fine against the Defendant. Mr. Macari also agreed to pay full restitution in the amount of $1,600,000, less any amount not previously credited to Mr. Macari.  It was agreed that no downward or upward departures were applicable, beside those applicable to the Defendant's cooperation,  though the Agreement does not preclude the Court from exercising its discretion in view of recent changes in sentencing law.

Since pleading guilty in February of 2002, Mr. Macari has fully accepted responsibility for his actions.  This is evidenced by his plea and his subsequent letter of apology, which states in pertinent part:

> I fully, completely and unequivocally accept responsibility for the actions which led to the charges against me and to which I pled guilty.  I have learned my lesson and I will never again be in trouble with the law.  In an effort to help law enforcement, I have agreed to cooperate with the FBI and the United State Attorney's Office, helping them uncover crime and prosecute those responsible for it.  I apologize to the Court and Government for my actions.[3]

Further, Mr. Macari has, in accordance with the Plea Agreement, provided substantial assistance to the government.  Mr. Macari has met with government agents and U.S. Attorney James McAdams at least ten (10) times, has testified before the Grand Jury 3 times, and even has spoken with Norwegian Officials to assist them in the investigation and prosecution of crimes in that Country.[4]  Indeed, sentencing herein has been continued several times to accommodate Mr. Macari's continuing cooperation.  Counsel for Mr. Macari has confirmed with AUSA McAdams

---

[3]  Please see Exhibit "B" an excerpt of the PSR which is annexed hereto and incorporated by reference.

[4]  A copy of the letter confirming Mr. Macari's assistance to Norwegian authorities is annexed hereto as Exhibit "C."

that he is recommending issuance of the motion pursuant to 5k1.1 to his supervisor on the basis of Mr. Macari's substantial assistance to authorities.

In its Presentence Investigation Report, hereafter "PSR," Probation recommended a total offense level of 17, rather than the stipulated offense level of 15, due to a 2-level adjustment for more than minimal planning pursuant to §2F1.1(b)(2).  The Defendant objected to the two-point adjustment because the parties agreed in the plea agreement that it did not apply. AUSA McAdams has authorized counsel to state that his position also remained in conformity with the plea agreement. This is reflected in Probation's Addendum to the PSR, and in paragraph 80 of the final submitted PSR.

In addition, the Supreme Court's recent decisions in <u>Blakely v. Washington</u>, 2004 WL 1402697; <u>Booker/Fanfan</u>,125 S.Ct. 738 (2005), and its progeny, support the conclusion that the two-level enhancement for more than minimal planning should not be applied since it is an enhancement on the basis of facts to which the Defendant did not specifically plead.    It is therefore urged that the Court, when determining the applicable Sentencing Guideline Range, apply a total Offense Level of 15. <u>See also</u> <u>U.S. v. Crosby</u>, 2005 WL 240916 (2nd Cir. 2005).

Mr. Macari agreed not to seek any downward departures, other than those authorized by the government's motion pursuant to §5k1.1, herein pursuant to his plea agreement.  However, the Court is now saddled with authority to consider factors previously couched in terms of "downward departures," in structuring a "reasonable sentence, as is now within the Court's purview." <u>See generally</u> <u>Booker</u> and <u>Crosby</u>. Probation did not recommend downward departures on the basis of Defendant's age or health, nor his extraordinary acceptance of responsibility.  However, it is respectfully urged that the Court consider these factors when exercising its discretion in structuring its sentence herein.

The following Memorandum in Aid of Sentencing is submitted, pursuant to Rule 32 of the Federal Rules of Criminal Procedure, in support of John Macari's arguments that: (1) the Defendant's extraordinary acceptance of responsibility and related assistance to the government warrant a sentence well below that suggested by the Sentencing Guideline range of 18-24 months based on the total appropriate adjusted offense level of 15; to wit, a sentence of probation; (2) the Defendant's age and related health problems mitigate in favor of the Court's exercising its discretion by imposing a probationary sentence; (3) these factors combined, when viewed in light of the policy behind them, mitigate in favor of the Court's exercising its discretion by imposing a probationary sentence; and (4) should a sentence of imprisonment be imposed, a voluntary surrender is appropriate.

## PERSONAL BACKGROUND OF DEFENDANT, JAMES MACARI

John Macari shall turn 76 years old on June 24th of this year. He was born in 1929 in Hartford, Connecticut, to Patrick and Josephine Macari, both of whom are now deceased. Mr. Macari was the oldest of four children.

The Defendant's father was a welder. Despite his hard work, the family was poor, having only its basic needs met by their father's income. As stated by the Defendant's brother, Joseph Macari:

> Our parents worked hard when we were kids, but times were tough. There often was not enough money to pay all the bills and feed a large family. John, the oldest child, had to leave school and get jobs to bring in extra money. John always had a part-time job from paper routes, shoveling snow, to working at the five and dime to help bring in much needed extra money. John also always helped out around the house....[5]

---

[5] A copy of Joseph Macari's letter to the Court is annexed hereto as Exhibit "D."

It was for this reason that the Defendant never had the luxury of attending college.  Rather, he

went to work immediately following his graduation from high school.  This is confirmed by the

Defendant's sister, Maryann Lynch, who observes:

> Our family went through some hard times; tight finances put a strain on the entire family.  John sacrificed school and was deprived most aspects of a normal childhood to help the family by working and taking care of my brother (Joe) and myself.[6]

The Defendant's devotion to his family's well-being was so complete that he did not

move out of his home until he was wed on September 6, 1952, to Shirley Stavola, the

Defendant's first and only love.  The Macari's remained married for 51 years, until Shirley's

death on August 2, 2003 of a brain tumor.

However, even with a family of his own to support, the Defendant never forgot his role

within the greater Macari family.  As stated by his brother, Joseph:

> As we got older, and John became somewhat successful in business, John helped our parents financially.  He paid some of their bills and always was there when one of them was sick or needed help . . . John was the rock who everyone in the family turned to for emotional, financial, and personal help.[7]

He adds:

> For myself, John has helped me financially and personally more times than I can remember.  John made it possible for me to buy my first house.  He found the site, built and paid the down payment on my first house.  John knows that I live on a small fixed income.  Again, John has been there for me each and every time I have needed help.  His efforts have been directly responsible for me to supplement my monthly income and thus, live with a modicum of comfort in my senior years.

---

[6] A copy of Maryann Lynch's letter to the Court is annexed hereto as Exhibit "E."

[7] See Exhibit "D."

The Defendant truly has been the patriarch of the Macari clan, in its purest sense. His impact on the family extends down to the youngest generation. As explained by his sister:

> John never has to be asked twice for help. He has always been there for me and my children-no matter what the situation. He has been a wonderful grandfather figure to my children and their children. He has been as caring and dependable to my children as he was to us while growing up...[8]

The Defendant was obviously blessed with a loving family-life – one that he worked very hard to foster. As stated by his son, Stephen:

> I love my father without reservation and believe he loves my son and me unconditionally.
>
> My father is the kind of man who is not afraid to let you know how he feels. My father was always very affectionate with my mother, brother and me: we laughed, hugged and cried together. I will always remember that my father taught me that all feelings were O.K. As such, my childhood was filled with good, strong, loving memories. We were a close family: If there was a problem or something sad, or even something joyous, we talked about it, laughed about it, celebrated it, and worked it out...[9]

The Defendant's kindness has reached beyond his blood-line to a larger family of friends, all of whom have been touched by him. This includes fourteen (14) year-old Chance M. Gorman, the son of the Defendant's employee, Robert L. Gorman. Chance suffers from cerebral palsy. He writes:

> I have known John about three years. My father was working for John and John would allow me to come to work with my father sometimes . . . I do my schoolwork - I am Home-Schooled by my father - in a private office...
>
> Mr. Macari has been very nice to me. He doesn't treat me like a dumb kid, but actually will talk with me. He also has been very concerned and interested in my Cerebral Palsy . . . He never makes fun of me and always treats me with respect . . .[10]

---

[8] See Exhibit "E."

[9] A copy of Stephen J. Macari's letter to the Court is annexed hereto as Exhibit "F."

[10] A copy of Chance M. Gorman's letter to the Court is annexed hereto as Exhibit "G."

Chance's father, Robert Gorman, elaborates:

> Personally, Mr. Macari has helped me when I have had difficult times. I am currently undergoing treatment for a serious illness. Mr. Macari has been there for me: He has accommodated my hectic schedule filled with Doctor appointments and allows me to bring my fourteen-year-old son (who suffers hemiplegic cerebral palsy) to the offices while consulting. His kindness and generosity are greatly appreciated by my son and myself...[11]

The Defendant is also charitable to those in need with whom he has no personal connection, other than a shared humanity. As his friend, Charles Clark, observes:

> John is a generous and charitable man. He donates regularly to Saint Jude's Church in Jupiter and Tequesta. Whenever we have traveled together, John is the type of person who always has a spare dollar for the needy.... Case in point: He will often donate a few dollars to a homeless person... John insists on giving the homeless person some money, say a prayer, and hope the contribution helps the poor person in some small way...

> In summation, John Macari is a very professional, generous, and kind person. My life and the lives of those he regularly helps, are richer, better, and happier for having known him.[12]

For all his charity and family devotion, the Defendant has recently been stricken with tragedy. As stated earlier, John has been devastated by the loss of his wife, Shirley, to whom he was utterly devoted. Shirley first fought lung and esophagus cancer, both of which went into remission. However, she was then diagnosed with a brain tumor and succumbed to it after fighting for eight months. John was at his wife's side for the duration of her illnesses, refusing to send her to the hospital, preferring to care for her himself at home with the help of an aid.

John and Shirley Macari had two children together, Stephen and Mark, both of whom work for Macari Development. The boys remain very close to their father, as documented by Stephen's letter, referenced above. The Defendant was shamed by his disclosure of the events

---

[11] A copy of Robert L. Gorman, J.D., M.S.'s letter to the Court is annexed hereto as Exhibit "H."

[12] A copy of Charles Clark's letter to the Court is annexed hereto as Exhibit "I."

herein to his boys, and only revealed this matter to them recently, out of a desire to shield them from any pain or embarrassment that it might cause them.

Mr. Macari had been employed in real estate development throughout the majority of his life. This led, in 1988, to the formation of Jamar Enterprises. Through this company, Mr. Macari provides financial consulting services to companies seeking financing for large construction projects. Jamar Enterprises has been very successful in assisting his clients in obtaining financing. Despite his companies' successes, however, Mr. Macari has been consumed by his wife's illnesses and ultimate loss.

Further, the Defendant has suffered from his own health problems over the last ten years. Mr. Macari has suffered two heart attacks, one in 1995 and another in 2000. He has had four stints placed in his heart, and was in and out of the hospital until the end of 2004 due to related complications.[13]    Mr. Macari continues to suffer on a daily basis from cardiac related complications. According to Mr. Macari, his heart "races like a drum." Even while resting, he is short of breath and is unable to lower his heart rate. Further, the Defendant suffers from diabetes melitis, or adult onset diabetes. Because he suffers from diabetes melitus, his vision has significantly decreased in recent years. He rarely drives himself and no longer drives at night. To control his various health difficulties, Mr. Macari presently takes many prescription medications. These include: glucophage, lipitor, lopressor, zestril, glucotrol and Avandia. Because Mr. Macari lives alone he is unable to get a full night of sleep as he is afraid that something might happen to him because of his deteriorating health and that nobody would be near him to assist.

---

[13] A copy of a portion of Mr. Macari's health records are annexed hereto as Exhibit "J."

Mr. Macari suffers from bouts of depression. The pending criminal charges, watching his wife of fifty-one (51) years slowly die from a painful and debilitating form of cancer and his own health problems have all contributed to this condition.

## THE DEFENDANT'S CONDUCT HEREIN

As stated above, Mr. Macari has pleaded guilty to one count of Mail fraud, in violation of 18 USC 1341.   He has readily accepted his responsibility in the charged conduct and has assisted law enforcement not only here in the United States, but also the authorities in Norway, to investigate and prosecute illegal activity here and abroad.   This assistance surpassed the requirements of the plea agreement and evidences Mr. Macari's extraordinary acceptance of responsibility.

Mr. Macari has been humiliated and saddened by his actions herein.   He asks the Court to consider his crimes against his subsequent attempts to remediate his wrongs and against the framework of his prior extraordinary and exemplary life.

## SUMMARY OF THE ARGUMENT

Even in the pre-Booker/Fanfan era, a district court was required to impose sentence in light of a number of sentencing factors, including those set forth in 18 U.S.C. § 3584 and 18 U.S.C. § 3553(a).   Viewing the totality of circumstances present in a given case, the district court has traditionally been tasked with imposing *no greater punishment than is necessary* to further the statutory objectives of sentencing.   Indeed, The Sentencing Reform Act of 1984, Pub. L. No. 98-473, § 211, 98 Stat. 1987, 1989-90 (1984) requires that courts "impose a sentence sufficient, but not greater than necessary," to comply with the purposes of criminal punishment. 18 U.S.C. § 3553(a).

Booker/Fanfan and Crosby require District Courts to consider the policy statements of the Sentencing Commission in formulating and imposing a sentence.    The prohibition against overly severe sentences is thus still relevant. Now, however, the sentencing Court has greater leeway to enforce such policy in a manner that is reasonable on a case-by-case basis.  For the reasons stated below, a reasonable sentence herein is either probation or home-detention.

**I.      The Court Should Exercise its Discretion and Impose a Sentence of Probation or Home Detention**

The Sentencing Reform Act defines the legitimate purposes of sentencing. 18 U.S.C. § 3551(a) requires that every defendant "shall be sentenced...so as to achieve the purposes set forth in subparagraphs (A) through (D) of § 3553(a) (2) to the extent that they are applicable in light of all the circumstances of the case." To wit:

> (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)  to afford adequate deterrence from criminal conduct;
>
> (C)  to protect the public from further crimes of the defendant;
>
> (D)  to provide the defendant with needed educational or vocational training, medical care, or other, correctional treatment in the most effective manner.

Our sentencing scheme has thus been defined by Congress as having four traditional justifications – deterrence, incapacitation, retribution, and rehabilitation.

In fashioning the appropriate sentence in light of these justifications, courts must consider: (a) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (b) "the kinds of sentences available"; (c) "the kinds of sentence and the sentencing range established" by the guidelines; (d) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"; (e) "any

> Thus, at this point, we can identify several essential aspects of Booker/-Fanfan that concern the selection of sentences. First, the Guidelines are no longer mandatory. Second, the sentencing judge must consider the Guidelines and all of the other factors listed in section 3553(a). Third, consideration of the Guidelines will normally require determination of the applicable Guidelines range, or at least identification of the arguably applicable ranges, and consideration of applicable policy statements. Fourth, the sentencing judge should decide, after considering the Guidelines and all the other factors set forth in section 3553(a), whether (i) to impose the sentence that would have been imposed under the Guidelines, i.e., a sentence within the applicable Guidelines range or within permissible departure authority, or (ii) to impose a non-Guidelines sentence. Fifth, the sentencing judge is entitled to find all the facts appropriate for determining either a Guidelines sentence or a non-Guidelines sentence.

Crosby at 113.

The Court may consider the calculated guideline range or simply impose a non-guidelines sentence altogether. The Judge's determination is reviewed for its "reasonableness." See Booker; See also Crosby.

Further, the Court may consider the policy behind previously applied, "downward departures" to determine whether those considerations are applicable in imposing a sentence below the calculated guideline range or in fashioning a "reasonable" sentence as an exercise of discretion. The policy behind Departures on the basis of age and physical condition pursuant to U.S.S.G. §§5H1.1 and 5H1.4 are accordingly pertinent herein, not as basis for a "departure" in the classic sense, but more as a basis for the Court to exercise its discretion in imposing a sentence of probation.

In U.S. v. Gigante, 989 F.Supp. 436 (E.D.N.Y.,1998), the Court explored various cases wherein sentencing Courts permitted departures on the basis of age and fragility, as per. U.S.S.G. §§ 5H1.1, 5H1.4. These cases included: U.S. v. Rioux, 97 F.3d 648, 662-63 (2d Cir.1996), wherein defendant's medical condition resulting

from a kidney transplant coupled with his prior civic good deeds permitted a ten point downward departure); <u>U.S. v. Moy</u>, 1995 WL 311441, at *25-29, *34 (N.D. Ill. May 18, 1995) wherein a downward departure was granted based upon defendant's advanced age, 78, aggravated health condition, and emotionally depressed state; <u>U.S. v. LiButti</u>, 1994 WL 774647, at *10 (D.N.J. Dec.23, 1994), wherein a downward departure was granted when "defendant's combination of physical and mental conditions present an extraordinary situation in which prison life may be significantly harder to endure."

In <u>Moy</u>, the Court recognized that prison is very difficult for the elderly and could serve to shorten an older person's life. The Court therefore departed from the requisite Guidelines range on the basis that, "Defendant's fragile physical state, his advanced age, and a court's duty not to impose sentences that are excessively cruel argue strongly for a downward departure." <u>Moy</u> at 29.

Mr. Macari urges that the his advanced age and deteriorating health mitigate in favor of a probationary sentence as outlined above. Although he may not have qualified for a "downward departure" on this basis under the traditional "heartland" analysis, the Court should consider his health and age in exercising its discretion to fashion a reasonable sentence herein. Defendant urges that a life-sentence, as any incarcerative sentence might be given Defendant's age and health problems, would be excessive under the circumstances herein.

Additionally, Mr. Macari's extraordinary assistance to law enforcement, both here and abroad, mitigates in favor of a probationary sentence. It is well-settled

public policy to reward such assistance to encourage future cooperation. The extent of Mr. Macari's assistance to the authorities, both here and abroad, should earn him considerable credit.  Mr. Macari's assistance to law enforcement, evidences Mr. Macari's extraordinary acceptance of responsibility.  In those cases where such acceptance has been recognized as extraordinary, additional reductions of sentence, beyond the two-point or three point reductions per U.S.S.G. 3E1.1 have been authorized.  U.S. v. Stuart, 384 F.3d 1243, (C.A.11 (Ga.) 2004) (a " 'truly extraordinary post-arrest pre-sentence [rehabilitation] may exceed the degree of [rehabilitation] contemplated in section 3E1.1 and therefore justify a downward departure,' " (quoting U.S. v. Williams, 948 F.2d 706, 710-11 (11th Cir.1991))).

## The Sentence Herein

It is urged that Probation is an appropriate sentence for Mr. Macari.  It is not necessary to deter the Defendant from further criminal conduct. He has learned his lesson and has attempted to right his wrongs.   His embarrassment at having been arrested has served the purpose of deterrence and incapacitation on its own.

Further, the Defendant is not in need of rehabilitation.  At almost 76 years of age, the Defendant, knows full well the benefits of working within the bounds of the law and he wishes to remain there. Defendant's current business interests are both legal and successful.  Society's interest in rehabilitation has been served.

Mr. Macari requires treatment for his heart condition and diabetes, which he fears can not be adequately addressed within the Bureau of Prisons.  If these conditions are not addressed properly, Mr. Macari's life is indeed at risk.

For all of these reasons, a sentence of probation is urged as being most appropriate. Such probation would adequately punish the Defendant for his conduct, yet encourage future Defendants to cooperate with law enforcement. However, should the Court deem probation inappropriate, then home-detention is urged so that the Defendant may receive adequate medical treatment, be close to his children and grand-children, and not be a burden on the BOP, which would struggle to adequately serve Defendant's and physical needs..

**Voluntary Surrender Is Proper**

Given that Mr. Macari has been exemplary in complying with the strictures of his release, it is respectfully requested that Your Honor allow him to surrender directly to his designated facility if the Court, indeed, imposes a sentence of incarceration. This would allow the Defendant: to wrap up his financial affairs and an opportunity to say good bye to his children and grand-children.

<div align="center"><b>CONCLUSION</b></div>

**WHEREFORE**, it is respectfully requested that the Court grant the relief requested herein, as well as any other relief that it may deem necessary and proper.

> **RICHARD G. LUBIN, P.A.**
> Second Floor, Flagler Plaza
> 1217 South Flagler Dive
> West Palm Beach, Florida 33401
> Telephone: 561/655-2040
> Facsimile: 561/655-2812
> **Attorneys for Defendant John Macari**
>
> By: _____
> **RICHARD G. LUBIN**
> Florida Bar No. 182249

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy hereof has sent via overnight delivery to **James McAdams, Esq.,** Assistant United States Attorney, P. O. Box 2497, Ft. Pierce, FL 34954; and to **Patricia Borah,** U.S. Probation Officer, 501 S. Flagler Drive, Room 400, West Palm Beach, FL 33401, this ___ day of May, 2005.

By: _____

**RICHARD G. LUBIN**

16

## AGREEMENT TO WAIVE INDICTMENT
## AND TO PLEAD GUILTY TO INFORMATION

The United States Attorney's Office (USAO) for the Southern District of Florida, through the undersigned Assistant United States Attorney, and JOHN MACARI (hereinafter referenced as "Macari" or "the defendant"), with full advice and counsel of his undersigned attorney, enter into the following agreement:

1.     The defendant agrees to waive his right to be charged by an indictment returned by the grand jury and agrees to be charged by way of information filed by the United States Attorney. The defendant further agrees to plead guilty to a one-count Information charging him with wire fraud in violation of 18 U.S.C. §§ 1343 and 2.

2.     The defendant is aware that the sentence will be imposed in conformity with the Federal Sentencing Guidelines and Policy Statements (hereinafter "Sentencing Guidelines" or "Guidelines"), and that the applicable guidelines will be determined by the court relying in part on the results of a Pre-Sentence Investigation (PSI) by the court's probation office, which investigation will commence after the guilty plea has been entered. The defendant is also aware that, under certain circumstances, the court may depart from the applicable guideline range and impose a sentence that is either more severe or less severe than the guidelines range. The defendant is further aware that the Sentencing Guidelines do not provide for or permit parole. Knowing these facts, the defendant understands and acknowledges that the court has the authority to impose any sentence within and up to the statutory maximum authorized by law for the offense identified in paragraph 1 and that the defendant may not withdraw his guilty plea solely as a result of the sentence imposed.

3.     The defendant also understands and acknowledges that the statutory maximum

<div align="center">Page 1 of 12</div>

<div align="center">EXHIBIT "A"</div>

term of imprisonment upon conviction of a violation of 18 USC §1343 is five (5) years of

imprisonment, followed by a period of supervised release not to exceed three years, and that the

court may impose a maximum fine of $250,000.

      4.    The defendant further understands and acknowledges that, in addition to any

sentence imposed under paragraph 3 of this agreement, the Court must also order that a special

assessment in the amount of $100 be imposed on the defendant.  The defendant agrees that he

will pay that  special assessment at the time of sentencing.

      5.    The defendant agrees that he will cooperate fully with the United States

Attorney's Office for the Southern District of Florida ("USAO") by providing truthful

information and testimony if called upon by the USAO to testify in a grand jury proceeding or

trial.  The USAO reserves the right to evaluate the nature and extent of the defendant's

cooperation and to make the defendant's cooperation, or lack thereof, known to the court at the

time of sentencing.  In addition, if in the sole judgment of the USAO the defendant's cooperation

is of such significance to the investigation and prosecution of this and other criminal matters so

as to warrant the court's departure from the sentence required by the guidelines and/or the statute,

the USAO may make a motion pursuant to Section 5K1.1 of the Sentencing Guidelines reflecting

that the defendant has provided substantial assistance.  The defendant acknowledges and agrees,

however, that nothing in this Agreement may be construed to require the USAO to file such a

motion.

      6.    The USAO reserves the right to inform the court and the probation office of all

facts pertinent to the sentencing process, including all relevant information concerning the

offenses committed, whether charged or not, as well as concerning the defendant and the

defendant's background.  Subject only to the express terms contained in this agreement, the
USAO further reserves its right to make any recommendation to the Court as to the quality and
quantity of punishment.

      7.     The USAO acknowledges that defendant Macari has provided timely notice of his
intent to plead guilty, thereby obviating the necessity to prepare for trial.  Subject to the
requirement that the defendant clearly demonstrate to the U. S. Probation Office his acceptance
of responsibility for his participation in his offense, and contingent upon defendant's full
compliance with the terms and conditions of this agreement, the USAO agrees to recommend
that defendant Macari be accorded a decrease of two offense levels pursuant to USSG §3E1.1(a)
and, if eligible, an additional one level decrease pursuant to USSG §3E1.1(b).  The defendant
understands, however, that such recommendation is not binding on the probation office or the
court.  The defendant further acknowledges that the United States will not be required to make
this sentencing recommendation if the defendant: (1) fails or refuses to make full, accurate, and
complete disclosure to this Office and the probation office of all of the circumstances
surrounding the relevant offense conduct and the defendant's present financial condition; or (2)
commits any misconduct after entering into this plea agreement, including but not limited to
committing a state or federal offense, violating any term of release, or making false statements or
misrepresentations to any governmental entity or official.

      8.     The defendant acknowledges his understanding and agreement that, if for any
reason he fails to comply with the any of the provisions of this agreement, he will thereby waive
any protection afforded by Section 1B1.8(a) of the Sentencing Guidelines as well as any
protection afforded by Rule 11(e)(6) of the Federal Rules of Criminal Procedure.  In that event,

the defendant understands and agrees that any statements made by the him under this agreement or as part of any plea discussions or as part of any attempted or actual cooperation with the USAO will be fully admissible against him in any civil or criminal proceedings, notwithstanding any prior agreement with the USAO.

9.      The defendant is aware that the sentence has not yet been determined by the court. The defendant also is aware that any estimate of the probable sentencing range or sentence that the defendant may receive, whether that estimate comes from the defendant's attorneys, the USAO, or the probation office, is a prediction, not a promise, and is not binding on the USAO, the probation office, or the court. The defendant understands further that any recommendation that the USAO makes to the court as to sentencing, whether pursuant to this agreement or otherwise, is not binding on the court and that the court may disregard the recommendation in its entirety. The defendant understands and agrees, as previously acknowledged in paragraph 2 above, that the defendant may not withdraw his plea based upon the court's decision not to accept a sentencing recommendation made by the defendant and/or the USAO, or due to the defendant's dissatisfaction with the sentence ultimately imposed by the Court.

10.      The defendant is aware that Title 18, United States Code, Section 3742 affords him the right to appeal the sentence imposed in this case. Acknowledging this, in exchange for the undertakings made by the United States in this plea agreement, the defendant hereby waives all rights conferred by Title 18, United States Code, Section 3742 to appeal any sentence imposed, including any restitution order, or to appeal the manner in which that sentence was determined, unless (1) the sentence exceeds the maximum permitted by statute, or (2) the sentence is the result of an upward departure from the guideline range the court establishes at

Page 4 of 12

sentencing. The defendant further understands that nothing in this agreement shall affect the

USAO's right and/or duty to appeal as set forth in 18 U.S.C. § 3742(b). If the United States

appeals the defendant's sentence pursuant to Section 3742(b), the defendant shall be released

from the above waiver of appellate rights.

11.     The USAO and the defendant stipulate to the following facts concerning the

scheme and artifice devised and/or executed in the Southern District of Florida, and elsewhere,

by the defendant and others with the intent to defraud and to obtain money or property by means

of false or fraudulent pretenses, representations, or promises:

> In 1998 and 1999, defendant Macari, George Manter, and other persons more
> fully identified below, collaborated to defraud several individuals of moneys and
> fees paid by those victims to Manter and Macari for placement in a so-called
> high-yield investment program. As part of the scheme, Manter and Macari
> represented to the investors that Macari was the owner, or otherwise had
> exclusive control, of United States Treasury Bills (T-bills) with a face value that
> varied from $100 million to over $1 billion. According to the scheme, Macari, in
> exchange for a fee paid by the investor, would execute an assignment of T-bills to
> the investor, which T-bills would serve as collateral to protect the principle
> invested by those wishing to participate in the high-yield investment program.

> In another permutation of the scheme, Macari would agree that, for a fee, he
> would, in essence, "lease" T-bills to a person seeking a large commercial loan, but
> who lacked the requisite collateral for that loan. According to the scheme, and as
> represented by Macari, those T-bills would serve as collateral for a letter of credit
> that could then be used to obtain a loan from a bank.

> As proof of Macari's ownership of these T-bills, Macari provided, inter alia, (1)
> an alleged assignment of the T-bills from Dr. John and Dr. Jeanmarie Juncal to
> Century Capital (Marcari's corporation); (2) an attestation by at least one attorney
> of the authenticity of the CUSIP numbers assigned to the T-bills and of the lack of
> public record as to any liens or encumbrances on those T-bills; and (3) safe
> keeping receipts (SKRs) from an Italian investment company reflecting the
> existence and authenticity of the T-bills in question. In certain instances, he also
> told investors that Deutsche Bank would endorse the SKRs.

> The Cusip numbers that were provided to the victims were, in fact, valid CUSIP
> numbers for existing Treasury Bills. Moreover, Macari and Manter advised
> several persons that these CUSIP numbers could be verified by checking with the

Bloomberg web site on the Internet. What they did not explain, however, was that the information on the Bloomberg page confirmed only the existence, but not the ownership, of a particular T-Bill

The evidence shows that the T-bills and CUSIP numbers that form the basis of the fraud in this case were referenced as collateral in various fraudulent transactions initiated in the mid 1990's by Dr. John and Dr. Jeanmarie Juncal. In the late 1990's, the Juncals and defendant Macari were introduced to each other by Edward Price. Price was the owner of Price Capital, Inc., located just outside of Atlanta, Georgia, and had become involved with the Juncals in the effort to market the use of T-bills that the Juncals allegedly owned or controlled as collateral for loans.

After his introduction to the Juncals, Macari claimed to various investors in this case that he purchased T-bills from the Juncals with a total face value in the hundreds of millions of dollars. Initially, Macari would offer these T-bills, for a fee, for use by the investors as collateral to be leveraged in one manner or another for funding of commercial loans. One method suggested by Macari was the pledging of the T-bills in exchange for a letter of credit (LOC), which LOC could then be used to obtain funding from a bank. However, because there was no proof of Macari's ownership/control of the T-bills, and therefore none that could be used by the victims to leverage a loan as promoted by Macari, Macari's and Manter's "clients" were unable to obtain the loans that they sought.

Expert testimony would reveal that, virtually without exception, proof of ownership of a T-bill would be reflected in an account statement for the bank or financial institution account where that T-bill is being held. Such account statement would reflect the face amount of the T-bill, the date issued, the maturity date, the CUSIP number, and, of course, the identity of the owner(s) of the account. Macari could not show such an account statement, however, for the simple reason that he never owned or otherwise had control of these T-bills.

To overcome that hurdle, Macari initially attempted to convince his investors of his ownership/control of the T-bills by providing the investors with "safe keeping receipts" (SKRs) purportedly issued by an escrow agent. These SKRs were not issued by any bank or other reputable and easily contacted business entity. Rather, the primary purported "escrow agent" and issuer of SKRs that Macari used was Milton Brothers, Ltd. (MBL) of Rome, Italy. The FBI's investigation has revealed that MBL is well-known to law enforcement in Italy as being engaged in various fraudulent financial activities. That investigation has also revealed that, in November 1999, MBL filed an application with the Department of Treasury, Bureau of Public Debt (BOPD), in which MBL claimed to be the lawful owners of certain T-bills that it had received from JAMAR Enterprises (JAMAR), Macari's corporation.

Included with that application was documentation signed by John Macari averring ownership of those same T-Bills by JAMAR and purporting to transfer them to MBL. Also included with that application was a sworn affidavit by an attorney, William E. Corley, of Stuart, Florida, in which he certified that the T-bills that were the subject of MBL's application had previously been owned by Red Rock Dragon (RRD - a company owned by the Juncals), that RRD had assigned those T-bills to Price Capital Corporation (PCC - owned by Edward Price, a Macari business associate), and that PCC had assigned those T-bills to JAMAR. The BOPD rejected that application due to its awareness of allegedly fraudulent activities in which John Macari had previously engaged.

Those investors who attempted due diligence of Macari and the financing that he proposed, quickly encountered the ownership/control hurdle. Like anyone with access to a computer, those persons, or their legal counsel, were able to confirm the existence of those T-bills and CUSIP numbers through the Bloomberg web page; however, they were unable to confirm ownership or possession of the underlying T-bills. Most were nevertheless convinced of Macari's bona fides upon receipt of the SKR's.

In an effort to enhance the indicia of his ownership of the T-bills that were at the heart of his fraudulent scheme, Macari, in early 2000, opened a Treasury Direct account with the Treasury Department's BOPD in the name of Century Capital, Inc., one of his corporations. He then attempted to transfer several T-bills into that account by preparing and executing a U.S. Treasury Form PDF5179 that purported to transfer the T-bills from the Juncals to Century Capital, Inc. The defendant forged the signature of Dr. Jeanmarie Juncal on that form; however, even if Dr. Juncal had executed the form herself, such document could not have served as the basis for a transfer of the T-bills into Macari's account at BOPD inasmuch as the Juncals had no proof of ownership of those instruments.

As a jurisdictional matter, the government's evidence, in the form of official government records and testimony of James Kramer-Wilt, General Counsel of the Bureau of Public Debt, shows that the previously-described scheme to defraud was executed through various methods of communication by Macari and Manter, between themselves, and with the victims. One such method of communication was the use, either by or caused by Macari and/or Manter, of the telephone lines for voice and facsimile communications. In addition, on or about April 6, 2000, Macari mailed, or caused to be mailed, from Palm City, Florida, to the Federal Reserve Bank in Jacksonville, Florida, an application for a Treasury Direct Account in the name of Red Rock Dragons. Finally, in or about December 1999, the defendant caused to be mailed by a private interstate courier, from Rome, Italy, to Washington, D.C., USA, an application for a Treasury Direct Account in the name of Milton Brothers, Ltd.

In or about September 1999, defendant Macari and George Manter discussed a

joint venture between JAMAR Enterprises, Inc., Macari's corporation, and International Banque Holding Corp., Manter's corporation, to induce participation of various persons in a high yield investment program sponsored by Manter. According to the plan, defendant Macari would provide collateral in the form of T-bills for the investors' funds placed into a bank debenture trading program. According to Macari, the T-bills were being held by Milton Brothers, Ltd., an Italian corporation, which company had issued safe keeping receipts (SKRs) reflecting that Milton Brothers was holding the T-bills. Defendant Macari also represented that, for $50,000, he arranged for Milton Brothers to obtain endorsements of those SKRs from Deutsche Bank. Macari never produced such documents, however. On September 7, 1999, Macari and Manter executed an agreement for the sharing the proceeds of the joint venture. That agreement specified, among other things, as follows:

  (i)   that Manter had contacts who were "capable of performing high yield investments;"

  (ii)  that Macari had United States Treasury Bond CUSIP Nos. 912810DW5(B), 912810DW5(E), 912827X49(F), and 912827X49(G), each with a face value of $100,000,000 and "capable of collateralizing high yield investments;"

  (iii) that Macari would obtain "Safekeeping Receipts" and "Reserve T-bond letter from Milton Brothers, Ltd., and a Deutsche Bank confirmation

As the result of the efforts of Manter and Macari, several victims wrote checks or otherwise transferred funds to Manter's account at Planter's National Bank for placement in Macari's investment program. The total amount of those payments by the victims was $2,800,000. In turn, Manter transferred a portion of those funds to Macari, that is, $910,000, purportedly to obtain use of the T-bills as collateral for investor funds. At no time did Macari provide T-bills or any other legitimate or verifiable collateral for these investors' funds. Nor did Macari or Manter ever place any of these investors' funds into an investment program. None of these investors ever received any proceeds whatsoever from any so-called high yield investment program.

To date, a total of $1,200,000.00 of the victim's payments to Manter have been refunded to the victims. Thus, the net loss to the victims is $1,600,000.

As further evidence of defendant Macari's criminal intent in the instant offense, the USAO would offer evidence, pursuant to Federal Rule of Evidence 404(b) that, as early as 1997, Macari offered another William Cornell the use of these same T-bills as collateral for a high yield investment program. Cornell had previously been seeking funding through a Norwegian businessman named

Christian Mohr and, in correspondence from Mohr had noted the reference to
Macari at a U.S. phone number. He called that number to inquire of Macari about
Mohr and, when Macari learned that Cornell was seeking funding, suggested that
Cornell deal directly with him rather than with Mohr. Cornell ultimately chose to
do that and agreed to pay Macari several hundred thousand dollars as a fee for the
promised use of T-bills. Cornell thereafter paid Macari $90,000 of the amount
due for that fee. When Cornell presented the assignment of T-bills that Macari
provided to him as collateral for a loan, he was rejected by the various lending
institutions with the explanation that proof of ownership of the T-bills, not merely
of existence thereof, was required. Although Cornell demanded that Macari
return the fee paid to Macari, to date, Macari has refused to do so.

12.     The USAO and the defendant agree that, although not binding on the probation

office or the court, they will jointly recommend that the court make the following findings and

conclusions as to the sentence to be imposed:

      a.     <u>Applicable Guidelines Manual</u>:  The United States Sentencing

          Commission Guidelines Manual for 2000, *i.e.*, the Guidelines Manual

          incorporating amendments effective November 1, 2000, governs the

          defendant's sentencing in this case.

      b.     <u>Applicable Guideline</u>.  Pursuant to Section 1B1.2(a) of the Sentencing

          Guidelines, Section 2B1.1 of the Sentencing Guidelines is the offense

          guideline applicable to the offenses of conviction.

      c.     <u>Base Offense Level</u>.  Pursuant to 2F1.1(b)(1)(M), 1B1.2(a), and 1B1.3 of

          the Sentencing Guidelines, the defendant's offense level is eighteen (18)

          based on a net loss to the victims in this case of more than $1,500,000

          (but less than $2,500,000).

      d.     <u>Adjustments/Departures</u>.  Aside from the downward adjustment provided

          for in paragraph 7 of this Agreement, and except in the event that the

USAO files a motion pursuant to USSG §5K1.1, the parties agree that no

upward or downward sentencing departures and no upward or downward

sentencing adjustments are warranted in this case.

    e.    <u>Overall Adjusted Offense Level</u>. As a result of the foregoing, and

assuming that the defendant meets all of the conditions set forth in

paragraph 7, the applicable offense level for the offense committed by the

defendant is fifteen (15).

    f.    <u>USAO's Recommendation As To Sentence</u>. Assuming the defendant's

compliance with each of the terms and conditions set forth herein, the

USAO will recommend at sentencing that the defendant be sentenced to

the minimum period of time set forth in the applicable Guideline range. In

addition, if the USAO files a motion pursuant to USSG §5K1.1, any

downward departure recommended by the USAO as the result of that

motion shall be in the form of a specified number of offense levels based

upon the significance of defendant's cooperation. The USAO agrees that

it will not seek a fine in this case and will recommend to the Court that

any of the defendant's assets that would be available to pay a fine and/or

restitution be used first to pay restitution.

    13.    The defendant hereby agrees that, based upon the net loss to the victims in this

case, he will stipulate to a restitution order to be entered against him and George Manter for the

amount of $1,600,000, less any amount not previously credited that the defendant sufficiently

demonstrates has already been refunded to the persons whose funds were the source of those

funds paid to Manter or Macari. The defendant further acknowledges and agrees that he shall be held jointly and severally liable with Manter for the foregoing amount and that such amount shall be due and payable in accordance with the Court's restitution order entered as to defendant Macari.

14.   The USAO agrees that it will endeavor and use best efforts in doing to obtain a global settlement with the United States Attorney's Offices in other federal districts in which the activities occurred relating to the scheme that is the basis for the crime to which he will plead guilty pursuant to this Agreement. The parties understand and agree, however, that the refusal of any such district to enter a global settlement will neither constitute a breach by the USAO of the terms and conditions of this Agreement nor serve as a basis for defendant Macari to withdraw from this Agreement.

15.   The USAO agrees to recommend to the Court that, following his initial appearance in this case and pending imposition of sentence, the defendant remain free on a personal surety bond.   16.   This is the entire agreement and understanding between the United States and the defendant. There are no other agreements, promises, representations, or understandings.

Date: 7/17/02         By: _____
                           John Macari
                           Defendant

Date: 7/17/02         By: _____
                           Rebekah J. Poston
                           Attorney for Defendant

Page 11 of 12

Date: 7/23/02                By:

James G. McAdams, III
Senior Litigation Counsel
United States Attorney's Office

### Victim Impact

20.    The provisions of the Mandatory Victims Restitution Act of 1996 apply to this Title 18 offense.  Restitution in the amount of $1,380,000 shall be ordered to compensate the victims in this case, pursuant to 18 U.S.C. § 3663A(a)(1).  A total of 14 victims have been identified.  To date, seven victims have responded with loss amounts. Three letters were returned as undeliverable.  Four victims have not responded.  The restitution owed, to date, is $1,380,000.

### Adjustment for Obstruction of Justice

21.    The probation officer has no information to suggest that the defendant impeded or obstructed justice.

### Adjustment for Acceptance of Responsibility

22.    The defendant provided a written statement as follows:

> " I fully, completely and unequivocally accept responsibility for the actions which led to the charges against me and to which I pled guilty. I have learned my lesson and I will never again be in trouble with the law.  In an effort to help law enforcement, I have agreed to cooperate with the FBI and the United States Attorney's Office, helping them uncover crime and prosecute those responsible for it.  I apologize to the Court and to the Government for my actions."
>
>                    Thank you.
>
>                    Sincerely,
>                    /s/ John R. Macari

### Offense Level Computation

23.    Pursuant to § 1B1.11(a), the Court shall use the Guidelines Manual in effect on the date the defendant is sentenced, unless the use of that book violates the ex post facto clause of the United States Constitution.  In which event, the Court shall use the Guidelines Manual in effect on the date the offense was committed.  The 2000 and 2004 Guidelines Manuals were compared and the earlier edition produces a lower total offense level and will be used in applying the guidelines.

8

Rev. 04/27/05

**EXHIBIT "B"**



# ØKOKRIM

### The Norwegian National Authority for Investigation and Prosecution of Economic and Environmental Crime

US Attorney's Office
505 S.2nd St, Suite 200, Ft. Pierce 34950
Florida USA

Att: Jim McAdams

| Your reference | Our reference | Our date |
|---|---|---|
| | | 11.2.04 |

**Regarding interview of John Macari, West Palm Beach**

On December 16 2003 John Macari was interviewed by ØKOKRIM- The Norwegian National Authority for Investigation and Prosecution of Economic and Environmental Crime in connection with a criminal case in Norway. Also present was the attorney for the defendant. The interview took place at the US Attorney's office in West Palm Beach.

Mr Macari had agreed to be interviewed by the prosecution and the defendant.

In our opinion Mr Macari for the most part was helpful during the interview.

His answers to the questions he was given did assist us in our case.

Best Regards

Arnt Angell
Chief Public Prosecutor

RECEIVED

FEB 19 2004

USAO
FT. P...

| Postal address | Address | Tel/Fax | okokrim@okokrim.no |
|---|---|---|---|
| Postboks 8193 Dep | C. J. Hambros plass 2B | | www.okokrim.no |
| N-0034 OSLO | | | |

**EXHIBIT "C"**

**Joseph Macari**
**3220 Holly Creek Drive**
**Jensen Beach, Florida 34957**

April 19, 2005

The Honorable Kenneth A. Marra
U.S. District Court Judge
299 East Broward Blvd.
Fort Lauderdale, Florida 33301

Re: <u>USA v. John Macari</u>

Dear Judge Marra:

I am writing to you today to let you know what kind of person my brother, John Macari, is. First, he has always been the dependable one in our family. John has been the rock we could always depend on whenever there was any kind of problem. If there was ever a problem with money, or a family problem, or somebody's child was in trouble, John was always there to help out.

While growing up, John was the kind of older brother that always watched out for us.  If food was short, as it was sometimes during the lean years around the depression, or if our father was out of work, then John always made sure we were fed first.

Our parents worked hard when we were kids, but times were tough. There often was not enough money to pay all the bills and feed a large family. John, the oldest child, had to leave school and get jobs to help bring in extra money. John always had a part-time job from paper routes, shoveling snow, to working at the five and dime to help bring in much needed extra money. John also, always helped out around the house; cleaning up the yard, painting the house, and helping our parents raise my sister and me.

As we got older and John became somewhat successful in business, John helped our parents financially. He paid some of their bills and always was there when one of them was sick or needed help. When our parents became elderly and sick, John was there for them. He paid our parents' medical bills and made and paid for all the final arrangements. Again, John was the rock who everyone in the family turned to for emotional, financial, and personal help.

For myself, John has helped me financially and personally more times than I can remember. John made it possible for me to buy my first house. He found the site, built, and paid the down payment on my first house. John knows I live on a small fixed income. Again, John has been there for me each and every time I have needed help. His efforts have been directly responsible for me to supplement my monthly income and thus, live with a modicum of comfort in my senior years.

In short, I am grateful that John is my caring and loving older brother. I love him and respect him, as do all our family.

Sincerely,

Joseph Macari

**EXHIBIT "D"**

**Maryann Lynch**
**47 Crowes Purchase Road**
**West Yarmouth, Massachusetts 02673**

April 18, 2005

The Honorable Kenneth A. Marra
U.S. District Court Judge
299 East Broward Blvd.
Fort Lauderdale, Florida 33301

Re: <u>USA v. MACARI</u>

Dear Judge Marra:

I am writing this letter on behalf of my brother, John Macari. Let me state at the outset that John has always been there for me and my family. John was always the responsible older brother; he helped raise my brother Joe and me when we were children. He always watched over us and protected us.

John has always been a dependable hard worker and was devoted to our family. As a youngster, John took jobs to help the family finances. He took his first job when he was fourteen years old – working as a mechanic's helper in the local garage – and has never stopped working. Our family went through some hard times; tight finances put a strain on the entire family. John sacrificed school and was deprived most aspects of a normal childhood to help the family by working and helping take care of my brother (Joe) and myself.

When John reached adulthood, his diligent hard work helped him become somewhat financially successful. Again, John was always there for our family. He took care of our aging parents – physically and financially – and helped my brother and I many times. When my brother or I had a problem, John volunteered his assistance. He was and continues to be a great big brother.

When I went through a tough time with one of my children and when my husband and I experienced financial problems, John stepped right up and helped us financially and emotionally. John never has to be asked twice for help. He has always been there for me and my children – no matter what the situation. He has been a wonderful grandfather figure to my children and their children. He has been as caring and dependable to my children as he was to us while growing up. He remembers the children and grandchildren's birthdays and special occasions. My children love and respect John as much as I do.

I have always loved John and he holds a special place in our family's hearts.

If I can be of any further assistance, please do not hesitate to contact me.

Sincerely,

*Maryann Lynch*
Maryann Lynch

**EXHIBIT "E"**

Stephen J. Macari
3600 Heron Blvd.
Tequesta, Florida 33458

April 20, 2005

The Honorable Kenneth A. Marra
U.S. District Court Judge
299 East Broward Blvd.
Fort Lauderdale, Florida 33301

Re: <u>USA v. John Macari</u>

Dear Judge Marra:

I am writing this letter to describe my father, John Macari. My father has always been honest, dependable and, above all else, very loving. I love my father without reservation and believe he loves my son and me unconditionally.

My father is the kind of man who is not afraid to let you know how he feels. My father was always very affectionate with my mother, brother and me: we laughed, hugged, and cried together. I will always remember that my father taught me that all feelings were O.K. As such, my childhood was filled with good, strong, loving memories. We were a close family: If there was a problem or something sad, or even something joyous, we talked about it, laughed about it, celebrated it, and worked it out.

My father was no slacker; if I did something wrong, or failed to live up to my word, or (worst of all) lied, my father and I would have a, heart – to – heart. However, after our heart – to – heart, there would be some consequences. In other words, my father never let us slide when doing the wrong thing. My father taught us right from wrong and expected us to be responsible for our behavior. We knew what was right and were expected to do the right thing. In short, I was well loved and well taken care of.

My father did have to work, and work hard, while I was growing up. This meant he had to be at work a good deal of the time. Irrespective of his hectic work schedule, my father always found a way to spend quality time with my brother and me. We would go fishing, play catch, and have informal cookouts. The activities did not matter but our time together did.

As an adult, my father has always been there for me: He helped me get started in my business, bought my first house, and has been a good grandfather for my son, Stephen, Jr. I recently went through a divorce. As usual the divorce was hard on everyone. My father was there for my son and me. He has provided much needed guidance and a sense of security for Stephen, Jr. as our respective worlds fell apart. If it were not for my father, I do not know how I would have made it through this extremely stressful time.

In summation, my father is, and has been, a man of positive moral character: He is a caring, conscientious, and loving man. My father taught me that in work, as well as in family affairs, one should always be conscientious, straightforward, fair, and apply the Golden Rule. Do unto others, as you would have them do unto you. I am proud to call John Macari: my father.

Please do not hesitate to contact me should you have any questions.

Sincerely,

Stephen J. Macari

**EXHIBIT "F"**

Chance M. Gorman
162 S.E. St. Lucie Blvd.
Stuart, Florida 34996

April 22, 2005

The Honorable Kenneth A. Marra
U.S. District Court Judge
299 East Broward Blvd.
Fort Lauderdale, Florida 33301

Re: USA v. John Macari

Dear Judge Marra:

I am writing this letter for John Macari. I have told my father, Robert L. Gorman,  what to write as I am 14 years old and can not type well because I have Cerebral Palsy on my left side.

I have known John about three years. My father was working for John and John would allow me to come to work with my father sometimes. This past year I have come to John's offices a lot more. I think it is nice that John allows me to come to his offices with my father. I do my schoolwork – I am Home-Schooled by my father – in a private office. My father explained to me that a lot of places don't allow the people who work there to bring children to work. So, I think it's very nice of Mr. Macari to let me come to his office.

Mr. Macari has been very nice to me. He doesn't treat me like a dumb kid, but actually will talk with me. He also has been very concerned and interested in my Cerebral Palsy. He never makes fun of me and always treats me with respect. He doesn't patronize me and understands that I have and use my large vocabulary. For instance, Mr. Macari didn't make fun of me because I said he was "avuncular." (Of an uncle; having traits considered typical of uncles; jolly, indulgent, stodgy, etc., Webster New World Dictionary,1988). So, I find Mr. Macari, like an Uncle: Jolly and indulgent.

I like Mr. Macari very much as he is a good man.

Sincerely,

Chance M. Gorman

**EXHIBIT "G"**

Robert L. Gorman, J.D., M.S.
162 S.E. St. Lucie Blvd.
Stuart, Florida 34996

April 22, 2005

The Honorable Kenneth A. Marra
U.S. District Court Judge
299 East Broward Blvd.
Fort Lauderdale, Florida 33301

Re: USA v. John Macari

Dear Judge Marra:

I am writing this letter as a personal reference for John Macari.

I have worked as a consultant for Mr. Macari and his organizations providing organizational / counseling / and paralegal services for approximately five years. As a Master level mental health clinician / psychologist / Florida certified teacher for "Gifted" students, with my Juris Doctor degree from Suffolk University Law School, Massachusetts, I have come to know John Macari personally and professionally.

As a mental health clinician and educator, I am impressed that John has managed to continue functioning at a high level of productivity given the number and severity of life – stressors in his life: recent death of his wife of 51 years; legal complications; physical calamities (heart catheterization / diabetes), and the frenetic pace and inherently traumatic nature associated with the world of investment speculation. I am astonished that John continues to function given the above stressors, any one of which would leave most people severely incapacitated.

Irrespective of the stressors Mr. Macari suffers daily, he remains consistent, reliable, and trustworthy. I believe Mr. Macari to be a highly professional businessperson who is straightforward and honest in his communication and all business practices.

Personally, Mr. Macari has helped me when I have had difficult times. I am currently undergoing treatment for a serious illness. Mr. Macari has been there for me: He has accommodated my hectic schedule filled with Doctor appointments and allows me to bring my fourteen – year – old son (who suffers hemiplegic cerebral palsy) to the offices while consulting. His kindness and generosity are greatly appreciated by my son and myself.

I consider John Macari my friend. His honesty, compassion, consideration, and sound ethical business practices make him a true friend.

If there is anything I can do to help clarify, facilitate, and / or add to the current issues, please do not hesitate to call.

Sincerely,

Robert L. Gorman, J.D., M.S.

**EXHIBIT "H"**

**Charles Clark**
**901 Martin Downs Blvd.**
**Palm City, Florida  34990**

April 17, 2005

The Honorable Kenneth A. Marra
U.S. District Court Judge
299 East Broward Blvd.
Fort Lauderdale, Florida 33301

Re: <u>USA v. John Macari</u>

Dear Judge Marra:

I am writing this letter as a personal reference for John Macari.

I have known Mr. Macari personally and professionally for approximately nine years. I have worked with Mr. Macari providing accounting services to him and his organization(s) throughout our years of acquaintance.

John and I have also been personal friends for years. John is a generous and charitable man. He donates regularly to Saint Jude's Church in Jupiter and Tequesta. Whenever we have traveled together, John is the type of person who always has a spare dollar for the needy. I was always impressed with John's willingness to reach out to help a person in need. Case in Point: He will often donate a few dollars to a homeless person, who is invariably muttering something about needing train fare. Irrespective of strong suspicions the donation will go not for train fare, but to some other less desirable end, John insists on giving the homeless person some money, say a prayer, and hope the contribution helps the poor person in some small way.

In summation, John Macari is a very professional, generous, and kind person. My life, and the lives of those he regularly helps, are richer, better, and happier for having known him.

If you have any questions, please do not hesitate to contact me.

Sincerely,

Charles Clark

**EXHIBIT "I"**

Palm Beach Gardens Medical Center
3360 Burns Road, Palm Beach Gardens, Florida 33410

```
PT:      MACARI, JOHN .                    MR#: 725124279
ROOM#:                                     PATCOM#:
DR:      EDGAR A. COVARRUBIAS, M.D.        CATH#: 973489
MB#:     56/274
```

DATE:                      11/04/97

REFERRING PHYSICIAN:       Luis S. Ulloa, M.D.


PALM BEACH GARDENS HEART INSTITUTE
PALM BEACH GARDENS MEDICAL CENTER
CARDIAC CATHETERIZATION LABORATORY

CARDIAC CATHETERIZATION

CLINICAL SUMMARY:  Mr. Macari is a 68 year old gentleman admitted to Palm Beach Gardens Medical Center with unstable angina who has multiple risk factors for coronary artery disease.  Because of recurring symptoms the patient was brought to the catheterization laboratory for cardiac catheterization to determine his coronary anatomy and further treatment.

PROCEDURE:  Left heart catheterization was performed using the Seldinger technique via right femoral artery having a 5-French venous sheath for venous access.

Selective coronary arteriography was performed with the 5-French JR4 and JL4 coronary catheters.  Left ventriculogram was performed with a 5-French Cordis pigtail catheter.

The patient tolerated the procedure well, without any complications and the patient is being prepared for angioplasty in view of the high-grade proximal left anterior descending obstruction.

HEMODYNAMICS:  The left ventricular end-diastolic pressure was mildly increased with left ventricular end-diastolic pressure of 19 with a left ventricular ejection fraction of 38%.

CORONARY ANGIOGRAPHY:

LEFT CORONARY ARTERY:  The left ostium is widely patent with the left main being similarly free of any significant disease.  The left anterior descending artery reveals a 90% discrete obstruction in its proximal portion with the proximal left anterior descending being a tortuous vessel with luminal irregularities and increased density on fluoroscopy suggesting significant calcification.  The left anterior descending gives a proximal relatively large diagonal

Continued,

CARDIAC CATHETERIZATION LABORATORY

EXHIBIT "J"

DR. COPY

**Palm Beach Gardens Medical Center**
**3360 Burns Road, Palm Beach Gardens, Florida 33410**

PT:  MACARI, JOHN .
PAGE 2

branch with no evidence of significant disease.

The distal left anterior descending is free of any significant obstruction.

CIRCUMFLEX CORONARY ARTERY:  This is a complex coronary artery that is a relatively large vessel with no evidence of obstruction but mild luminal irregularities giving a large second obtuse marginal branch with no evidence of significant disease.

RIGHT CORONARY ARTERY:  The right coronary artery is a dominant vessel with luminal irregularities but no evidence of a significant obstruction giving a high marginal branch that is mildly diseased at its origin but being a small vessel for revascularization.

LEFT VENTRICULOGRAM:  The left ventriculogram performed at 30 degrees right anterior oblique revealed an increased left ventricular end-diastolic pressure with mild diffuse hypokinesia of the inferior and anteroapical wall likely related to an element of a cardio-myopathy in addition to coronary artery disease.  No evidence of significant mitral regurgitation.

SUMMARY OF FINDINGS:

1.   INCREASED LEFT VENTRICULAR END-DIASTOLIC PRESSURE WITH DECREASED DIFFUSE LEFT VENTRICULAR CONTRACTILITY.

2.   CORONARY ARTERY DISEASE WITH:

     A.   HIGH-GRADE PROXIMAL LEFT ANTERIOR DESCENDING OBSTRUCTION.

     BA.  DISEASE OF A SMALL HIGH MARGINAL BRANCH OF THE RIGHT CORONARY ARTERY.

RECOMMENDATIONS:   Mr. Macari is advised to undergo angioplasty of the proximal left anterior descending.

EAC:W10:MTI Cas#:291
D: 11/19/97    T: 11/20/97                     _____
                                               EDGAR A. COVARRUBIAS, M.D.

CC: Luis S. Ulloa, M.D.


CARDIAC CATHETERIZATION LABORATORY

DR. COPY

Palm Beach Gardens Medical Center
3360 Burns Road, Palm Beach Gardens, Florida 33410

ECHOCARDIOGRAPHIC REPORT

PT:  MACARI, JOHN          MR : 725124279      Rm # : 00124-1
DT:  11/04/97              Pat: 4596447
DR:  EDGAR A. COVARRUBIAS, M.D.

Ordering Physician   : ULLOA M.D., LUIS

INDICATION FOR STUDY : ISCHEMIC HEART DISEASE, EVALUATION OF
                       LV FUNCTION, SYSTOLIC MURMUR

INTERPRETATION:  M-mode and two-dimensional tracing revealed an
increased left ventricular internal dimension with mild
hypokinesia of the anterior and septal wall with an estimated
ejection fraction of 45%.

The left atrial size is borderline increased on the two-
dimensional views.  Aortic root is dilated with aortic leaflets
opening well in systole with no evidence of significant
obstruction.  The mitral valve motion is normal.

No evidence of pericardial effusion.

Doppler Study:  Continuous, pulsed wave and color flow Doppler
revealed trivial mitral regurgitation of no hemodynamic
significance.  There is an increased flow velocity during atrial
contraction consistent with a stiff left ventricle or diastolic
dysfunction.

CONCLUSIONS:    1.   MILD LEFT VENTRICULAR ENLARGEMENT WITH
                     ANTERIOR AND SEPTAL HYPOKINESIA AND MILDLY
                     DECREASED SYSTOLIC FUNCTION.

                2.   LEFT VENTRICULAR DIASTOLIC DYSFUNCTION BY
                     ECHO DOPPLER.

                3.   MILD MITRAL REGURGITATION BY DOPPLER STUDY.


                     EDGAR A. COVARRUBIAS, M.D.

EAC/SJF
D: 11/05/97    0925
T: 11/05/97    1139
O: 126444
cc: Luis S. Ulloa, M.D.


PT  : MACARI, JOHN                    EDGAR A. COVARRUBIAS
Ord : 126444                                Page  1
Printed on 11/05/97 at 1145 (DC )
                ECHOCARDIOGRAPHIC REPORT

# PALM BEACH HEART GROUP, P.A.

## Consultative and Interventional Cardiology

Edgar A. Covarrubias, M.D. F.A.C.C.                    Michael D. Castillo, M.D.

### STRESS ECHO STUDY

NAME OF PATIENT:          MACARI, JOHN
DATE OF STUDY:            11/11/98
REFERRING PHYSICIAN:

CLINICAL SUMMARY:  Mr. Macari is a 69-year-old patient post angioplasty of the LAD with recurrent episodes of chest discomfort.

PROCEDURE:  Following an informed consent, the patient had a baseline echocardiographic study with increased left ventricular internal dimension with apical septal and anterior wall hypokinesia.

His baseline EKG revealed sinus rhythm with a baseline ST segment.

Patient exercised using a modified Bruce protocol able to exercise for 7 minutes with an increase in his heart rate to 122 equivalent to 80% of his maximally predicted heart rate.  BP baseline was 170/90 with an increase in his BP to 220/90 at peak exercise.

Patient denied any chest pain but had significant fatigue at peak exercise.

EKG monitoring revealed no significant ST segment depression with similarly his post stress echo revealing persistent hypokinesia of the posterior, anteroapical and lateral wall of the left ventricle.

CONCLUSION:     Equivocal stress test for myocardial ischemia with persistent wall motion abnormality post exercise with poor tolerance to exercise and hypertensive response.

Patient is advised to increase his Lopressor to 50 mg bid.  If patient has a persistent chest discomfort, he will be scheduled for a coronary angiogram as the best way to determine his coronary anatomy and assessment of his LAD following angioplasty.


EAC/blh                    EDGAR A. COVARRUBIAS, M.D.

cc Luis Ulloa, M.D.

Macari, John                    11/18/97

Mr. Macari is a pleasant patient of Dr. Ulloa's who was admitted to Palm Beach Gardens with unstable angina and underwent cardiac catheterization and subsequently an angioplasty with stent placement of the left anterior descending artery with successful intervention.  Patient is doing well on Ticlid 250 mg for one month, Lopressor 25 mg bid, Glucotrol, Zestril and Isordil.  His only complaint is having severe headaches likely related to Isordil.

His BP today is 128/60, pulse 70 per minute regular.  He weighs 222 pounds.  Lungs are fairly clear.  Cardiac exam is unremarkable with decreased heart sounds.  No significant murmurs.  No peripheral edema.

His EKG revealed sinus rhythm with poor R wave progression in right precordial leads.

He is to continue with his current medications except decreasing his Isordil to 10 mg bid.  If he continues having headaches, he will taper down to 5 or discontinue if he continues having headaches.  Will see him in 4-5 weeks at which time patient will have a stress test and further follow-up accordingly.


EAC/blh                          EDGAR A. COVARRUBIAS, M.D.
(dictated but not read)

cc Luis Ulloa, M.D.
   3370 Burns Rd.
   #105
   Palm Beach Gardens, FL  33410

   cc EKG

Macari, John                        10/12/98

Mr. Macari is a 69-year-old patient post angioplasty of the LAD. He is doing well except has recurrent episodes of chest discomfort, short-lasting, over the past few weeks.   Patient had his chem. profile checked with Dr. Ulloa being within normal limits.   His hemoglobin A1C was elevated.   Patient is on Glucophage and Glucotrol as per Dr. Ulloa.

His BP is 140/80, pulse 76.   He weighs 233 pounds which is 11 pounds higher than his previous visit in November of '97. Lungs are clear. Cardiac exam is unremarkable.   No peripheral edema.

His EKG revealed sinus rhythm with no acute changes.   He has poor R wave progression in right precordial leads consistent with anteroseptal infarction.

Mr. Macari will be scheduled for a stress echo and further workup accordingly.

                                    *Saludos Edgar.*

EAC/blh                             EDGAR A. COVARRUBIAS, M.D.
(dictated but not read)

cc Luis Ulloa, M.D. ✓

        *10/14/98*

Macari, John                        1/14/99

Mr. Macari is a 69-year-old patient who underwent a stress test on 11-11-98 with low tolerance to exercise and hypertensive response. Patient was advised to increase his Lopressor to 50 mg bid.  He is seemed to be doing better with no significant chest pain.

His BP is 150/62, pulse 80.  He weighs 235 pounds.  Lungs are clear.  Cardiac exam is unchanged.  No peripheral edema.

Patient was encouraged to be more active and be more careful with his weight.  Patient follows his lipid profile with Dr. Ulloa.  He is presently on Lipitor 10 mg daily.

Patient will be seen in four months or on a prn basis.  He was instructed to call me if he has increasing angina considering repeating his angiogram.

EAC/blh                             EDGAR A. COVARRUBIAS, M.D.
(dictated but not read)

cc Luis Ulloa, M.D.

*1-18-'99*

Macari, John                    5/18/99

Mr. Macari is a pleasant gentleman with a history of coronary artery disease, angioplasty of the LAD, doing well on medical treatment which includes Lopressor 50 mg bid in addition to aspirin. Patient is a diabetic on Glucophage and Glucotrol as per Dr. Ulloa. Similarly he is on Lipitor.

His BP is 136/70, pulse 68 regular. He weighs 234 pounds. Lungs are clear. Cardiac exam is unchanged. No significant edema.

Patient was encouraged to continue making an effort of losing weight and increasing his exercise. We will see him in six months or on a prn basis.


EAC/blh                         EDGAR A. COVARRUBIAS, M.D.
(dictated but not read)

cc Luis Ulloa, M.D.



Macari, John                    11/4/99

Mr. Macari is a pleasant patient of Dr. Luis Ulloa's with a history of coronary artery disease, post angioplasty of the LAD, doing well on medical treatment. He is moderately active. He continues on Lipitor 10 mg daily. His lipid profile as per Dr. Ulloa was satisfactory.

His BP today is 140/80, pulse 72 regular. He weighs 231 pounds. He lost only 3 pounds from his last visit six months ago. JVP not distended. Lungs are clear. Cardiac exam is unchanged. No peripheral edema.

His EKG revealed sinus rhythm with old anteroseptal infarction pattern.

He is to continue his current medications. We will see him in six months or on a prn basis.


EAC/blh                         EDGAR A. COVARRUBIAS, M.D.
(dictated but not read)

cc Luis Ulloa, M.D.

    EKG enclosed

Sist
11-5-99
p.

INT. MED DR. ULLOA, M.D.

Pg 1

Macariz John

DATE 12/05/95    BP. 140/70

AGE 66    PR. 100/20

WT. 227    TEMP. 98.9

Referial from Dr Abouch. Pt sent in for evaluation of BS = 180 on 11/10/95. NO polyuria or polydipsia.

FH - mother & sister diabetic DM.

PH - S/P BS - 248? - Tx c Angioplasty.

PLo → not reduced.

Impression

① Hyperglycemia

② FHx DM

Plan

① Suggest CBC c FBS & 2h PPBs

② Since pt is leaving for vacation next week, will schedule for testing upon his return.
(Pt report 1/96)

Ulloa MD

Pg 2

Macari, John

**INT. MED DR. ULLOA, M.D.**

DATE_____ BP._____
AGE _____ PR._____
WT. _____ TEMP._____

1/14/96  _____  FBS/2h.PPBS = 167/305 x 3 ⇒ DM Type II

**INT. MED.**

DATE 1/18/96  BP. 140/60
AGE  60e  PR. 92  16
WT. 227½  TEMP. 97⁵

Cold

Facial congestion & cough x 1 month.

Cough productive of yellow phlegm.

Former smoker 2 PPD x 30 yrs. D/C 1990.

p̄ LO  _____ - _____ WNL, ā IT

     neck: supple     chy: mineral ostenon _____ - _____ ā _____

     LN : 1, 1-2 cm     Abd: soft, nontdr.—

     Ext: ⊘ edema, nontdr.—

~~Dispnea~~
~~acute~~
① Bronchitis

② Hyperglycem / prob DM

Plan

① Zithromax, Flonase

② Keep sur appoint.

③ D/C Afrin          _____ MD

pg 3

Macaic, John

INT. MED DR. ULLOA, M.D.

DATE _____

AGE _____

WT. _____ TEMP. _____

1/24/86 — outside cxr 12/15/43 (Jupiter, Dr. guy center) compared
to 11/10/86 cxr → no significant change. No further
evolution needed.

AU M.D.

---

INT. MED.

DATE 2/8/96   BP. 160/90

AGE 66   PR. 92 — 16   forh on nech × 3 days.

WT. 226   TEMP. 97²   worse +

Rash on Neck — multiple pruritic papules
0.5 – 1 cm in rough area.
— No scalp lesion.

_Impress_

① Papul urticaria
   ? Tinea

_plan_

① Nizoral cream 2% after cleansing × 3 wk
② Keep MD × appointed

AU M.D.

John Macali

INT: MED DR. ULLOA, M.D.

DATE 12-13-96   BP. 146/74

___ 107   PR. 88   20

___ 227   TEMP. 98.9

CC: Elevated BP

Pt had BP 170/122 in dispatch on 12/9/96.

BP 140/90.

Blds Reg. lur   Cor: S, 8/p

Abd, soft, obese

Dysu

① ASHD

② Elevated BP

Plan

① Advise to really come

· needs proper eval

② Refer to dev of only

3/17/97. Lab sure - 3/11/97

g GT = 109

SGPT = 52

LDL/HDL = 252/220

neg HIV profile → neg

will advise DX & sure



**GI** Appetite → good
- Pain
- Dysphagia
- Food Intol.
- Blood — none
- BM's
- Gas
- Cramps
- Bowel Habits — 1X daily

**GU**
- Pain
- Blood
- Urgency
- ~~Frequency~~
- Nocturia — 2 X
- Stream
- Stones
- Discharge
- Sex
- Menses

**MS** — numbness, feet + hands
- Pain
- Weakness
- Swelling
- Stiffness — none
- Cramps

**NEURO**
- T.I.A.
- Seizure
- C.V.A.
- Fainting — none
- Dizziness
- Diplopia
- Cephalgia

**Breasts**
**ABDOMEN**
- Liver
- Spleen  ⎱ soft
- Masses
- Tenderness
- Hernias

**RECTAL**
- Stool Heme →

**GENITALIA**
- Prostate
- Testes

**PELVIC**
- Vulva
- Vag.
- Cx
- Adnexae
- R.V.

**MS**
- ROM
- Swelling
- Effusion
- Edema
- Back

**NEURO**
- Mental
- C.N.
- M
- S
- C
- T

**PULSES**

|      | R | L |
|------|---|---|
| C    | ✓ | ✓ |
| R    | ✓ | ✓ |
| F    |   | ✓ |
| P    |   | ✓ |
| D.P. | ✓ | ✓ |
| P.T. | 9 | ✓ |

**REFLEX**

|   | R | L |
|---|---|---|
| B | ✓ | ✓ |
| P | ✓ | ✓ |
| A | ✓ | ✓ |

---

**IMPRESSION**

1) ASHD – s/p MI 1989.
   Tx. Amyoplasty – (Pt declined)

2) DM

3) Hyperlipid.

4) Loneliness
   Tract – psych. eval.

**PLAN**

1) 1800 calorie ADA

2) Resume EtOH – (Pt declines)

3) ✓ PFS / ___ ) visit
   KPNet

4) ✓ Breasts c̄ ___ ) seen

Name Maccari, John        Age 67        Date 1/20/97

Address                    Case No.

---

**HISTORY**

Established c new MD

---

| PMH: | Allergies NONE | Hospital None | FH: F 92 Heart Attack | DM M | Asthma |
|------|------|------|------|------|------|
| Operations Angioplastic | Childhood Chicken Pox Measles | M 81 - ?cere y body | HBP | Gout |
| | | 2B younger died aged Heart Attk | MI F | TB |
| Preg: | | 1 S | CVA F | Mental |
| | | C | CA | Renal |

| SH: MARITAL yes | TOB 3 Days 3 pks daily | ETOH No | DRUGS & MEDS. see med list | HOME |
|------|------|------|------|------|
| WORK | RECREATION pick up? No | | DIET no | |

ROS:                    BP—158/86        T 98²        H
Wt.                     Pulse - 88       R 16         W 227½

HEENT                                               HEENT
  Headache                          Reit Cous        Oral
  Vision                            bely th          Perla
  Tinnitus                                           EOM
  Vertigo        } none                              Fundi
  Epistaxis                                          Nose
  Mouth                                              Canals
  Dysphagia                                          TM

RESP                                               NECK
  Dypsnea                           neg              Nodes
  Pain                                               Bruits
  Cough          } none             u                Thyroid
  Sputum                                           CHEST
  Hemoptysis                        u                P
                                                     A
                                                     SKIN

CV                                                 CV
  Pain                                              PMI
  Palpitation                       u               M
  Dyspnea        } none                             G
  Orthopnea                                         S₁
  Edema          Had OTT                            S₂
  Claudication   1996. dr Abuch    neg              JVP

INT. MED DR. ULLOA, M.D.

DATE _____ BP. _____
AGE _____ PR. _____
WT. _____ TEMP. _____

Macari, John

3/21/97

dizzy & nausea

anti-vert  25 q  po q1d  (for dizziness) #20

Compazine spansule  15 q  ↓ bid  prn nausea #6

INT. MED.
DATE 4/11/97   BP. 142/82
AGE 67   PR. 104  16
WT. 227   TEMP. 97²

Follow up

Auto rentg 3/21/97 - fully better
now. Dizziness also better

no right, no left
as / or → unus

Abd. wally done - no apply-
routine

T₁ 3/97 & repeat next mo.

Inguinal

① PENID U/S mts 1989
② ↑ LFT (see 1/96)
③ U/S kidney

BGTP=109   SGOT=52   CHT=252
flex                    LDL=161
① Pty sacribiton
(off statin x 2 gm)
② Abd U/S
③ DX BTOH/ LFT should
Add.

Macaie, John

A86

**INT. MED DR. ULLOA, M.D.**

DATE_____ BP._____
AGE _____ PR._____
WT. _____ TEMP._____

5'.(97    Med vs. (4/29/97)

Diffuse fatty infiltration of liver —
18 mm *(2)* duplex cyst —
mild splenomegaly

will discuss c̄ pt
at folloup

---

**'NT. MED.**

DATE 5-16-97    BP. 160/74
AGE 67    PR. 96    16
225    TEMP. 98⁸

Feeling well — Appetite → good.

DISCUSSION of Abdominal US — Liver & others overview.
(2 liver on riw/mid) — OK
all others — 3/97.

Abd. — really doing — soft, nontender
no organomegaly.

---

Impression

① ↑ LFT's

② Mild splenomegaly
on Abd US

③ Hyperlipia

Plan

① GI consult — for evaluation & read

② ↑↑↑ 2 weeks —
Stop no ↑↑ cause of Tylenol → GI

---

5.20.97 labs f Ultrasound faxed to Dr.
Chakravorty
offic.

5/29/97 — doo New — 5/27/97 → LFT's → ww
FBS J = 219
trig = 201
ww V Sponsz.

pg 7

Macari, John

**INT. MED DR. ULLOA, M.D.**

DATE _____ BP. _____
AGE _____ PR. _____
WT. _____ TEMP. _____

8/8/97   lab drew 8/7/97

$gluc = 240$
$96T = 12$
$chol = 188$

10/17/97   lab drew 10/16/97

$gluc = 290$
triglycerides $AFB = 10.1\%$ (per cath)
$96T = 109$
$ALT = 58$
$chol = 229$

— need oral hygiene
— could refer to $GI$ evaluator
  at once

10.20.97  pt w/ wife needs to come in to
discuss lab results me.

**INT. MED DR. ULLOA, M.D.**

DATE 10/28/97   BP. 162/80
AGE 67   PR. 100   76
WT. 224   TEMP. 96⁵

Pt follow a diabetic diet
no strom intake

Follow up

Pt quickly review 1/20/97

Impr
① P LAFI
② DM
③ SPMD

Plan
① Glucotrol XL
② GI refer - diff colonent
③ My √ T3 / T4 / FBS / liver
④ 1/48 Bpr√

INT. MED DR. ULLOA, M.D.

Macari, John

DATE _____ PR. _____
AGE _____ FR. _____
WT. _____ TEMP. _____

11/3/47 — Rewrite – PSOM – Out pain
pson 12/4/97

11.24.97 Stopped nitro thurs. due to headaches.

11/24/97 – Lovely it – 11/18/97 – Dr. Covais.

Px: unstable Angina

Tx. S/P Angioplasty / stent

LAD –

Px: ↓ Imod or DSC of HA's
Rev / instr for SOT

11/26/97. pt = Pt c/o HA's @ frontal / cont. over. × 2 weeks.
better after ↓ Imod – rarely HA's 4 dep. No N or V. or
Bluy view. No prior HA's. Also localizing sign – will r/o CT non of head, NL.
Tx = cutoflem p.c + ice pak. 83-44

DATE 12-1-97   BP. 150/80
AGE 68   PR: 88   16
WT. 221½   TEMP. 97²

Pacari, John
P39

Follow up — [illegible]

(illegible handwritten clinical notes)

Dx:
① [illegible]

Plan:
① [illegible]

② [illegible]

12/[?] [illegible]  S_ = 11  CH = 282  [illegible]  LPC = 167

12/[?] CT [illegible]

LOUIS _____, M.D.
_ Ebbtide Drive
North Palm Beach, FL 33408

DATE: _1-23-98_

NAME: _Macari, John_          AGE: _68_   ALLERGY: _Isordil_

CHIEF COMPLAINT: _____

HISTORY: _____

**DENIES OTHER**

D.O.S.  ☐ Fever/Chills ____  Fatigue ✗  Anorexia ____  Rash ____  Dysphagia/Dyspepsia ____

☐ Nausea ____  Vomiting ____  Diarrhea ____  Constipation ____  Abdominal Pain ____  Other/ENT ____

☐ SOB on Exertion/Rest ____  SOB at Night ____  Chest Pain/Palpit. ____  Injury ____

☐ Cough ____  Sputum ____  Pain/Cramps on ............  Discharge from ..............  Blood in ...............

☐ Swelling/Edema ____  Genit./Gyneco. ____  Joint Problems ____  Urine Problems ____  Tumor/Lump ____

☐ Visual Changes ____  Headaches ✓  Dizziness/Vertigo ____  Psyc. Compl. ____  Anxiety/Depression ____

☐ Neuro compl. ____  ☐ Prolonged & detailed R.O.S discussed: No Complaint ____

PMH: _____

MEDS: _see med list_

SH/FH: _ETOH ∅,  Smkg ∅,  Cpre ruler –D/C 1992_

☑ Chart, PMH, diagnosis, meds., labs and data reviewed with patient and discussed.

Exam:   Weight _223½_   Pulse _80_   BP _150_,_86_   Temp _98_⁶   Comfortable/Not Ill Yes/Distressed ____

|  | NO FINDINGS |  |  | NO FINDINGS |
|---|---|---|---|---|
|  | ☐ Ment. |  |  | ☐ Back |
|  | ☐ Skin |  |  | ☐ Chest Wall |
|  | ☐ Head |  |  | ☐ Lungs |
|  | ☐ Eyes |  |  | ☐ Heart |
|  | ☐ Ears |  |  | ☐ Abdomen |
|  | ☐ Face |  |  | ☐ Neuro |
|  | ☐ Nose/Sinus |  |  | ☐ Joints/Extrem. |
|  | ☐ Throat/Mouth |  |  | ☐ Genitalia |
|  | ☐ Neck |  |  | ☐ Breasts |
|  | ☐ Nodes |  |  | ☐ Rectal |

MPR: 1) Cardiomegaly / ASCVD S/P study – 11/97 Dr. _____  (2) DM  (3) Hyperlipid.

PLAN: _____

☐ Decision making process, diagnosis/diff. diagnosis explained to patient. Management options reviewed together.

☐ Long explanation about risks of complications, Morb./Mort   ☐ Minutes with patient under/over 5·10·15·25·45

☐ Extended time spent in counseling about disease, care, plan, side effects, of meds.

INT. MED DR. ULLOA, M.D.

Macari, John

| | | | |
|---|---|---|---|
| DATE | 4-29-98 | BP. | 148/74 |
| AGE | 68 | PR. | 88    16 |
| WT. | 230 | TEMP. | 98⁵ |

Follow up — full well - D/C digoxin 2 wks due to
loose BM's — almost back to usual with some water
now getting BM's - D/C Zantac 2 wks ago.

§ Co    moist - heard all, A/T

        TM's → smooth - scaly erythema prox canal —

    dis → neg

    red reflex                 try¹ clear

    Co¹: (,) CV            Abd. obese, non tender

    percuss → extend Ausc'd +2    prostate → not enlg

Dxy's                          Plan
1) Dermatitis ear              1) V staff ds smely × J
2) Osteoarthritis              2) Resume Zantac H6 d Zyrtec
3) HOH                         3) Sy deche permit → 6 ā enable
4) Nephrolith                  4) B pans salt rety Butts
5) S/P Duodenum — ? Zyrtec     5) NSO 3 reatry č eld sure
6) DM                          6) continue cream to extra ..

**INT. MED. DR. ULLOA, M.D.**                    PAGE 12

DATE 8/31/98   BP. 160/80   NAME Macaii, John

AGE 69   PR. 88   16

WT. 233   TEMP. 98°

Follow up — c/o swell feet c painully x/gu
constit my cor x 3 weeks

[illegible handwritten clinical notes spanning the remainder of the page]

Pos = 171    LDL = 123

PLAN

(1) DO Mendpt
(2)
(3) NPO 1/7/98
(4)

10/17/98 —

11/17/98 —

INT. MED. DR. ULLOA, M.D.                              PAGE 13

DATE 11/23/98  BP. 150/72   NAME Macaui, John

AGE 69    PR. 84   16

WT. 232    TEMP. 97⁸

Follow up — *fully well* — *agitat* → *eqit* B's (+) T.g.y
No C.P.

P to *aprly umkyt* . 8/21/99.

Tod   FBS = 144.        Chol = 171.
Hemoglob A1c = 7.8%    HDL = 49.
                       LDL = 93.

Imp
① DM
② HTN(?)

Plan
① ↑ *wkly clung* — *lentit* ↓ *mng*
② NPO 2/99 *vcak*

11-24-98 labs faxed to Dr Covarrubias's *m*

1/21/99- *cardiolgy* 1/14/99- *PE Con*.
         *DTT* (11/98) → *blu Colum* & FBS. ↑ *Synm*
         *no ↓ Yeast. levarg* if *Synm*

301 _____ otide Drive
North Palm Beach, FL 33408

DATE: 3.11.99

NAME: Macari, John                      AGE: 69    ALLERGY: NKA

CHIEF COMPLAINT: _____

HISTORY: _____

**DENIES OTHER**

D.O.S. ☐ Fever/Chills ____ Fatigue ✓ Anorexia ____ Rash ____ Dysphagia/Dyspepsia ____

☐ Nausea ____ Vomiting ____ Diarrhea ____ Constipation ____ Abdominal Pain ____ Other EENT ____

☐ SOB on Exertion/Rest ____ SOB at Night ____ Chest Pain/Palpit. ____ Injury ____

☐ Cough ____ Sputum ____ Pain/Cramps on ____ Discharge from ............... Blood in ...............

☐ Swelling/Edema ____ Genit./Gyneco. ____ Joint Problems ____ Urine Problems ____ Tumor/Lump ____

☐ Visual Changes ____ Headaches ____ Dizziness/Vertigo ____ Psyc. Compl. ____ Anxiety/Depression ____

☐ Neuro compl. ____ ☐ Prolonged & detailed R.O.S. discussed: No Complaint ____

PMH: _____

MEDS: See Med List

SH/FH: non-smoker, no alcohol consumption

☐ Chart, PMH, diagnosis, meds., labs and data reviewed with patient and discussed.

Exam: Weight 233½   Pulse 88   BP 142 / 83   Temp 98¹   Comfortable/Not Ill Yes/Distressed ____

NO FINDINGS                                    NO FINDINGS

☐ Ment.          ☐ Back
☐ Skin           ☐ Chest Wall
☐ Head           ☐ Lungs
☐ Eyes           ☐ Heart
☐ Ears           ☐ Abdomen
☐ Face           ☐ Neuro
☐ Nose/Sinus     ☐ Joints/Extrem
☐ Throat/Mouth   ☐ Genitalia
☐ Neck           ☐ Breasts
☐ Nodes          ☐ Rectal

MPR. 1) DM   (2) HTN   (3) Hyperlip.   (4) Arthr.

PLAN: _____

☐ Long explanation about risks of complications, Morb./Mort    ☐ Minutes with patient under/over 5·10·15·25·45

☐ Extended time spent in counseling about disease, care, plan, side effects, of meds.

INT. MED. DR. ULLOA, M.D.                                    PAGE ___ 15

DATE _____ BP. _____        NAME  Macasic, John

AGE _____ PR. _____         5/21/99 · ABbleu 8/13/99

WT. _____ TEMP. _____       Phet CA+ said guth of
                                  Bete ruwest stop - not gapx
                                  Rx → ReVKu 4 cooy po

5/24/99  PC ō Dr. Chakravty - drius recut
         evuluter - NO G6 ⓧ i -
         Rumul rept Abd US re: splenigly 8/97.

5/26/99 pc ē wife he is out of town will have him call
6/4/99 pc p/ wife again he is still out of town
        will have him call monday ms.

INT. MED. DR. ULLOA, M.D.
DATE  6/8/99    BP. (168/92)   6/9/99
AGE _____    PR. _____   ABbleu - DBs = 214 }  Ngheolte
WT.  233        TEMP. _____ Hemgbuh A1c = 80  }   n4 √ G6 ē 7/99
                                                    OUPr

6/10/99 - Abdun US. (6/8/99) - 1800C,
          Paueu / splen → soul rig..
          suutigh swel 6 ts Jay.
          T Euloyeuin 4 hgute souples.

6:10.99  Abd. US. faxed to Dr. Chakravoty AB.

7.8.99  refared W hasound m.

7/8/99 PC ē Dr. Urleuf - Eueldd for tst. No Cbligpteuy w tes Cure
       sme emyptetue. dyft rgt W+1 9/6 witt. If dygspu →
       Uvleuplet.

**Luis Ulloa, M.D.**          **Internal Medicine**          Page _16_

Patient Name _Macari, John_                    Date _1_ /99

Age _____  BP _____  Weight _____ lbs  Temperature _____._____

Pulse Rate / Respiration _____

9.7.99 Cancelled

INT. MED DR. ULLOA, M.D.

ATE _9-27-99_  BP. _160/80_

GE _70_  PR. _78 0 18 B_

T. _233_  TEMP. _98.0_

9-27-99   Pt in for a Flu visit.

[remainder of handwritten clinical notes illegible]

Dijin

① [illegible]

② [illegible]

③ WNL [illegible] 7/99
   + [illegible]

10/8/99 - PC c̄ [illegible] cov. - OK to [illegible]

**INT. MED. DR. ULLOA, M.D.**   PAGE 17

DATE 10/15/99   BP. 140/86   NAME Maccari, John

AGE 70   PR. 72/16

WT. 232   TEMP. 96.7

[Cold × 1½ wks]

Head + sore congestion × 10 day
no fever or chills.
no relief c Tylenol. no exp.
sweats clear phlegm

P Co.   _illegible_ M 16 A 1 T

_illegible handwritten clinical notes_

_illegible_

_illegible_

(1) _illegible_

10/17/99 — 60 _illegible_ 12/2/99 — Dr. M. _illegible_
Dr. _illegible_   Tx: Full SO w/u
                    √ PSA

10/25/99   _illegible_ → _illegible (9/10/99)_

INT. MED.DR.ULLOA, M.D.

DATE 11/4/99   BP. 130/80

AGE 70   PR. 72/16

WT. 231   TEMP. 97.4

NAME Maccari Joh

PAGE 1

cold — *[illegible handwritten clinical notes]*

PLO

*[illegible handwritten clinical notes]*

11/8/99

11/13/99 — *[illegible handwritten notes]* 11/4/99 —

INT. MED.DR.ULLOA, M.D.                          PAGE _19_

DATE _12/6/99_ BP. _160/80_    NAME _Macari John_

AGE _70_  PR. _88/16_

WT. _228_  TEMP. _98.2_      Cold x 1 wk

Onset cold & 1 week + had cold x 6 dy - slept _____ - _____

No treatment. No body aches. Cough productive of _____ phlegm

Plo      _____ - nose → mild _____. Sug ↑ _____

They. _____ _____.  (6) - 1, _____ m 98th

_____. _____, no _____   OST _____

Impression

(1) _____ Bronch

(2) Rhinitis - _____ AR

Plan

(1) Ceflex, nosocur

(2) RT _____ → see _____

12/11/99 _____

Hemoglobin A1C = 7.2        B51 = 1/3

HDL = _____        K = 5.7

LDL = 17        _____ = 51 (1-40)

Chol = 152        _____ = 225

_____        RP 162/88

12/14/99

ALT = 76 - _____ _____ _____

1/03/00 _____ _____ _____. ↑ LFT _____ 2°
    to _____ - _____ _____ ↓ LFT; _____ _____ _____ LFT ≥ 3xreal

**INT. MED. DR. ULLOA, M.D.**   PAGE 20

DATE 1/3/2000   BP. 150/76   NAME Macari, John

AGE 70   PR. 88/16

WT. 231   TEMP. 99.0

12/17/99 Labs faxed to Chiavorly Dr —
12/28/99 Labs, faxed, to Chiavorly Dr —
1/3/00 Labs faxed " " & verified by Dr —
1/3/2000 sore in chest area / ~~cough~~

Italy / numb feeling ⊘ chest x lunch. No hx of trauma.
Not ↑ ē walking — no related to breath or eating.
no prior surrou.

P/O:

Chest: mild muscle ____ ⓡ subscapular area t appr
T₇-8 deviation.

Heart: no gross abnormality.

Lungs          b.s, the          int. ⊘ wheeze, ⊘ rales

CNS → no localizing sign (intact reflexes / touch sensation)

Impression                          Plan
① Hx of numbness / discomfort        ① ✓ chest for sore
  ⓡ upper chest (? coll, Herpes Zoster)  ② If ⊘X / numb > 2 wks ⇒ see
② ↑ LFT ?, 2° to depakote              neurology
                                       ③ NTD 3/2000 AEPA

**LUIS S. ULEOA, M.D.**
3370 Burns Road • Suite 105
Palm Beach Gardens, Florida 33410

Pg 21

DATE: 3/21/00

NAME: John Macari     AGE: 70     ALLERGY: ∅

CHIEF COMPLAINT: physical exam
cold symptoms — lung core _____

HISTORY: _____

**DENIES OTHER**

- D.O.S. ☐ Fever/Chills _____ Fatigue ✓ Anorexia _____ Rash _____ Dysphagia/Dyspepsia _____
- ☐ Nausea _____ Vomiting _____ Diarrhea _____ Constipation _____ Abdominal Pain _____ Other EENT _____
- ☐ SOB on Exertion/Rest _____ SOB at Night _____ Chest Pain/Palpit. _____ Injury _____
- ☐ Cough _____ Sputum _____ Pain/Cramps on _____ Discharge from _____ Blood in _____
- ☐ Swelling/Edema _____ Genit./Gyneco. _____ Joint Problems _____ Urine Problems _____ Tumor/Lump _____
- ☐ Visual Changes _____ Headaches _____ Dizziness/Vertigo _____ Psyc. Compl. _____ Anxiety/Depression _____
- ☐ Neuro compl. _____ ☐ Prolonged & detailed R.O.S. discussed: No Complaint _____

PMH: _____

MEDS: Glucotrol XL 5mg TBID  Proscar 5mg Tgd  Glucophage 500mg TBID
+ Zestril 5mg gd  Lopressor 50mg TBID, Lipitor 10mg Tgd.

SH/FH: Mother (?DM)  Uncle (CA)
TOB ∅  ETOH ∅  _____

☐ Chart, PMH, diagnosis, meds., labs and data reviewed with patient and discussed.

Exam:  Weight 231     Pulse 80   BP 140/80   Temp 97.3  (Comfortable/Not Ill Yes/Distressed) _____

|  | NO FINDINGS |  |  | NO FINDINGS |  |
|---|---|---|---|---|---|
|  | ☐ Ment. |  |  | ☐ Back |  |
|  | ☐ Skin |  |  | ☐ Chest Wall |  |
|  | ☐ Head |  |  | ☐ Lungs |  |
|  | ☐ Eyes |  |  | ☐ Heart |  |
|  | ☐ Ears |  |  | ☐ Abdomen |  |
|  | ☐ Face |  |  | ☐ Neuro |  |
|  | ☐ Nose/Sinus |  |  | ☐ Joints/Extrem. |  |
|  | ☐ Throat/Mouth |  |  | ☐ Genitalia |  |
|  | ☐ Neck |  |  | ☐ Breasts |  |
|  | ☐ Nodes |  |  | ☐ Rectal |  |

MPR. 1) DM     2) _____     3) _____     4) _____

☐ Decision making process, diagnosis/diff. diagnosis explained to patient. Management options reviewed together.

PLAN: _____

☐ Long explanation about risks of complications, Morb./Mort   ☐ Minutes with patient under/over 5·10·15·25·45
☐ Extended time spent in counseling about disease, care, plan, side effects, of meds.

**INT. MED.DR.ULLOA, M.D.**

PAGE ___

DATE_____ BP. _____   NAME _Macari, John_

AGE _____ PR, ____ 3/23/00 _Cardiac report_

WT. _____ TEMP. _____

3/14/00 & 2/26/98 CT —

_left mild diverticulosis_

_full more pronounced_

_left CT insignificant_

4/8/00

_CT Scan Wet - 4/3/00_

_[illegible handwritten notes]_

4.10.00 PC c̄ wife needs pulm (R)

Opinion will sched. m.

4/20/00 Pulmonary ref. - 4/16/00 - Dr D.

Dr: _[illegible]_

Tx: _[illegible]_ 4/21/00 Called

Left message m

5/3/00 - Cont. 4/24/00 → Dr. Vogel

6/12/00 _[illegible]_ 5/30/00 - Dr. G. mini __

Dr: _[illegible]_   Tx: _[illegible]_

PAGE 23

INT. MED.DR.ULLOA, M.D.

NAME: MACARI J John

DATE 6/6/00   BP. 138/70

AGE 70   PR. 72/16

WT. 235   TEMP. 97.8   cc Insects bite both legs mains Rt

Pt w/o fevers. LOI on 6/4/00 while working in yard.
C/o itchy bilat lower ext feel fits

P/O   Ext:   Erythematous eruption resol.   B LBs (1cm → 3cm)

& 3 eruptns resol on L 2°

pruris only

Dyrns
1) Insects - prob.
   insect bite

2) D.M.

Plan

1) Antihistamine
   Antihistamine cur & Weigh

2) Bll derm if ext bite & rust red

3) Keep meds appt

INT. MED. DR. ULLOA, M.D.

PAGE 34

DATE 6/19/00 BP. 156/80     NAME Macau, John

AGE 70     PR. 72/16

WT. 230     TEMP. 98.0     F/U — _illegible_

_illegible handwritten clinical notes_

(1) DM

(2) ASHD

(3) _illegible_

(4) Chronic (L)hip pain

(1) ↑ _illegible_

(2) ↓ _illegible_

(3) _illegible_

(4) _illegible_

7/10/00 - pt WAS IN OFFICE FOR CXR — _illegible_

8/12/00 — Pulm dx. 8/7/00 — _illegible_

Dx: _illegible_ LLL _illegible_ — _illegible_ 3/14/00

Tx _illegible_ 12/00 & 3/01. _illegible_

8/18/00  Lab Rev (8/16/00)

serum K = 5.3  ( _illegible_ → _illegible_ ) — K⁺ _illegible_

PAGE _25_

INT. MED. LUIS S. ULLOA, MD

NAME _Macair, John_

DATE _10/23/00_  TEMP _98.3_

CHIEF COMPLAINT:

BP _142/80_  AGE _70_

PULSE _76_    Wt 239

RESP. _16_

F/U — _feely well. Appet —off_
_now CP/SOB — still no interest_
① _hip_ —
③ _Cots per x-ray_

PE

_Heg — Cer_
_Cor — S_1 _4 2_
_Abd. soft, nontender_
_LM — Ø edema_

_lg_

_Normal Alk = 8.9_  _PBS 147._
_TG = 216_    _LDL = 192_
_K = 57_

_Dx:_

① _Nephrolun — ? Tubulopathy_
② _DM —_
③ _PVD_

_Plan:_

① _DC old Cots off of it_
② _P disorder_
③ _NV sens K._
④ _RTO 1/01 ī W_ pm

_11/16/00_  _lab res_

_Sens K = 56_
_Plenk = 57_
_Rbc K = 100 (90–111)_

_1st 3/00 — Refer sd — 12/7/00 — ...._

NAME: _Macari___

CHEIF COMPLAINT:

INT. MED. LUIS S. ULLOA, MD

DATE 01/10/01     AGE 70

BP 160/80     TEMP 98.4

PULSE 80     WT 234

RESP. 16

CC URI

Runy nose + fatige on 1/4/01 follrwd

by Cofs 1/6/01. fever + chills.

nousea → ↑↑ hr

P/o: blowit — fever W/c, ↑↑

sore ↑plegia → mild gttr — dry ↑hy

— pher — nre + ns

hy + pstic nbusir — cent ↓ Lfy

. los. f. Ox. n : NV rblen, wczys

N/c : ∅ ulse

Dyer

1) Auto Bnlits

2) DM

plan

1) Augentin

2) Tessules Med

3) DTO 2 uel

1/17/01  Pc in Nt of staff — high case — Tessler ↑ wheeze — DK Augentin

Rey tw 1/19. Will switch to Baxin + V c/pc

PAGE 27

NAME: MACARI, John

CHEIF COMPLAINT:

INT. MED. LUIS B. ULLOA, MD

DATE 1 30 01     AGE 70

BP 140 80     TEMP 97.8

PULSE 64     WT 234

RESP 16

Flu *illegible* both

LEE S. ULLOA, M.D.
3370 Burns Road • Suite 105
Palm Beach Gardens, Florida 33410

DATE: 4/2/01

NAME: John Maca R?                                    AGE: 72  ALLERGY: Isodil - HA

CHIEF COMPLAINT: Physical Exam

HISTORY: _Fully well kept for "stomach flu" x 4 dy (in vacity). Appt - both_
_Bm's → ↑ 0↑ gd → Nortin → ↑↑ BS_
_Drd ott c/ x 2 mth. SOB in early am x /exer. "early arou" in am_

**DENIES OTHER**

D.O.S.
☐ Fever/Chills ____ Fatigue ____ Anorexia ____ Rash ____ Dysphagia/Dyspepsia ____
☐ Nausea ____ Vomiting ____ Diarrhea ____ Constipation ____ Abdominal Pain ____ Other EENT ____
☐ SOB on Exertion/Rest ____ SOB at Night ____ Chest Pain/Palpit. ____ Injury ____
☐ Cough ____ Sputum ____ Pain/Cramps on ............ Discharge from ............ Blood in ...............
☐ Swelling/Edema ____ Genit./Gyneco. ____ Joint Problems ____ Urine Problems ____ Tumor/Lump ____
☐ Visual Changes ____ Headaches ____ Dizziness/Vertigo ____ Psyc. Compl. ____ Anxiety/Depression ____
☐ Neuro compl. ____ ☐ Prolonged & detailed R.O.S. discussed: No Complaint

PMH: _____

MEDS: _Albudia 5mg/gd, Glucatrol XL 5mg - BID, Lipitor 10mg ↑ gd, Lysinarin?_
_Zestril 5mg ↑ gd  Glucophage 500mg ↑ gd  ? statins._

SH/FH: _Mother (DM)  Uncle (CA)  Father (MI).  no Alcohol._
_Tob ⊘    RTDA 2 wives 2 JNK._

☐ Chart, PMH, diagnosis, meds., labs and data reviewed with patient and discussed.

Exam:   Weight **237**   Pulse **72**  BP **150 / 80**  Temp **98.0**   Comfortable/Not Ill Yes/Distressed ____

150/82.

|  | NO FINDINGS |  |  | NO FINDINGS |  |
|---|---|---|---|---|---|
| Nuto cowl bellig. | ☐ Ment. |  |  | ☐ Back | 2 cm |
|  | ☐ Skin |  |  | ☐ Chest Wall |  |
|  | ☐ Head |  |  | ☐ Lungs | clr |
| JM? ↑ nodu? | ☐ Eyes  Rt to lft |  |  | ☐ Heart  S1 Th |  |
|  | ☐ Ears |  |  | ☐ Abdomen  Jd ee |  |
|  | ☐ Face |  |  | ☐ Neuro  cc |  |
| no ↑a neck | ☐ Nose/Sinus |  |  | ☐ Joints/Extrem  J cd m - abt (B) PT pdu |  |
|  | ☐ Throat/Mouth |  |  | ☐ Genitalia |  |
|  | ☐ Neck  Sft |  |  | ☐ Breasts  dep SOB Racol |  |
|  | ☐ Nodes |  |  | ☐ Rectal |  |

MPR. †† _Dm (2) DM2 SM MS.  989 - Dr Cov. (3) Nbnml (2 nomfb?) 4/00 Dr V._
_(3) Pol colum Callisul) (3) Dr twitted Nortin - improved_

☐ Decision making process, diagnosis/diff. diagnosis explained to patient. Management options reviewed together.

PLAN _Begin statin re: (cherp). ↑ Lipiton. PW. 2 Dr Cov. ?? Zestin ↓ gluco?_
_↑ V depth, Recomp - Fu 3 mth. ↓ Wso albumi_

☐ Long explanation about risks of complications, Morb./Mort.   ☐ Minutes with patient under/over 5-10-15-25-45
☐ Extended time spent in counseling about disease, care, plan, side effects, of meds.

_4/19/01, Upd msuulfn → 10._
_Hypo 46 - √0 (3/01)_    ②

_4/30/01  retn ab 4/6/01 - M②_
_Lee Ud (2)_

Maccari, John

INT. MED DR. ULLOA, M.D.

DATE 5/14/01 BP. 130/80
AGE 72 PR. 72/16
WT. 235 TEMP. 97.8

CC. stomach discomfort / Sinus

Awakened from sleep c̄ deep [illegible] chest / epigastric discomfort (4 days). Lasts 3-5 days. on + off x [illegible]. [illegible] c̄ [illegible]
No fever - [illegible] [illegible] [illegible] at h.s. [illegible]
5/12/01. No [illegible] [illegible] to [illegible] old !!
No resp. Tx except [illegible] drug
[illegible] - [illegible] MI, [illegible]: None → mild [illegible]

[illegible] [illegible], [illegible]
[illegible] [illegible] [illegible]

Abd. obese, soft, [illegible] [illegible]. No [illegible]

[illegible] ulcer

Diagn
Thr chest/
(1) Epigastric pain - noted.
(2) [illegible].

Plan
(1) ✓ Abd US.
CMP, Amy, Lipase, UA, [illegible]
(2) [illegible] / [illegible]

[illegible]

5/17/01 Lab Rev. (5/14/01)
Na/K = 138/5.3 WBC = 8,200
H/H = 13.1/37.8
NAB5 = 348.
BUN/Cr = 23/1.4
LFT's → [illegible]
Amylase/Lipase → [illegible]
[illegible] [illegible] [illegible]

5/21/01 DNKA

INT. MED. LUIS S. ULLOA, MD

NAME _Macari John_

PAGE 30

DATE _____ TEMP _____

CHEIF COMPLAINT:

BP _____ AGE _____

PULSE _____ WEIGHT _____

RESP. _____

5/30/01 – pc c̄ Jup. Drugs pharm. pt Rec̄ᵈ
Lotrisone cream. pc to pt – Whats being
treated. Insect bites legs + feet. Called
in Bactroban Ointment – Come in if
not better ℞

INT. MED DR. ULLOA, M.D.

DATE _7/26/01_    BP. _140/70_
AGE _72_    PR. _76/16_
WT. _236_    TEMP. _98.0_

Flu – Fatigue. no fever
All pm.

P Co

Abd. soft, tender

[handwritten notes, illegible]

T4 – see lab sheet

Imp

① HTN/hyper pain
② DM
③ APND

Pln

① ADD diet
② will draw & Urinalysis, tray ℞
    swelling. Drug dir.
③ RTC  10/01
    TU

INT. MED LUIS S. ULLOA, MD

PAGE 31

NAME _Macau, John_

DATE_____   TEMP_____   CHIEF COMPLAINT:

BP_____   AGE_____

PULSE_____   WEIGHT_____

RESP._____

7-26-01 gave pt copy 7/16/01 lab + 5/15/lab +
5-21-01 abdominal US. JR.

8/1/01 _16 lu_ (7/26/01)
    _lu  K = 5.1_
    Pleom K = 105

INT. MED DR. ULLOA, M.D.

DATE  11/7/01   BP.  158/80
AGE       72    PR.  80/16
WT.      238    TEMP.  97.8

Flu — fully call — Aqft → cguy
no oldu.  Demi B/d ×2 nt

Q LE

        Reg. Cen        Len: S, 7/    Abd: obey, zenlu
        DTR- 1/4 × unk ule
        appo hh = 6.7

I gue
① DM                    ① OFOqu
② ASMD                  ② nu lab 2/02
③ heone BP?             ③ 100  4/02 NFX
④ Aoynta LB. slero

PAGE _____32_____

INT. MED LUIS S. ULLOA, MD

NAME _Macari, John_

DATE_____ TEMP_____

BP_____ AGE_____

PULSE_____ WEIGHT_____

RESP._____

CHIEF COMPLAINT:

02/15/02

B/P 150
      80

s/n - no show
4-18-02 DNKA

4/27/02
Return of 3/27/02 (blood)

Rx J&K cxa 3/19 fr

TX no jr/exa + add yr

**LOIS S. FULEGA, M.D.**
3370 Burns Road • Suite 105
Palm Beach Gardens, Florida 33410

DATE: 5/3/02

NAME: _Doccass John_

AGE: 7-2   ALLERGY: _See list_

CHIEF COMPLAINT: _Phipiety edema_

HISTORY: _PO x weekly x10' x 5-6 wk. NO CP. Appette → full._
_BM's → ti/gd. _____ → TAL._

**DENIES OTHER**

D.O.S.
- ☐ Fever/Chills _____ Fatigue _____ Anorexia _____ Rash _____ Dysphagia/Dyspepsia _____
- ☐ Nausea _____ Vomiting _____ Diarrhea _____ Constipation _____ Abdominal Pain _____ Other EENT _____
- ☐ SOB on Exertion/Rest _____ SOB at Night _____ Chest Pain/Palpit. _____ Injury _____
- ☐ Cough _____ Sputum _____ Pain/Cramps on .............. Discharge from .............. Blood in ..............
- ☐ Swelling/Edema _____ Genit./Gyneco. _____ Joint Problems _____ Urine Problems _____ Tumor/Lump _____
- ☐ Visual Changes _____ Headaches _____ Dizziness/Vertigo _____ Psyc. Compl. _____ Anxiety/Depression _____
- ☐ Neuro compl. _____  ☐ Prolonged & detailed R.O.S. discussed: No Complaint

PMH: _____

MEDS: _See list_                                    colon

SH/FH: _Mother (DM)  uncle (CA)  Father (MI)  Sister (HTN)_
_TOB ☐ _____ FTOH _____ wine 2-3 wk _____ weekly Tha Thu (3 wk)_

☐ Chart, PMH, diagnosis, meds., labs and data reviewed with patient and discussed.

Exam:   Weight 240   Pulse 104   BP 190/80  140/70   Temp 98.8   Comfortable/Not Ill Yes/Distressed _____

| NO FINDINGS | | NO FINDINGS | |
|---|---|---|---|
| ☐ Ment. | | ☐ Back | |
| ☐ Skin | | ☐ Chest Wall | |
| ☐ Head | | ☐ Lungs | |
| ☐ Eyes | | ☐ Heart | |
| ☐ Ears | | ☐ Abdomen | |
| ☐ Face | | ☐ Neuro | |
| ☐ Nose/Sinus | | ☐ Joints/Extrem. | |
| ☐ Throat/Mouth | | ☐ Genitalia | |
| ☐ Neck | | ☐ Breasts | |
| ☐ Nodes | | ☐ Rectal | |

MPR: 1) _DM ②  APND Sept 1989 a Cov. ③ Abd CT ____ 4/00 ___ ____ 3/9/___ CP test LAD 1/82_

☐ Decision making process, diagnosis/diff. diagnosis explained to patient. Management options reviewed together.

PLAN: _____

☐ Long explanation about risks of complications, Morb./Mort   ☐ Minutes with patient under/over 5·10·13·25·45

☐ Extended time spent in counseling about disease, care, plan, side effects, of meds.

PAGE 34

INT. MED LUIS S. ULLOA, MD

NAME John Macari

DATE 7/22/02   TEMP 98.6

CHIEF COMPLAINT:

BP 128/78   AGE 73

c/u - bld wk

PULSE 64   WEIGHT 834

RESP. 18

7/12/02 DNKA

Falling well - did hg
Comm bon's 1/wely

PLO 5/3/02 ...

Exam.

① Altered sars
② TI K
③ DM-II
④ DA1NO

Plan

① GF Exam
② √ ferr/ABC K led
& CBC
③ NTD. 1d/or

PAGE 35

INT. MED LUIS S. ULLOA, MD

NAME _John Macust_

DATE _12/12/02_   TEMP _98.0_   CHIEF COMPLAINT:

BP _170/84_   AGE _73_

PULSE _88_   WEIGHT _242_

RESP. _16_

CC. foot pain / Flu

(R) foot pain X 4 days. No new trauma.

[illegible handwritten clinical notes]

BP 160/80

[illegible]

no CP/OB

[illegible handwritten notes continue]

(1) (R) [illegible]

(2) [illegible]

(3) DM

(4) [illegible] DM's.

INT. MED LUIS S. ULLOA, MD

NAME _Macari, John_   PAGE _36_

DATE _1_ _15_ _03_   TEMP _97.9_   CHIEF COMPLAINT:

BP _156_/_80_   AGE _____

PULSE _64_   WEIGHT _245_

RESP. _16_

_Feels well, no further_
_loose BM's. Worries about_
_recurrence._

_158/80 R  158/80 L_

_P/o_

_[illegible handwritten notes]_

_Impr_

1) HTN  ? controlled

2) DM

3) [illegible]

1) [illegible]

2) [illegible]

3) [illegible]

_1/17/03  [illegible] (115-lbs)_

_Serum K = 7.6_
_RBC K = 110._  } _[illegible handwritten note]_

PAGE _37_

INT. MED. LUIS S. ULLOA, MD

NAME _MACARI, JOhN_

DATE _2/11/03_   TEMP _97.8_

CHIEF COMPLAINT:

BP _130/84_   AGE _73_

PULSE _68_   WEIGHT _245_

RESP. _16_

F/u labs

fu/ cc _

_(handwritten clinical notes, illegible)_

2/12/03 . _lab res_ (2/11/03)

Sen K= 5.4 (N 3.5 - 5.1)

Plsm K= 4.9 (N 3.5 - 5.1)

2/13/03- Informed pt of K+ blood levels & to avoid excess green leafy veggies & citrus fruits.

**Holy Cross**

**Hospital**
Ft. Lauderdale,
Florida

MACARI, JOHN R.

CIU-02
973455

55120844141

KHAN, ASLAM

05/20/04

## HEART LAB

AGE:              HGT:        WGT:                      CASE
#:

ADMISSION DATE:  05/20/04

DATE OF PROCEDURE:      MAY 20, 2004

REFERRING PHYSICIAN:

INDICATIONS FOR CORONARY CATHETERIZATION:
1.    Recurrence of angina pectoris.
2.    Status post percutaneous transluminal coronary angioplasty.

PROCEDURE: Left heart catheterization,  cine angiography,  and
stenting of the dominant right coronary artery.

MEDICATIONS:   Intravenous nitroglycerin,  intravenous heparin,
intravenous Integrilin, calcium channel blockers, and
antiplatelet agents.

CATHETERIZATION TECHNIQUE:   Under local anesthesia with 2%
solution of Xylocaine the right femoral artery was cannulated
with #6 French sheath.  Left ventricular end-diastolic pressure
was recorded with the help of #6 French right coronary catheter.
  Left  ventricular cine angiography  was not done to avoid
excess dye load.  The patient is going to have an echocardiogram.
 Since new high-grade stenosis was noted in a very large dominant

**CARDIAC CATHETERIZATION REPORT**
Page 1

NAME:       MACARI, JOHN R.

MR:         973455
ACCT:       55120844141

right coronary artery distally. Additional  pre-stenting  right
coronary arteriograms were obtained with #6  French Hockey stick
guarding catheter with side holes.  The lesion was crossed with
0.014 inch extra support guide wire and a 3 mm x 16 mm Sci-med
drug eluted Taxus stent was deployed  up to 15 atmospheres for
angiographic 90% stenosis in the distal right coronary artery,
regressed to zero percent residual stenosis.   The patient
tolerated the procedure well without any complications.


FLUOROSCOPIC OBSERVATION: No intracardiac calcifications were
seen.  Normal cardiac silhouette was noted.   Lungs were clear.
The diaphragms are symmetrical and move well.

ANGIOGRAPHIC FINDINGS:

LEFT VENTRICULOGRAM CINE ANGIOGRAM:    Revealed a normal  left
main trunk.  The left anterior descending coronary artery is a
large caliber vessel, which gives rise to fair size diagonal
branches and several septal perforators.   The previously stented
segments in the  left anterior descending was widely patent.
The left circumflex coronary artery  is also a large caliber
vessel, which gives rise to a fair size marginal division  in the
circumflex proper.  The left circumflex coronary artery has mild
luminal irregularities.


SELECTIVE RIGHT CORONARY ANGIOGRAM: Exhibit a  very large
dominant right coronary arterial system, which  gives arise  to
the posterior descending artery,  branches posterior lateral wall
of the left ventricle and the right ventricular branches.  The
right coronary artery  had 90% stenosis, pre-stenting distally
with normalization of the lumen for stenting.

SUMMARY AND CONCLUSIONS:
1.   Successful stenting of a very large dominant right coronary
     artery.



Date                         Date


## CARDIAC CATHETERIZATION REPORT
### Page 2

NAME:        MACARI, JOHN R.

MR:          973455
ACCT:           65120844141
Dictated:   05/20/04
      Transcribed:   05/20/04

ASLAM KHAN, M.D.

AK/as
cc: ALI R. GHAHRAMANI, M.D.

## CARDIAC CATHETERIZATION REPORT
### Page 3

Palm Beach Gardens Medical Center
3360 Burns Road, Palm Beach Gardens, Florida 33410
CONSULTATION REPORT

Palm Beach Gardens Medical Center
3360 Burns Road
Palm Beach Gardens, Florida 33410

PT NAME: MACARI, JOHN
MR#: 000263842
DOCTOR: PREDRAG KNEZ, M.D.
MB:
DATE OF CONSULTATION: 9/16/2004


CARDIOLOGIC CONSULTATION

REFERRING PHYSICIAN: Luis S. Ulloa, M.D.

CLINICAL HISTORY: The patient is a pleasant 75-year-old gentleman with past medical history significant for coronary artery disease, status post angioplasty and stent placement in the left anterior descending and the right coronary artery in May 2004; history of hypertension; longstanding diabetes mellitus; and anemia; who presented to Palm Beach Gardens Medical Center with a 7-day history of right-sided chest pain. The pain is described as a rather sharp pain with worsening and improvement over the past 7 days but with no disappearance. The pain has not been related to activities nor has it been relieved by rest. It gets worse with certain movements but is not worse with deep inspiration or coughing. The pain has not prevented the patient from doing his regular activities. The patient reports marked reduction in exercise capacity in the past 6 months. He develops shortness of breath with the activities that he used to do easily previously. The symptoms have not changed after the angioplasty recently. He underwent a stress test in Fort Lauderdale where the angioplasty was done, and it was borderline abnormal, and a medical path was recommended. The patient denies paroxysmal nocturnal dyspnea, orthopnea, palpations, near-syncope, or syncope. He denies respiratory infection or a flu-like syndrome this past 2 weeks.

At the time of my evaluation, the patient appears comfortable, though he still has right-sided chest pain. The pain is located right beyond the lowest rib in the rib cage on the right side. He denies any nausea and vomiting. He has not had abdominal pain related to the pain in the chest.

PAST MEDICAL HISTORY: As above.

ALLERGIES: No known drug allergies..

SOCIAL HISTORY: The patient is a nonsmoker. He denies drinking alcohol. He denies the use of elicit drugs.

FAMILY HISTORY: Noncontributory.

REVIEW OF SYSTEMS:
GENERAL: No weight loss or weight gain. No appetite loss. No


Patient : MACARI, JOHN R                    CONSULTATION REPORT
                              Page 1
Printed on 10/12/2004 at 1350

Palm Beach Gardens Medical Center
3360 Burns Road, Palm Beach Gardens, Florida 33410
CONSULTATION REPORT

generalized weakness.
CARDIOVASCULAR: As above noted.
RESPIRATORY: No shortness of breath. No cough sputum production,
hemoptysis, or wheezing.
GASTROINTESTINAL: No abdominal pain. No nausea or vomiting. No
diarrhea or constipation.
GENITOURINARY: No symptoms related to this system are reported.
MUSCULOSKELETAL: Osteoarthritic pain in the lower extremities
reported.
NEUROLOGICAL: No headaches. No difficulty sleeping. No difficulty
with memory loss.
SKIN: No skin rashes noted.
LYMPHATIC: No lymphadenopathy.
VISUAL: No recent reduction of visual acuity noted.

PHYSICAL EXAMINATION:
GENERAL APPEARANCE: The patient is a well-developed, moderately
obese, elderly gentleman lying in a bed with no evidence of acute
respiratory distress. The patient appears to be comfortable;
although he still has chest pain on the right side, which he can
pinpoint over the lower right rib in the mammary line.
VITAL SIGNS: Heart rate 64 beats per minute. Respiratory rate 18.
Blood pressure 150/82. The patient is afebrile.
HEENT: Normocephalic, atraumatic. PERRLA. EOMI. No throat, nose,
or ear abnormalities noted.
NECK: Supple. No JVD or carotid bruits appreciated. No thyromegaly
or lymphadenopathy.
CHEST: Without deformities. No accessory muscles of respiration are
being used.
LUNGS: Clear to auscultation and percussion. A few rhonchi, rales.
No wheezes.
HEART: Sounds are both present and of normal intensity. There are
no murmurs, rubs, or gallops appreciated. The PMI is not palpable.
ABDOMEN: Soft, nontender. No organomegaly or abdominal bruits
noted. The bowel sounds are present. No lymphadenopathy.
GENITORECTAL: Exams are deferred.
EXTREMITIES: Without edema. Peripheral pulses 2+ bilaterally.
NEUROLOGICAL: Exam grossly within normal limits.

DIAGNOSTIC DATA: WBC count is 16. Hemoglobin is 11.9, hematocrit
34, and platelet count 229,000. Enzymes negative. Sodium 140,
potassium 4.4, chloride 104, bicarbonate 30, BUN 34.4, creatinine
1.6, and glucose 113. Liver function tests within normal limits.

An echocardiogram showed sinus rhythm at 72 beats per minute. There
is a suggestion of Q-waves in leads II and III and Q-waves noted in
leads V1 through V3, suggesting previous anteroseptal myocardial
infarction. No ischemic ST-T changes noted. No change compared to
the echocardiogram done in Dr. Ulloa's office.

CT angiogram of the chest is pending.

IMPRESSION:
1. Chest-pain syndrome with atypical features. Post-pericarditic

Patient : MACARI, JOHN R                    CONSULTATION REPORT
                    Page 2
Printed on 10/12/2004 at 1350

Palm Beach Gardens Medical Center
3360 Burns Road, Palm Beach Gardens, Florida 33410
CONSULTATION REPORT

versus noncardiac chest pain versus GI pain.
2. Coronary artery disease, status post angioplasty with stent in
the left anterior descending and right coronary artery with
exertional dyspnea' suggestive of angina.
3. Hypertension on medical therapy.
4. Diabetes mellitus.
5. Anemia.

RECOMMENDATIONS:
1. I agree with the CTA of the chest to rule out the possibility of
aortic dissection or other noncardiac causes of chest pain.
2. Will check amylase and lipase to rule out the possibility of
pancreatitis; although the patient's abdominal exam is not
indicative. Will check ESR for possible evidence of acute
inflammation, which may pinpoint pericarditis or pleurisy.
3. Will obtain 2-D echocardiogram with Doppler to evaluate left
ventricular function and to rule out the possibility of pericarditis.
4. A stress test will be arranged on an inpatient basis since the
patient's recent stress test was done with low exercise and was
suboptimal in quality. Will review the results of the recent one.
5. Abdominal ultrasound will be ordered to rule out the possibility
of gallstones or liver disease, which my explain the patient's chest
pain.
6. Also, the suggestion of x-ray of the ribs may be needed.


DICTATED BY: PREDRAG KNEZ, M.D.

PK:aah
D: 09/17/2004 11:08:16
T: 09/18/2004 21:21:59
Job#: 6483166



cc:      LUIS S. ULLOA, M.D.
         3360 Burns Road
         Palm Beach Gardens, FL 33410
ELECTRONICALLY SIGNED/RELEASED BY DR.    KNEZ M.D., PREDRAG
On 09/22/2004 At 1353

Patient : MACARI, JOHN R                 CONSULTATION REPORT
                          Page 3
Printed on 10/12/2004 at 1350

ECHOCARDIOGRAPHIC REPORT

Palm Beach Gardens Medical Center
3360 Burns Road, Palm Beach Gardens, Florida 33410


PT: MACARI, JOHN R.         MR#: 000263842   Room: 0341
Date of Service: 9/17/2004     Pat#: 16353732   PType: I
DR: EDGAR A. COVARRUBIAS, M.D.   MB: 056       ORD#: 1981515
Ordering Physician: 274 LUIS S ULLOA M.D.


ECHO-DOPPLER

INDICATION:  Evaluation of LV function, systolic murmur.

INTERPRETATION:  M-mode and 2-dimensional tracings of limited quality
revealed mild increased left ventricular internal dimensions with
septal and anterior wall hypokinesia with an estimated ejection
fraction of about 45% to 50%.

Aortic root is increased with mild thickening of aortic leaflets but
opening well in systole.  No arrhythmias or significant obstruction.
Left atrial size is similarly mildly increased on the 2-dimensional
views.  No evidence of a pericardial effusion.  Right ventricular and
atrial dimensions are in the upper limits of normal.

Doppler study, continuous, pulse-wave, and color-flow Doppler,
revealed mild mitral and tricuspid regurgitation.  There are normal
flow velocities of the outflow tract of the left ventricle.

CONCLUSION:
1.  Mild left ventricular enlargement and hypertrophy with septal and
anterior distal hypokinesia with an estimated ejection fraction of
about 45%.  This is a technically limited study.
2.  Dilated aortic root with no evidence of aortic valvular disease.
3.  Mild mitral regurgitation with mild left atrial enlargement.
4.  Mild tricuspid regurgitation.


SC:jmm
D: 09/24/2004 10:04:25
T: 09/25/2004 08:24:21
Job#: 6529018



cc:      LUIS S. ULLOA, M.D.
         3360 Burns Road
         Palm Beach Gardens, FL 33410

ELECTRONICALLY SIGNED/RELEASED BY DR.    COVARRUBIAS M.D., EDGAR A.
On 09/29/2004 At 1541



P : MACARI, JOHN R                  [DOCNAME          ]
rd: 1981515                                 Page 1
rinted on 10/12/2004 at 1348
                    ECHOCARDIOGRAPHIC REPORT

Palm Beach Gardens Medical Center
3360 Burns Road
Palm Beach Gardens, Florida 33410

PT NAME: MACARI, JOHN
MR#: 000263842
DOCTOR: ZBIGNIEW  LITWINCZUK, M.D.
MB: 193
DATE: 9/24/2004
CATH#: 4279

REFERRING PHYSICIAN: PREDRAG KNEZ M.D.

PALM BEACH GARDENS HEART INSTITUTE
PALM BEACH GARDENS MEDICAL CENTER
CARDIAC CATHETERIZATION LABORATORY

PROCEDURE PERFORMED:  Intravascular ultrasound-guided PTCA and
stenting of the mid left anterior descending coronary artery.

INDICATION:
1.  Angina.
2.  Positive stress test indicating ischemia in the distribution of
the anterolateral wall and apex.

PROCEDURE:  The procedure was performed after completion of
diagnostic catheterization by Dr. Knez.  The left coronary system was
engaged with a 6-French XB-LAD 3.5 guiding catheter.  The patient
received bolus of Angiomax, followed by an Angiomax drip.  The left
coronary artery was crossed with a BMW wire, and following this,
intravascular ultrasound was performed, see separate report.  Based
on the report of the ultrasound, the lesion in the mid left anterior
descending was predilated with a 3.0 x 20-mm Maverick balloon in 2
positions.  Subsequently, the vessel was stented with 3.0 x 24-mm
medicated TAXUS stent and postdilated with 3.0 x 20-mm noncompliant
NC monoRAIL balloon, which produced excellent angiographic result,
resolution of the stenosis by intravascular ultrasound from less than
4 mm squared to more than 6 to 7 mm squared in that area, produced
TIMI 3 flow in the vessel.  There was no dissection.  The patient
tolerated the procedure well.  There were no immediate complications.

IN SUMMARY:  Successful intravascular ultrasound-guided PTCA and
stenting of the mid left anterior descending coronary artery with 3.0
x 24-mm medicated TAXUS stent.

RECOMMENDATIONS:  Continuation of medical therapy and risk factor
modification per Dr. Knez.

DICTATED BY: ZBIGNIEW  LITWINCZUK, M.D.

ZL:jmm
D: 09/24/2004 12:49:46
T: 09/25/2004 08:02:16
Job#: 6530878
ELECTRONICALLY SIGNED/RELEASED BY DR.    LITWINCZUK M.D., ZBIGNIEW J.

Palm Beach Gardens Medical Center
3360 Burns Road
Palm Beach Gardens, Florida 33410

PT NAME: MACARI, JOHN
MR#: 000263842
DOCTOR: PREDRAG  KNEZ, M.D.
MB:
DATE: 9/24/2004
CATH#: 4279

REFERRING PHYSICIAN: PREDRAG KNEZ M.D.

PALM BEACH GARDENS HEART INSTITUTE
PALM BEACH GARDENS MEDICAL CENTER
CARDIAC CATHETERIZATION LABORATORY


PRIMARY PHYSICIAN:  Dr. Ulloa and Dr. Covarrubias.

CLINICAL HISTORY:  The patient is a 75-year-old gentleman with
history of diabetes mellitus, hypertension, coronary artery disease,
status post angioplasty to the left anterior descending and right
coronary artery in May of this year in Fort Lauderdale, who was
referred for cardiac catheterization after an abnormal stress test
showing ischemia involving the apex and distal inferior wall.  The
patient had symptoms of progressive exertional angina.

PROCEDURES PERFORMED:
1.  Left heart catheterization.
2.  Selective coronary angiography.
3.  Left ventriculography (RAO projection).
4.  Right femoral artery angiography.

PROCEDURE DESCRIPTION:  After informed consent and conscious sedation
with Versed 2 mcg and fentanyl 50 mcg intravenously as well as local
anesthesia to the right groin with a 2% lidocaine solution, 6-French
arterial sheath was placed to the right femoral artery without
difficulties.  Following the placement of the sheath, the left heart
catheterization was performed in the regular projections using the
following catheters: A 6-French JL4, 6-French JR4, and 6-French
angled pigtail catheters.  Following the completion of left
ventriculography, right femoral artery was imaged in the RAO
projection.  The patient then underwent intravascular ultrasound to
the left anterior descending artery and eventually angioplasty of the
left anterior descending by Dr. Litwinczuk of interventional
cardiology.


HEMODYNAMICS:  Left ventricular pressure was 141/21.  Aortic pressure
was 139/53 mmHg.  No pressure gradient across the aortic valve noted.

CORONARY ANGIOGRAPHY:  Coronary angiography was performed in the
regular projections using the following catheters: A 6-French JL4
and 6-French JR4 catheters.

LEFT MAIN CORONARY ARTERY:  The left main coronary artery is a large
artery which bifurcates into the left anterior descending and left
circumflex coronary artery.  The left main coronary artery has some
mild diffuse disease but no hemodynamically significant stenosis.

LEFT ANTERIOR DESCENDING ARTERY:  The left anterior descending artery
is a very large artery which wraps around the apex.  In the proximal
portion prior to the stent, there appears to be a 60% to 70% focal
calcified stenosis.  The stent noted in proximal-to-mid portion was
patent with mild diffuse in-stent restenosis.  Midportion of the left
anterior descending artery has moderate diffuse disease with no
hemodynamically significant stenosis.  Distal vessel has mild diffuse
disease.  The first diagonal branch and second diagonal branch are
moderate-sized vessels with approximately 50% ostial stenosis each.

LEFT CIRCUMFLEX CORONARY ARTERY:  The left circumflex coronary artery
is a large artery which gives rise to a small obtuse marginal 1 and a
very large obtuse marginal 2.  Second obtuse marginal branch is a
very large vessel with ostial 50% stenosis.  First obtuse marginal
has mild-to-moderate diffuse disease.

RIGHT CORONARY ARTERY:  The right coronary artery is a large,
dominant artery.  In the proximal portion, there was mild diffuse
disease.  In the midportion, there was moderate diffuse disease, at
most 50% mid-to-distal stenosis.  In the distal portion, there was a
stent, which is widely patent without residual stenosis.  The artery
bifurcates into the right posterior descending artery and
posterolateral branch, which are both diffusely diseased and small
vessels.

LEFT VENTRICULOGRAPHY:  Left ventriculography was performed in the
RAO projection with a 6-French angled pigtail catheter.

The left ventricle appears to be mildly dilated.  There appears to be
severe hypokinesis of the distal anterior wall, apex, and distal
inferior wall.  The left ventricular ejection fraction is estimated
at 45%.

RIGHT FEMORAL ARTERY ANGIOGRAPHY:  Right femoral artery angiography
was performed in the RAO projection via a pre-existing arterial
sheath.  Common right femoral artery as well as superior portions of
superficial and deep femoral arteries have mild diffuse disease.


IMPRESSIONS:
1.  Coronary artery disease, 3-vessel disease, with continued patency
of the stents in the proximal-to-mid left anterior descending artery
and distal right coronary artery, moderate stenosis of the obtuse
marginal branch 2, and moderate-to-severe stenosis of very proximal
left anterior descending artery prior to the stented site.
A.  LAD:  Proximal 60% to 70% focal stenosis prior to the stent,
patent stent in proximal-to-mid vessel, and moderate diffuse disease
in mid vessel.  D1 and D2 with 50% ostial stenosis each, apparently
moderate-sized vessels.
B.  LEFT CIRCUMFLEX OM2:  Large vessel with a 50% ostial stenosis.
C.  RIGHT CORONARY ARTERY:  Moderate diffuse disease in the mid
vessel with, at most, 50% stenosis in the mid-to-distal portion and
patent stent in the distal right coronary artery.
2.  Elevated left ventricular pressure, left ventricular
end-diastolic pressure, and aortic pressure.  No pressure gradient
across the aortic valve.
3.  Mildly dilated left ventricle with severe hypokinesis of distal
anterior wall, myocardial apex, and distal inferior wall.  Left
ventricular ejection fraction is estimated at 45%.
4.  Mild peripheral vascular disease demonstrated along the course of
common right femoral artery and superior portions of superficial and
deep femoral arteries.

RECOMMENDATIONS: The patient has moderate-to-severe stenosis in the proximal left anterior descending artery, which would explain his ischemia of the apex and distal inferior wall, supplied by the left anterior descending artery, which is a wrap-around vessel. At this point, intravascular ultrasound followed by angioplasty if necessary is recommended. Dr. Litwinczuk of interventional cardiology was consulted.


DICTATED BY: PREDRAG KNEZ, M.D.

PK:jmm
D: 09/24/2004 11:20:27
T: 09/25/2004 06:59:22
Job#: 6529971



cc:        EDGAR A. COVARRUBIAS, M.D.
           3360 Burns Road
           Palm Beach Gardens, FL 33410

           LUIS S. ULLOA, M.D.
           3360 Burns Road
           Palm Beach Gardens, FL 33410
ELECTRONICALLY SIGNED/RELEASED BY DR.    KNEZ M.D., PREDRAG
On 10/11/2004 At 1639

3360 Burns Road, Palm Beach Gardens, Florida 3341^

EXERCISE STRESS TEST

Palm Beach Gardens Medical Center
3360 Burns Road, Palm Beach Gardens, Florida 33410

PT: MACARI, JOHN R.          MR#: 000263842   Room: 0341
Date of Service: 9/17/2004   Pat#: 16353732  FType: I
DR: PREDRAG KNEZ, M.D.       MB: 247          ORD#: 1981517
Ordering Physician: 274 LUIS S ULLOA M.D.

PROCEDURE:  Adenosine Cardiolite stress test.

CLINICAL HISTORY:  The patient is a 75-year-old gentleman with a
history of coronary artery disease, previous angioplasty who
presented to Palms Beach Gardens Medical Center with right-sided
chest pain.  The patient is being evaluated for evidence of
adenosine-induced ischemia.

PRESENT MEDICATIONS:  Lopressor, Avandia, Norvasc, Zetia, Lipitor,
and Plavix.

RESULTS:  The patient's baseline heart rate was 68 beats per minute
with a baseline blood pressure of 140/70 mmHg.  The patient was
infused with a total of 60 mg of adenosine over a 4 minute infusion.
After the completion of the 2nd minute of  adenosine infusion,
Cardiolite was injected.  The maximal blood pressure during the
adenosine infusion was 140/64 mmHg with a maximal heart rate of 85
beats per minute.  The patient experienced shortness of breath but no
chest pain.

The baseline echocardiogram showed sinus rhythm at 68 beats per
minute.  The QRS complex leads V1 through V3 suggest a previous
anteroseptal myocardial infarction.  The electrocardiogram during the
adenosine infusion on the recovery period showed no ischemic ST-T
changes.

IMPRESSIONS:
1.  Negative adenosine stress electrocardiography for evidence of
ischemia.
2.  Normal heart rate and blood pressure response to adenosine
infusion.
3.  No chest pain or arrhythmias during adenosine infusion recovery.
4.  Nuclear scintography is reported separately.

PK:whr
D: 09/17/2004 09:35:38
T: 09/19/2004 14:32:28
Job#: 6482144

PT : MACARI, JOHN R                    Page 1
Ord: 1981517
Printed on 10/12/2004 at 1349
                    EXERCISE STRESS TEST

3360 Burns Road, Palm Beach Gardens, Florida 33410
EXERCISE STRESS TEST

cc:    EDGAR A. COVARRUBIAS, M.D.
      3360 Burns Road
      Palm Beach, FL 94538

      LUIS S. ULLOA, M.D.
      3360 Burns Road
      Palm Beach Gardens, FL 33410

ELECTRONICALLY SIGNED/RELEASED BY DR.    KNEZ M.D., PREDRAG
On 09/22/2004 At 1400

PT : MACARI, JOHN R                Page 2
Ord: 1981517
Printed on 10/12/2004 at 1349
              EXERCISE STRESS TEST

# Palm Beach Heart Clinic
### Board Certified in Cardiology and Nuclear Cardiology

Predrag Knez, M.D., F.A.C.C.

Date: October 13, 2004.
PATIENT: MACARI, JOHN
Primary physician: L. ULLOA, M.D.
Follow up visit
Clinical history:
75 y.o. gentleman with history of CAD, hypertension, hyperlipidemia and diabetes is coming for f/u after recent PTCA to mid LAD. The patient originally had PTCA/stents to proximal LAD and RCA in Ft. Lauderdale but has not noticed any improvement. He was admitted to PBGMC with CP and had repeat stress-test indicating LAD territory ischemia. Subsequent catheterization revealed severe long stenosis of mid LAD beyond the stent (confirmed by IVUS). He underwent PTCA/stenting of mid LAD by Dr. Litwinczuk. Since the PTCA, the patient actually reports worsening of his symptoms with progressive dyspnea with even minimal activities. Denies SOB or CP at rest but would consistently get out of breath with 1/3 of the activities he used to do prior to most recent PTCA. Denies PND or orthopnea. Denies palpitations, near-syncope or syncope. His LV function was mildly reduced and estimated at 45 % by echo and cardiac catheterization.
Medications: ASA 81 mg QD, HCTZ 25 mg QD, Glucophage 500 mg BID, Adalat 60 mg QD, Llipitor 20 mg QD, Lopressor 50 mg BID, Zestril 10 mg BID, Avandia 4 mg QD, Plavix 75 mg QD, Glucotrol 5 mg
Review of systems:
*General:* no weight gain or weight loss. No fevers or night sweats, no chills, no generalized weakness; *Cardiovascular:* as above; *Respiratory:* shortness of breath with minimal activities but none at rest, no cough or wheezing, no hemoptysis *GI:* occasional abdominal pain/heartburn related to GERD, no diarrhea or constipation *Genitourinary:* negative; *Musculoskeletal:* positive for osteoarthritic pains; *Neurological:* negative; *Skin:* no skin rashes; *Lymphatic:* no lymphadenopathy *Visual:* no recent reduction in visual acuity noted
Physical examination:
Well developed, moderately obese elderly gentleman with no signs of acute distress.
HR: 66 bpm          RR: 18          BP: 130/58          Weight: 230.5 lbs
HEENT:  PERLA, EOMI, no throat, nose or ear abnormalities
NECK:          supple, no JVD or carotid bruits, no thyroidomegaly or lymphadenopathy
CHEST:          without deformities
HEART:          Normal heart sounds. 2/6 systolic murmur along the LSB. No rubs or gallops. PMI is not palpable.
LUNGS:          clear to auscultation and percussion. No wheezes. No accessory muscles are being used.
ABDOMEN:          benign, no organomegaly, normal bowel sounds, no inguinal lymphadenopathy
EXTREMITIES:          without edema, R groin w/o hematoma or ecchymosis. Peripheral pulses 1+
NEURO:          A&O x 3. Normal cognitive function and coordination. No focal sensory or motor deficits. Normal gait.
Impression/diagnoses:
1. Coronary artery disease, s/p recent stenting of mid LAD, clinically worse since PTCA
2. Hypertension, well-controlled on medical therapy
3. Hyperlipidemia
4. Diabetes mellitus with multiple complications
5. Gastroesophageal reflux disease
6. Obesity
The patient reports worsening of his SOB since the PTCA. He had no recurrence of CP. Possibility of early stent occlusion vs additional non-corrected stenosis needs to be excluded. Other possibilities including anemia or electrolyte imbalance are less likely. Will arrange a repeat cardiac catheterization to reevaluate patency of newly placed stent and degree of in-stent restenosis reported on previous cardiac catheterization. Reduction in activities and continuation of present medical therapy recommended in the mean time.
Return for f/u post cardiac catheterization scheduled for next week.
Predrag Knez, M.D.

Palm Beach Gardens Medical Center
3360 Burns Road, Palm Beach Gardens, Florida 33410
DIAGNOSTIC IMAGING REPORT    OUT PATIENT - I

Patient:  MACARI, JOHN R.
MR#: 000263842                     Room:
Imaging: 4279                      Pat#: 16497513
Exam Date: 12/10/2004              Ptype#: O
Order #: 2267941                   Ord: 82623
Attd:
REASON FOR EXAM:SOB,LEG PAIN[ORDER NOTE byNWK]


Exam:  LOWER EXTREMITY ANGIOGRAM

FINDINGS:  CT angiography of the lower extremity is performed.  No
comparisons currently available.

The common femoral arteries demonstrate atherosclerotic change
bilaterally.  The profunda arteries are patent bilaterally.  The left
profunda artery demonstrates significant atherosclerotic change and
origin stenosis.  Moderate atherosclerotic disease noted within the
superficial femoral and profunda arteries bilaterally.  Mild stenosis
noted within the right superficial femoral artery.  The left
superficial femoral artery demonstrates mild stenosis with moderate
stenosis within the distal superficial femoral artery in the region
of the adductor canal.  Mild to moderate stenosis of the left
popliteal and mild stenosis of the right popliteal artery identified.
 The trifurcation vessels are patent bilaterally with in-line flow to
the dorsalis pedis and plantar arch.

IMPRESSION:

BILATERAL ATHEROSCLEROTIC CHANGES WITH NOTE OF STENOSES WITHIN THE
SUPERFICIAL FEMORAL AND POPLITEAL ARTERIES AS DESCRIBED.


DICTATED BY: YUVRAJ  SINGE, M.D.

YS:saf
D: 12/10/2004 19:29:25
T: 12/10/2004 19:40:35
Job#: 6977895

ELECTRONICALLY SIGNED/RELEASED BY DR.    YOUNG M.D., BRIAN J. for SINGE M.D., YUVRAJ
On 12/11/2004 At 0932


PT : MACARI, JOHN R        Dictated : {DOCNAME              }
Ord: 2267941                        Page: [# OF #]
Printed on 12/15/2004 at 102
          DIAGNOSTIC IMAGING REPORT

Palm Beach Gardens Medical Center
3360 Burns Road, Palm Beach Gardens, Florida 33410
DIAGNOSTIC IMAGING REPORT    OUT PATIENT - I

Patient: MACARI, JOHN R.
MR#: 000263942                         Room:
Imaging: 4279                          Pat#: 16497513
Exam Date: 12/10/2004                  Ptype#: O
Order #: 2267890                       Ord: 82623
Attd:
REASON FOR EXAM: SOB, LEG PAIN [ORDER NOTE byNWK]


Exam:  CT ANGIOGRAM ABDOMEN AND PELVIS

FINDINGS:  Imaging abdomen and pelvis performed following the
administration of nonionic intravenous contrast with study optimized
to evaluate the arterial system.  No comparisons currently available.

Respiratory motion present at the lung bases.  The most cephalad
aspect of the liver and spleen are out of field of view of the study.
Fatty infiltration of the liver does appear present.
Post-cholecystectomy clips identified.  No definite splenic or
adrenal lesion appreciated.  Aortoiliac vascular calcific change
identified.  No hemodynamically significant iliac arterial in-flow
stenosis identified.  Large 1.8 x 1.4 cm calcification noted within
the dependent aspect bladder consistent with a bladder calculus.  No
pathologic adenopathy or soft tissue mass appreciated.  The celiac
axis and superior mesenteric artery origins are patent.  The renal
artery origins are not optimally visualized.  Mild to moderate
stenoses of the renal arteries cannot be excluded.  If clinically
relevant, a dedicated MRA of the renal arteries or CTA angiogram
focused at this level could be considered.  The inferior mesenteric
artery does appear patent with a possible origin stenosis.  No free
air, free fluid or inflammatory fat stranding identified.  Scattered
diverticula do appear present within the ascending and descending
colon.  The mid to distal left ureter demonstrates focal dilation,
which is of uncertain etiology but may relate to prior inflammatory
of infectious etiology.  Mild prominence of the left pelvocaliceal
system and ureter proximal to the focal dilation is additionally
present.  Findings may not be of functional significance.  Further
evaluation could potentially be provided with a renal Lasix scan if
clinically relevant.

IMPRESSION:

1.  FATTY INFILTRATION OF THE LIVER.

2.  MILD PROMINENCE OF THE PELVOCALICEAL SYSTEM AND LEFT URETER.
MORE DISTAL MID URETER DEMONSTRATES FOCAL DILATION.  FINDINGS MAY
RELATE TO PRIOR INFLAMMATORY OR OBSTRUCTIVE PROCESS.  NO DEFINITE
OBSTRUCTION ON THE CURRENT STUDY.  ADDITIONAL IMAGING COULD BE
CONSIDERED IN THE APPROPRIATE CLINICAL SETTING.  A LARGE
NONOBSTRUCTIVE BLADDER CALCULUS PRESENT.

3.  AORTOILIAC ATHEROSCLEROTIC DISEASE WITH NO SIGNIFICANT ILIAC
IN-FLOW STENOSIS.

4.  RENAL ARTERY AND INFERIOR MESENTERIC ARTERY ORIGINS ARE NOT


PT : MACARI, JOHN R        Dictated : [DOCNAME                    ]
Ord: 2267890                        Page: [# OF #]
Printed on 12/15/2004 at 10%
            DIAGNOSTIC IMAGING REPORT

Palm Beach Gardens Medical Center
3360 Burns Road, Palm Beach Gardens, Florida 33410
DIAGNOSTIC   AGING REPORT     OUT PATIENT - I


OPTIMALLY VISUALIZED BUT ARE PATENT.  MILD TO MODERATE NARROWING OF
THE RENAL ARTERY ORIGINS MAY BE PRESENT.  NARROWING OF THE INFERIOR
MESENTERIC ARTERY ORIGIN MAY BE PRESENT AS WELL.  FURTHER
CHARACTERIZATION OF THE RENAL ARTERIES COULD BE PROVIDED WITH A
DEDICATED STUDY IF CLINICALLY RELEVANT.


DICTATED BY: YUVRAJ  SINGH, M.D.

YS:saf
D: 12/10/2004 18:21:22
T: 12/10/2004 19:35:35
Job#: 6977872

ELECTRONICALLY SIGNED/RELEASED BY DR.    YOUNG M.D., BRIAN J. for SINGH M.D., YUVRAJ
On 12/11/2004 At 0932


PT : MACARI, JOHN R           Dictated : [DOCNAME                    ]
Ord: 2267890                              Page: [# OF #]
Printed on 12/15/2004 at 102
          DIAGNOSTIC IMAGING REPORT

# Nephrology Associates, P.A.
### Diseases of the Kidney and Hypertension

Jack Waterman, D.O., F.A.C.O.I. • Kenneth A. Rappaport, D.O., F.A.C.P. • Jacquelynn T. Swan, M.D.

January 3, 2005

Luis S. Ulloa, M.D.
3370 Burns Road - Suite #105
Palm Beach Gardens, Florida  33410

    **Re:**  <u>**John R. Macari**</u>

Dear Dr. Ulloa:

Mr. John Macari was seen today in our office now
approximately three and one-half months after his
hospitalization at Palm Beach Gardens Medical Center
secondary to right-sided chest pain that required a CT scan
of the chest with intravenous iodine to rule out a dissecting
aortic aneurysm. The test was unremarkable.

The patient is scheduled to be seen by his cardiologist Dr.
Knez, later this week due to complaints of intermittent
claudication. In addition, he is scheduled to be seen by his
urologist, Dr. Jacobs, in the near future.

The patient is markedly interested in decreasing the number
of medications he is currently taking.

**PHYSICAL EXAMINATION:**
On examination today, the patient's blood pressure is 118/52;
pulse is 80; his temperature is 98.1F. CARDIOVASCULAR: The
heart has a regular rate and rhythm. PULMONARY: The lungs
are clear to auscultation. EXTREMITIES: No lower extremity
edema was present.

**LABORATORY:**
1. The patient's creatinine remains stable at 1.6.
2. BUN is stable at 36.
3. Blood sugar is 140.
4. Urinalysis was remarkable for the presence of 6 to 10
   RBCs per high-powered field.

2543 Burns Road, Palm Beach Gardens, FL 33410 • Telephone: 561-627-6454 • Facsimile: 561-625-4374

Luis S. Ulloa, M.D.
Re: John R. Macari
January 3, 2005
Page Two

**IMPRESSION:**

1. Stable chronic renal insufficiency that is most likely secondary to nephrosclerosis in a patient who has a history of hypertension and is maintained on an ACE inhibitor. The patient has a possible component of mild intravascular volume completion. He is on hydrochlorothiazide. He has no history of diabetic retinopathy. He has only an approximate six-year history of type 2 diabetes mellitus, making diabetic nephropathy unlikely.
2. Probable peripheral vascular disease.
3. Mild normocytic normochromic anemia.
4. Coronary artery disease; the patient is status post two previous myocardial infarctions and previous percutaneous transluminal coronary angioplasty.

**PLAN:**

1. The patient is adamant about reducing the number of his medications. I have, therefore, recommended he reduce his Adalat from 60 to 30 mg daily. The patient will be seen by Dr. Knez in the near future, and hopefully this medication can be discontinued if his blood pressure remains under good control.
2. From my standpoint, I would like to have the patient obtain a renal ultrasound, repeat a urinalysis and culture, spot urine for electrolytes, urine for eosinophils, serum protein electrophoresis, and urine immunoelectrophoresis, as well as a 24-hour urine for protein/creatinine clearance.
3. The patient will be seen by Dr. Jacobs in the near future, who may address his microhematuria.
4. In addition, the patient is in need of an annual ophthalmological examination as his last examination was performed more than one year ago.
5. We will see the patient back for reevaluation in one month.

Sincerely yours,

Jacquelynn T. Swan, M.D.
JTS:lb:46161

2543 Burns Road, Palm Beach Gardens, FL 33410 • Telephone: 561-627-6454 • Facsimile: 561-625-4374

APR-25-2005 09:23 From:DR L. ULLOA          5616914865          To:7727813393          P.4/7



**Quest on Demand™**

QUEST DIAGNOSTICS INCORPORATED
CLIENT SERVICE 800.745.3020

PATIENT INFORMATION
**MACARI,JOHN R**

REPORT STATUS **Final**

SPECIMEN INFORMATION
SPECIMEN:    MI708337T
REQUISITION: 0008345
LAB REF NO:

DOB: 06/24/1926  Age: 78
GENDER: M
SS: 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
ID: MA092
PHONE: 561-743-1582

ORDERING PHYSICIAN
**ULLOA,LUIS B**

CLIENT INFORMATION
12823
LUIS ULLOA MD
**P BL
3370 BURNS RD STE 105
PALM BEACH GARD, FL

COLLECTED: 02/08/2005    10:00
RECEIVED:  02/08/2005    20:34
REPORTED:  02/10/2005    09:23

COMMENTS:   FASTING

| Test Name | In Range | Out of Range | Reference Range | Lab |
|---|---|---|---|---|
| LIPID PANEL | | | | |
| TRIGLYCERIDES | 106 | | <150 MG/DL | QDB |
| CHOLESTEROL, TOTAL | 145 | | <200 MG/DL | QDB |
| HDL CHOLESTEROL | 64 | | > OR = 40 MG/DL | QDB |
| LDL-CHOLESTEROL | 60 | | <130 MG/DL (CALC) | QDB |
| CHOL/HDLC RATIO | 2.3 | | <5.0 (CALC) | QDB |
| COMPREHENSIVE METABOLIC PANEL | | | | QDB |
| GLUCOSE | | | FASTING REFERENCE INTERVAL | |
| UREA NITROGEN (BUN) | | | | |
| CREATININE | | | | |
| BUN/CREATININE RATIO | 23 | | 6-25 (CALC) | |
| SODIUM | 139 | | 135-146 MMOL/L | |
| POTASSIUM | 4.9 | | 3.5-5.3 MMOL/L | |
| CHLORIDE | 103 | | 98-110 MMOL/L | |
| CARBON DIOXIDE | 22 | | 21-33 MMOL/L | |
| CALCIUM | 9.2 | | 8.5-10.4 MG/DL | |
| PROTEIN, TOTAL | 7.2 | | 6.0-8.3 G/DL | |
| ALBUMIN | 4.2 | | 3.2-4.6 G/DL | |
| GLOBULIN | 3.0 | | 2.2-4.2 G/DL (CALC) | |
| ALBUMIN/GLOBULIN RATIO | 1.4 | | 0.8-2.0 (CALC) | |
| BILIRUBIN, TOTAL | 0.7 | | 0.2-1.5 MG/DL | |
| ALKALINE PHOSPHATASE | 61 | | 20-125 U/L | |
| AST | 26 | | 2-50 U/L | |
| ALT | 30 | | 2-60 U/L | |
| RETICULOCYTE COUNT | | | | QDB |
| RETICULOCYTE COUNT, AUTOMATED | 1.1 | | %37 | |
| RETICULOCYTE, ABSOLUTE | 40920 | | 25000-90000 CELLS/MCL | |
| CBC (INCLUDES DIFF/PLT) | | | | QDB |
| WHITE BLOOD CELL COUNT | 4.0 | | 3.8-10.8 THOUS/MCL | |
| RED BLOOD CELL COUNT | | | | |
| HEMOGLOBIN | | | | |
| HEMATOCRIT | | | | |
| MCV | 97.0 | | 80.0-100.0 FL | |
| MCH | 32.8 | | 27.0-33.0 PG | |
| MCHC | 33.8 | | 32.0-36.0 G/DL | |

MACARI,JOHN R - MI708337T

Page 1 - Continued on Page 2

P.1

**Michael A. Jacobs, M.D., P.A.**
*Board Certified*
*American Board of Urology*

Urology - Urologic Surgery
Male and Female

3370 Burns Road
Suite 101

Palm Beach Gardens
Florida 33410

(561) 624-9797
(561) 624-9816 Fax

January 10, 2005

Mr. John Macari
133 Hampton Circle
Jupiter, FL 33458

Dear John:

A note to say that I hope you are doing well. As we discussed in August, during the workup for your history of blood in the urine, I found you to have a stone in the bladder, as well as what appears to be an early polyp along one of the walls of the bladder, something that may be a malignancy and needs to be removed and sent to the pathologists for analysis.

I understand hat you have been in the hospital for medical issues over the last couple of months. I hope you are doing better, and are now able to schedule with me, the procedure, which would be an overnight stay.

Please call the office to coordinate a date with me. Looking forward to hearing from you. Again, hoping this finds you well.

Cordially,

Michael A. Jacobs, M.D.
MAJ/m
cc: Luis Ulloa, M.D.
cc: Predrag Knez, M.D.

1/21/05

Case 2:02-cr-14084-KAM Document 53 Entered on FLSD Docket 05/23/2005 Page 103 of 106

INT. MED LUIS S. ULLOA, MD        NAME  mocari John        PAGE  52

DATE 2/8/05    TEMP 98.6    CHIEF COMPLAINT:

BP 160/80    AGE 75

PULSE 72    WEIGHT 233    CC. Flu Symptoms

RESP. 16

PAGE 53

INT. MED LUIS S. ULLOA, MD

NAME _Macali John_

DATE _2/22/05_     TEMP _97.9_

CHIEF COMPLAINT:

BP _140/70_     AGE _78_

PULSE _64_     WEIGHT _233_

RESP. _16_

BP 130/64.

Flu — feels better
↓ stuffy cy,
no C/P/SOB
pt will ret xx on tun.

P UC — sys culped 2/9/04

Tb · re blode 2/1/05

Dru
(1) S/P Myts
(2) Luitos
(3) Dm
(4) APND
(5) CHF
(6) DOE on Ccy.
(7) renlue

Plan
(1) pt will rettn to
sun ndntf
(2) Cuits + untrug
(3) NPO   b/as A-fix

3/7/05 PE & Dy-stay
Primul contr'd plurix indgnty
Du to cy segus f a-stons

## Quest Diagnostics

Quest on Demand™

QUEST DIAGNOSTICS INCORPORATED

PATIENT INFORMATION
**MACARI, JOHN R**

REPORT STATUS **Final**

DOB: 06/24/1926  Age: 78
GENDER: M

ORDERING PHYSICIAN
**ULLOA, LUIS B**

REPORTED:   02/10/2005    09:23

| Test Name | In Range | Out of Range | Reference Range | Lab |
|---|---|---|---|---|
| CBC (INCLUDES DIFF/PLT) (Continued) | | | | |
| RDW | 14.1 | | 11.0-15.0 % | |
| PLATELET COUNT | 212 | | 140-400 THOUS/MCL | |
| ABSOLUTE NEUTROPHILS | 2292 | | 1500-7800 CELLS/MCL | |
| ABSOLUTE LYMPHOCYTES | 976 | | 850-3900 CELLS/MCL | |
| ABSOLUTE MONOCYTES | 604 | | 200-950 CELLS/MCL | |
| ABSOLUTE EOSINOPHILS | 104 | | 15-500 CELLS/MCL | |
| ABSOLUTE BASOPHILS | 24 | | 0-200 CELLS/MCL | |
| NEUTROPHILS | 57.3 | | %37 | |
| LYMPHOCYTES | 24.4 | | %37 | |
| MONOCYTES | 15.1 | | %37 | |
| EOSINOPHILS | 2.6 | | %37 | |
| BASOPHILS | 0.6 | | %37 | |
| HEMOGLOBIN A1c | 6.2 | | NON-DIABETIC: <6.0% | |

CULTURE, THROAT
    CULTURE

MI

ORDERED TEST:          CULTURE, THROAT

MICRO NUMBER:          05078439
TEST STATUS:           FINAL
SPECIMEN SOURCE:       THROAT
SPECIMEN COMMENTS:     ADEQUATE
RESULT:                GROWTH OF NORMAL OROPHARYNGEAL FLORA

------------------------------------------------------------------

**Performing Laboratory Information:**

MI    QUEST DIAGNOSTICS-MIAMI 10200 COMMERCE PARKWAY MIRAMAR PARK OF COMM MIRAMAR FL  33025
      Laboratory Director: ANTHONY SIMONETTI, MD
QDB   DEERFIELD BEACH (QUEST) 1300 E NEWPORT CENTER          DEERFIELD BEACH FL  33442-7727
      Laboratory Director: ANTHONY SIMONETTI, MD

FAXED
To Dr.
Krez.
2/12/05

DEA # AU1029023                                      FL Reg. # 038283

LUIS S. ULLOA, M.D.
P.B.G. MEDICAL OFFICE BUILDING
3370 BURNS ROAD • SUITE 105
PALM BEACH GARDEN, FL 33410
627-7760
OFFICE HOURS BY APPOINTMENT

NAME  Mzeoni, John

ADDRESS_____ DATE 4/26/05

℞  (Please Print)

To whom it may concern:

This is to certify that

Mr John Mzeoni has been

treated for D.M. at least

since 1/20/97.

☐ LABEL

REFILL _____ TIMES    PRN    NR                    M.D

TO INSURE BRAND NAME DISPENSING, PRESCRIBER MUST WRITE "MEDICALLY NECESSARY"
ON THE PRESCRIPTION.

E5-NOV-03                          TRI031189_100101287-17_01_38683_0024