UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 02-14084-MARRA/LYNCH

UNITED STATES OF AMERICA

v.

JOHN R. MACARI,

Defendant.
_____/

GOVERNMENT'S MOTION IN AID OF SENTENCING AND
RESPONSE TO DEFENDANT'S MOTION IN AID OF SENTENCING

THE UNITED STATES OF AMERICA, through the undersigned Assistant United States

Attorney, submits its Motion In Aid Of Sentencing And Response To Defendant's Motion In Aid

Of Sentencing and states as follows:

I.    INTRODUCTION

Defendant Macari pled guilty on February 28, 2003, to a one-count information charging him

with mail fraud in violation of Title 18, United States Code, Section §1341. He tendered that plea

pursuant to a previously-executed agreement with the United States Attorney's Office (USAO) in

which he not only agreed to that plea but also to cooperate with the USAO in its continuing

investigation into related criminal activities by, among others, George Manter.[1] In consideration of

the defendant's waiver of indictment and his willingness to assist the USAO in that manner, the

_____

[1] See Appendix A hereto. A summary of the criminal scheme devised and executed by
Macari, Manter, and others, to which the defendant stipulated as accurate at his change of plea
hearing, is set forth in Paragraph 11 of the defendant's plea agreement.



USAO refrained from filing any additional possible charges against Mr. Macari stemming from relevant conduct.  The parties further stipulated to restitution.

After accepting defendant Macari's guilty plea, Judge Paine set the sentencing hearing to occur in June 2003.  At the request of both the USAO and the defense, however, that date was continued to later in 2003.  Thereafter, again upon the joint request of both parties, Macari's sentencing date was delayed on at least two other occasions to allow the defendant additional time in which to cooperate with the USAO in its continuing investigation and also due to conflicts in both counsel's schedules.  The defendant is currently scheduled for sentencing at 1:00 p.m. on May 26, 2005, before this Court in Fort Lauderdale, Florida.[2]

## II.   DEFENDANT'S COOPERATION

### A.   Norwegian Criminal Investigation

In the course of the investigation of the illegal activities of defendant Macari, the undersigned AUSA and his case agents became aware of a criminal investigation by Norwegian authorities into Christian Mohr.  Defendant Macari agreed to meet with Norwegian law enforcement representatives concerning that investigation.  That fact was made known to the proper authorities in Copenhagen, Denmark, who expressed interest in interviewing Mr. Macari.  Thereafter, on December 16, 2003, defendant, accompanied by his attorney, met with and was interviewed by Arnt Angell, Chief Public Prosecutor of ØKOKRIM, the Norwegian National Authority for Investigation and Prosecution of Economic and Environmental Crime, and Mr. Angell's investigators.  On February 11, 2004, Mr. Angell sent a letter to the undersigned in which he stated, without elaboration, that Mr. Macari's

---

[2] Judge Paine recused himself from this case in January 2005.  Thereafter, the case was re-assigned to United States District Judge Kenneth Marra.

"...answers to the questions he was given did assist us in our case."[3]

## B.     Continuing Investigation Of George Manter And Others

As is set forth in the government's proffer underlying defendant Macari's guilty plea, George Manter played an equally significant role in the fraudulent scheme. In short, while Macari was the one who supposedly had control of billions of dollars in Treasury bills (T-bills) that, for a fee, were available for use as collateral in various types of transactions, it was Manter who marketed the scheme and brought investors to the table. Through several contacts, including Donald Raymond, Steven Martinez, and Leonard Bestgen, Manter spread the word that the T-bills could be used, among other ways, as collateral to establish a line of credit with a lending institution, the proceeds of which line of credit could then be used by to invest in something known as a "high yield trading program" or "high yield investment program." Manter was, by any standards, quite successful in his efforts which produced investor funds well in excess of $2 million. Defendant Macari has acknowledged receiving in excess of $900,000 of that amount from Manter.

In furtherance to the condition of his plea agreement that he cooperate with the USAO, Macari has submitted to numerous interviews by the FBI and others by both the FBI and the undersigned AUSA. In addition, he has testified on three separate occasions before the Federal Grand Jury sitting in Fort Pierce, Florida. That Grand Jury has also heard from numerous other witnesses who had direct knowledge of the criminal activities of both defendant Macari and Manter.

Generally speaking, although not without exception, the testimony and information provided by Macari in both of the above-described contexts was consistent with the information that was

_____

[3] See Appendix B.

3

obtained from other witnesses. After analysis of Macari's information and after consideration of all negative factors attendant to using him as a witness at any trial of George Manter, the undersigned concluded that, while Macari's conviction and cooperation agreement certainly present *Brady*[4] and *Giglio* issues if he is used as a government witness, those concerns were outweighed by the value of the direct testimony that he could offer at trial concerning George Manter's illegal activities.

## III.    Evidence That Macari Is Engaging In New Criminal Conduct

It was with the foregoing in mind that the undersigned, along with his case agent and forensic analyst, began the final review of the evidence in this case towards the objective of making charging decisions concerning George Manter. As set forth below, however, over the past several weeks, the United States Customs Service has learned of certain information involving the activities of defendant Macari that strongly suggest not only that he is again engaging in criminal behavior but that the new criminal activities are strikingly similar to those at the heart of this case. In summary, the new information concerning Macari is as follows.

Special Agent Matthew Duff, United States Customs Service has obtained information from multiple sources revealing that Macari has again become involved in fraudulent transactions, similar to the fraudulent scheme in the instant case, in which he induces victims to invest with him based on his false claim of ownership and control of large denominations of United States Treasury Bills (T-bills). Some of those sources have worked directly with Macari in developing and attempting to complete these transactions and therefore have provided direct evidence against Macari to Agent

---

[4] The undersigned AUSA and his case agent became aware in early 2005 of certain other information pertaining to bank transactions by Macari that appeared to constitute check kiting. That matter is under investigation by the FBI but, while the transactions in questions are certainly questionable and unusual, we have not yet concluded whether any criminal activity is involved.

Duff. That information, along with the supporting documentation reflect that, since November 2004, Macari has engaged in seven distinct transactions in which he induced, or attempted to induce, payments by an intended victim based on Macari's false claim of T-bill ownership. Those seven transactions are further described as follows:

1.      In November 2004 Macari, working through Century Capital, S.A., Macari's corporation, attempted to facilitate a transaction between Century and TSC Tri-Star Oil Corporation, a United Kingdom company.  Macari, through Century, represented that he had ownership/control over T-bill/CUSIP No. 912810DW5,[5] with a value of approximately $1,850,250,000, and that for an unspecified fee paid to Century he would assign that T-bill to TSC Tri-Star.

2.      In November 2004, Macari attempted to facilitate a transaction between Century Capital and Jewel Finance Netherlands, a Dutch corporation. Macari, through Century, represented to Jewel that he owned T-bill/CUSIP No. 912810EW4 with a value of approximately $1,290,500,000 and that for a fee of $130,000, Macari would assign that T-bill to Jewel.  Murray Stark, the Jewel representative with whom Macari was dealing, paid Macari $130,000 in or about November 2004 pursuant to the terms of the agreement with Macari; however, Macari and Century Capital failed to perform in accordance with the contract, that is, failed to deliver or assign the T-bill.  Jewel Finance has filed a civil lawsuit against Macari and Century.

---

[5] This CUSIP number is the same as one of the CUSIP numbers used as part of the fraud in the charge to which defendant pled guilty in the instant case. See Appendix A, page 8.

3.      In January 2005, Macari attempted, through Century Capital, to facilitate a transaction between Century and American Suisse Capital S.A., located in Miami, Florida, and Panama City, Central America.  The person with whom Macari dealt at American Suisse was Nelson Balbona.  Pursuant to negotiations between Macari and Balbona, American Suisse was to pay Macari $500,000 by January 22, 2005, to be followed by a second payment of $58,500,000 on February 4, 2005, as a fee for Macari's assignment to American Suisse of T-bill/CUSIP No. 912810W5, worth approximately $1,882,400,000.

4.      In February 2005, Macari, working through Century Capital, attempted to facilitate a transaction between Century and Mauricio von Luxburg of Financiera Astral located in Spain.  Pursuant to the terms of the negotiated agreement, Astral was to wire transfer $2,500,000 to a domestic bank account on February 25, 2005, where the funds were to be held in escrow pending assignment by Macari to Astral of T-bill/CUSIP No. 912810DF2 with a value of $1,475,500,000.

5.      In March 2005, Macari, working through Century Capital, negotiated an agreement with Gotteron Village S.A., a Swiss corporation, pursuant to which Gotteron was to wire $5,000,000 to a U.S. domestic bank to be held in escrow for Macari.  Once that occurred Macari was to send certain documents relating to the transaction to Michael Taylor of B&T Corporate Managers, a Bahamian corporation. Once executed those documents purported to assign T-bills/CUSIP No.s 912810EV6

6

and 912810DW5,[6] worth approximately $3,142,600,000 as follows:

| | | |
|---|---|---|
| La Caixa, Madrid | $ | 500,000,000 |
| Caja de Madrid Bolsa | $ | 75,000,000 |
| Banco Popular Spain | $ | 14,000,000 |

In return for the foregoing, Gottern Village S.A. was to make the following payments to Macari and Century:

| | | |
|---|---|---|
| 9/30/2005 | $ | 37,500,000 |
| 3/31/2006 | $ | 75,000,000 |
| 9/30/2006 | $ | 112,500,000 |
| 3/31/2007 | $ | 150,000,000 |

6.      In May 2005, Macari, through Century, attempted to facilitate a transaction between Century and Tradex Handel and Beatings A.G., a South African company.  Pursuant to the agreement negotiated by Macari with Tradex, Tradex was to wire $100,000 to a domestic U.S. bank to be held in escrow for Macari.  In return, Macari agreed to assign T-bill/CUSIP No. 912810DF2 (same T-bill Macari pledged to Mauricio von Luxburg of Financiera Astral in February 2005) to Tradex.

7.      In May 2005, Macari, through Century, attempted to facilitate a transaction between Century and Global Reserve Ltd. Trust, a New Zealand corporation.  Pursuant to an agreement with Macari, Global was to wire transfer

---

[6] This is the second use by the defendant in his current fraudulent activities of this CUSIP number which is the same as one of the CUSIP numbers used as part of the fraud in the charge to which defendant pled guilty in the instant case. See Note 6, *supra*, and Appendix A, page 8.

$500,000 to a U.S. bank to be held in escrow for Macari. In exchange Macari was to prepare and execute documents to be executed by Michael Taylor of B&T Corporate Managers in the Bahamas for the transfer to Global of T-bill/CUSIP No. 912810EM6 worth approximately $1,035,300,000.

Agent Duff has submitted all of the foregoing CUSIP numbers to a representative of the United States Treasury, Bureau of Public Debt. According to that office, there is no record that Century Capital or John Macari now owns, or ever in the past has owned, any U.S. Treasury issued securities. That finding is consistent with both the findings of the case agents in the instant case as well as the admission of defendant Macari as part of his plea colloquy that he never owned or had any legal right of control over any of the T-bills that were used in the instant case to defraud investors.

In addition to the foregoing, the FBI has learned that, in early 2004, Macari had several conversations and at least one meeting with one Joseph Sevitski of Santa Barbara, California. Mr. Sevitski is the sole owner of a company called Technology Application Specialists (TAS) and a co-owner of a company called Reality Media, Inc. (RMI). Mr. Sevitski and his business associates were at that time seeking capital for research and development in the use of stereoscopics in the 3-D entertainment film industry. According to Sevitski, he met with Macari at the Kennedy International Airport in New York at which time Macari represented that he owned and/or controlled U.S. Treasury Bills (T-bills) that, for a fee, he would make available to Sevitski and his companies to use as collateral for a loan from a bank. In exchange for providing the T-bills to Sevitski for that purpose, Macari was to receive an up-front fee of $150,000.

8

According to Sevitski, he initially delivered to Macari a "good faith" check drawn on his RMI account in the amount of $150,000 with the understanding that Macari would not negotiate that check until after Sevitski received the proceeds of the loan using the T-bills provided by Macari as collateral. Macari never produced the T-bills that he promised; however, according to Sevitski, and confirmed by review of his bank records and those relating to Macari's bank accounts, Macari deposited the $150,000 check in his account at Bank One in Houston, Texas, and began drawing funds against that amount.[7]

## IV.    DISCUSSION

In each of the above-described transactions, the defendant was claiming ownership and/or control of United States Treasury Bills, exactly as he did in the instant case. As is reflected in the factual portion of the plea agreement between Mr. Macari and the United States Attorney's Office, the crux of the scheme to which he pled guilty and for which he now stands before this Court for sentencing, was the false and fraudulent representation to investors that Macari and/or George Manter and/or John and Jeanmarie Juncal owned and controlled literally billions of dollars in T-bills which securities, for a fee, were available to investors to use as collateral for a line of credit from a financial institution, the proceeds of which would be placed into a so-called "high yield trading program" or "high yield investment program." Each investor was promised extraordinary returns

---

[7]  Shortly thereafter, Bank One notified Macari that the $150,000 check from RMI had been returned for insufficient funds. As the result, Macari was overdrawn on that account in the amount of $22,000. A few days later, Sevitski wrote a second check to Macari, this one in the amount of $49,215 drawn on Sevitski's TAS account and dated March 24, 2004. Macari deposited that check into his account at Harbor Federal in Stuart, Florida, and thereafter induced Harbor Federal to wire transfer $22,000 of those funds to Macari's account at Bank One, apparently to satisfy his overdrafts on that account. The TAS check was also returned for insufficient funds; thus Harbor Federal lost $22,000.

9

on this investment, e.g., 8-10% week. Not a single investor ever received even a dime of the promised return. Indeed, as defendant Macari has admitted both to this Court and to the government prosecutor and agents, the entire scheme was a fraud from the beginning and Mr. Macari well knew that. Similarly, Agent Duff's investigation has shown that the single investor whom it has been confirmed invested with Macari received nothing for his $130,000 and Macari has thus far refused that investor's demands for the return of those funds.

The striking thing about the new evidence of defendant Macari's criminal behavior is the continued prominent role of United States securities, or his ownership or control thereof, as a prop to induce investor confidence and payment. Given not only the existence or continuing fraudulent behavior by defendant Macari and the resemblance of that behavior to that which underlies the case for which he is now to be sentenced, the question with which this Court is now faced is what, if any, effect should that have on the Court's conclusions concerning the factors enumerated in Title 18, United States Code, Section 3553(a), that this Court must now consider in determining the appropriate sentence for Mr. Macari. Certain of those factors are particularly relevant to the issues now presented to this Court. They are as follows:

> (1)     the nature and circumstances of the offense and the history and characteristics of the defendant;

and

> (2)     the need for the sentence imposed--
>
>> (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

10

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational

training, medical care, or other correctional treatment in the most effective

manner[.]

Without any reservation, the undersigned believed at the time of defendant Macari's guilty

plea in this case that he was sincere about cooperating with this office and with its client agencies

in the investigation of criminal activities.  We also were of the belief that the defendant, having been

given the opportunity to admit to and accept responsibility for his prior criminal activities, and given

the fact of oversight by Pretrial Services and U. S. Probation in the performance of those agencies'

respective duties in this case, that the defendant would refrain from additional criminal activities.

During the course of debriefing the defendant, the case agents and this prosecutor told Mr. Macari

on numerous occasions that if he engaged in any additional criminal acts he would eliminate virtually

any value that his cooperation might have in the prosecution of other criminal defendants.  He was

also told of the fact that such behavior would constitute a violation of the terms of his release on

bond pending sentencing.  After each admonition, the defendant stated that he understood, that his

attorney had told him the exact same thing, and that he would do nothing that could compromise his

status as a government witness or that would violate his bond.

Yet, that is exactly what has happened.  In light thereof, the government has concluded that

it will not use the defendant as a witness in the trial of George Manter, as originally intended.  While

we acknowledge that Macari's grand jury testimony was helpful to the investigation, that assistance

11

becomes much like one hand clapping given that testimony as a government witness, the other hand so to speak, is now not a realistic option given the defendant's continued criminal behavior. The government, therefore, will not be filing a Substantial Assistance Motion under USSG §5K1.1[8]

To be sure, the defendant's efforts to cooperate could have been viewed, in the absence of additional criminal conduct, as respect for the law and as evidence that the defendant was no longer a threat to the unsuspecting public. Given that he has engaged in such conduct renders unreasonable any conclusion other than that this Court must, in order to comply with Section 3553(a) and the advisory sentencing guidelines, now impose a longer sentence that it would have otherwise.

## V.  GOVERNMENT'S SENTENCING RECOMMENDATION

The Advisory Guideline range for Mr. Macari, based on an offense level of 17 and a criminal history category of I, is 24 to 30 months. That range was determined based in part upon a three-level reduction for acceptance of responsibility under USSG §3E1.1(a) and (b). The defendant's plea agreement expressly conditions the defendant's receipt of the third of three offense levels on his refraining from committing any misconduct after entering into the plea agreement, including "committing a state or federal offense, violating any term of release, or making false statements or misrepresentations to any governmental entity or official."

Given the defendant's failure to comply with the foregoing condition, the United States will

---

[8] The reality, of course, is that George Manter will defend the case against him by pointing the finger of blame at John Macari, in other words, by attempting to paint himself as but another victim of the latter's skilled and calculatedly fraudulent actions. Based on the nature of Manter's defense, we acknowledge the possibility that it may become necessary for the government to call Macari as a rebuttal witness. If that happens, and if defendant Macari testifies truthfully, the undersigned will ensure that the Court is made aware of same in the form of a motion under FRCP 35(b).

12

not file a motion under Section 3E1.1(b) for defendant Macari to receive the third of the three levels of reduction for acceptance. Thus, the defendant's corrected advisory offense level is 18 and his advisory guideline range is 27 to 33 months.

In his instant motion, the defendant has called to the Court's attention the fact that, in the plea agreement, the parties did not contemplate any upward adjustment for more than minimal planning pursuant to USSG §2F1.1(b)(2). Thus, even though the parties both acknowledged that its Guidelines determinations and recommendations were not binding on the Probation Office or the Court, he demands, on the basis of the plea agreement but without contesting the factual appropriateness of the upward adjustment, that the Court remove such upward adjustment from the Guidelines computation.

Having thus relied on the plea agreement as a shield, defendant next attempts to avoid one of its conditions. He acknowledges that he agreed in that same document to refrain from seeking upward or downward departures from this Court; but then, citing the fig leaf of *Booker,*[9] he attempts to do exactly that:

> [T]he Court is now saddled with authority to consider factors previously couched in terms of "downward departures," in structuring a "reasonable sentence, as is now within the Court's purview." (citation omitted). Probation did not recommend downward departures on the basis of Defendant's age or health, nor his extraordinary acceptance of responsibility. However, it is respectfully urged that the Court consider these factors when exercising its discretion in structuring its sentence herein.

[Motion, page 3]. The defendant continues, arguing that his age, health, and "extraordinary acceptance of responsibility" form a sufficient basis for this Court to exercise its discretion and impose a probationary sentence.

---

[9] *United States v. Booker*, 125 S.Ct. 738 (2005).

In light of the defendant's continuing to engage in violations of the law, any basis for arguing that the foregoing request of the defendant is reasonable simply and completely evaporates.  The defendant's behavior suggests a complete lack of respect for this Court's authority in allowing him to remain on bond pending the resolution of this case and a complete inability to conform his behavior to societal norms.  A probationary sentence, indeed, we submit, any sentence below the advisory guideline range in this case, would simply not meet the requirements of Section 3553.

Therefore, given full consideration of all relevant matters as set forth in this pleading, in the defendant's motion, and in the Presentence Report, the United States recommends that the defendant be sentenced to prison for a period of thirty months.  We further request, pursuant to the terms of the plea agreement, that this Court enter a restitution order in the amount of $1,600,000 setting forth that the defendant shall be held jointly and severally liable for that amount along with George Manter.

Respectfully submitted,

MARCOS DANIEL JIMENEZ
UNITED STATES ATTORNEY


By: _____
James G. McAdams, III
Assistant United States Attorney
Florida Bar No. 0328839
1111 South Federal Highway, Suite 314
Stuart, FL  34994
Telephone:     772-219-6944
Facsimile:     772-219-3955

14

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was mailed and faxed this _23rd_ day of May, 2005, to:

Richard Lubin, Esq.
Second Floor, Flagler Plaza
1217 South Flagler Drive
West Palm Beach, Florida 33401
**FAX:  561-655-2182**

James G. McAdams, III
Assistant United States Attorney

15

# APPENDIX A

## AGREEMENT TO WAIVE INDICTMENT
## AND TO PLEAD GUILTY TO INFORMATION

The United States Attorney's Office (USAO) for the Southern District of Florida, through

the undersigned Assistant United States Attorney, and JOHN MACARI (hereinafter referenced as

"Macari" or "the defendant"), with full advice and counsel of his undersigned attorney, enter into

the following agreement:

1.      The defendant agrees to waive his right to be charged by an indictment returned by

the grand jury and agrees to be charged by way of information filed by the United States Attorney.

The defendant further agrees to plead guilty to a one-count Information charging him with wire fraud

in violation of 18 U.S.C. §§ 1343 and 2.

2.      The defendant is aware that the sentence will be imposed in conformity with the

Federal Sentencing Guidelines and Policy Statements (hereinafter "Sentencing Guidelines" or

"Guidelines"), and that the applicable guidelines will be determined by the court relying in part on

the results of a Pre-Sentence Investigation (PSI) by the court's probation office, which investigation

will commence after the guilty plea has been entered. The defendant is also aware that, under certain

circumstances, the court may depart from the applicable guideline range and impose a sentence that

is either more severe or less severe than the guidelines range. The defendant is further aware that

the Sentencing Guidelines do not provide for or permit parole. Knowing these facts, the defendant

understands and acknowledges that the court has the authority to impose any sentence within and

up to the statutory maximum authorized by law for the offense identified in paragraph 1 and that the

defendant may not withdraw his guilty plea solely as a result of the sentence imposed.

3.      The defendant also understands and acknowledges that the statutory maximum term

of imprisonment upon conviction of a violation of 18 USC §1343 is five (5) years of imprisonment, followed by a period of supervised release not to exceed three years, and that the court may impose a maximum fine of $250,000.

4.     The defendant further understands and acknowledges that, in addition to any sentence imposed under paragraph 3 of this agreement, the Court must also order that a special assessment in the amount of $100 be imposed on the defendant.  The defendant agrees that he will pay that special assessment at the time of sentencing.

5.     The defendant agrees that he will cooperate fully with the United States Attorney's Office for the Southern District of Florida ("USAO") by providing truthful information and testimony if called upon by the USAO to testify in a grand jury proceeding or trial.   The USAO reserves the right to evaluate the nature and extent of the defendant's cooperation and to make the defendant's cooperation, or lack thereof, known to the court at the time of sentencing.  In addition, if in the sole judgment of the USAO the defendant's cooperation is of such significance to the investigation and prosecution of this and other criminal matters so as to warrant the court's departure from the sentence required by the guidelines and/or the statute, the USAO may make a motion pursuant to Section 5K1.1 of the Sentencing Guidelines reflecting that the defendant has provided substantial assistance.  The defendant acknowledges and agrees, however, that nothing in this Agreement may be construed to require the USAO to file such a motion.

6.     The USAO reserves the right to inform the court and the probation office of all facts pertinent to the sentencing process, including all relevant information concerning the offenses committed, whether charged or not, as well as concerning the defendant and the defendant's background.  Subject only to the express terms contained in this agreement, the USAO further

reserves its right to make any recommendation to the Court as to the quality and quantity of punishment.

7.      The USAO acknowledges that defendant Macari has provided timely notice of his intent to plead guilty, thereby obviating the necessity to prepare for trial. Subject to the requirement that the defendant clearly demonstrate to the U. S. Probation Office his acceptance of responsibility for his participation in his offense, and contingent upon defendant's full compliance with the terms and conditions of this agreement, the USAO agrees to recommend that defendant Macari be accorded a decrease of two offense levels pursuant to USSG §3E1.1(a) and, if eligible, an additional one level decrease pursuant to USSG §3E1.1(b). The defendant understands, however, that such recommendation is not binding on the probation office or the court. The defendant further acknowledges that the United States will not be required to make this sentencing recommendation if the defendant: (1) fails or refuses to make full, accurate, and complete disclosure to this Office and the probation office of all of the circumstances surrounding the relevant offense conduct and the defendant's present financial condition; or (2) commits any misconduct after entering into this plea agreement, including but not limited to committing a state or federal offense, violating any term of release, or making false statements or misrepresentations to any governmental entity or official.

8.      The defendant acknowledges his understanding and agreement that, if for any reason he fails to comply with the any of the provisions of this agreement, he will thereby waive any protection afforded by Section 1B1.8(a) of the Sentencing Guidelines as well as any protection afforded by Rule 11(e)(6) of the Federal Rules of Criminal Procedure. In that event, the defendant understands and agrees that any statements made by the him under this agreement or as part of any plea discussions or as part of any attempted or actual cooperation with the USAO will be fully

admissible against him in any civil or criminal proceedings, notwithstanding any prior agreement with the USAO.

9.      The defendant is aware that the sentence has not yet been determined by the court. The defendant also is aware that any estimate of the probable sentencing range or sentence that the defendant may receive, whether that estimate comes from the defendant's attorneys, the USAO, or the probation office, is a prediction, not a promise, and is not binding on the USAO, the probation office, or the court.  The defendant understands further that any recommendation that the USAO makes to the court as to sentencing, whether pursuant to this agreement or otherwise, is not binding on the court and that the court may disregard the recommendation in its entirety.  The defendant understands and agrees, as previously acknowledged in paragraph 2 above, that the defendant may not withdraw his plea based upon the court's decision not to accept a sentencing recommendation made by the defendant and/or the USAO, or due to the defendant's dissatisfaction with the sentence ultimately imposed by the Court.

10.      The defendant is aware that Title 18, United States Code, Section 3742 affords him the right to appeal the sentence imposed in this case.  Acknowledging this, in exchange for the undertakings made by the United States in this plea agreement, the defendant hereby waives all rights conferred by Title 18, United States Code, Section 3742 to appeal any sentence imposed, including any restitution order, or to appeal the manner in which that sentence was determined, unless (1) the sentence exceeds the maximum permitted by statute, or (2) the sentence is the result of an upward departure from the guideline range the court establishes at sentencing.  The defendant further understands that nothing in this agreement shall affect the USAO's right and/or duty to appeal as set forth in 18 U.S.C. § 3742(b).  If the United States appeals the defendant's sentence pursuant to

Section 3742(b), the defendant shall be released from the above waiver of appellate rights.

11.     The USAO and the defendant stipulate to the following facts concerning the scheme and artifice devised and/or executed in the Southern District of Florida, and elsewhere, by the defendant and others with the intent to defraud and to obtain money or property by means of false or fraudulent pretenses, representations, or promises:

In 1998 and 1999, defendant Macari, George Manter, and other persons more fully identified below, collaborated to defraud several individuals of moneys and fees paid by those victims to Manter and Macari for placement in a so-called high-yield investment program. As part of the scheme, Manter and Macari represented to the investors that Macari was the owner, or otherwise had exclusive control, of United States Treasury Bills (T-bills) with a face value that varied from $100 million to over $1 billion. According to the scheme, Macari, in exchange for a fee paid by the investor, would execute an assignment of T-bills to the investor, which T-bills would serve as collateral to protect the principle invested by those wishing to participate in the high-yield investment program.

In another permutation of the scheme, Macari would agree that, for a fee, he would, in essence, "lease" T-bills to a person seeking a large commercial loan, but who lacked the requisite collateral for that loan. According to the scheme, and as represented by Macari, those T-bills would serve as collateral for a letter of credit that could then be used to obtain a loan from a bank.

As proof of Macari's ownership of these T-bills, Macari provided, inter alia, (1) an alleged assignment of the T-bills from Dr. John and Dr. Jeanmarie Juncal to Century Capital (Marcari's corporation); (2) an attestation by at least one attorney of the authenticity of the CUSIP numbers assigned to the T-bills and of the lack of public record as to any liens or encumbrances on those T-bills; and (3) safe keeping receipts (SKRs) from an Italian investment company reflecting the existence and authenticity of the T-bills in question. In certain instances, he also told investors that Deutsche Bank would endorse the SKRs.

The Cusip numbers that were provided to the victims were, in fact, valid CUSIP numbers for existing Treasury Bills. Moreover, Macari and Manter advised several persons that these CUSIP numbers could be verified by checking with the Bloomberg web site on the Internet. What they did not explain, however, was that the information on the Bloomberg page confirmed only the existence, but not the ownership, of a particular T-Bill

The evidence shows that the T-bills and CUSIP numbers that form the basis of the fraud in this case were referenced as collateral in various fraudulent transactions initiated in the mid 1990's by Dr. John and Dr. Jeanmarie Juncal. In the late 1990's, the Juncals and defendant Macari were introduced to each other by Edward Price. Price was the owner of Price Capital, Inc., located just outside of Atlanta, Georgia, and had become involved with the Juncals in the effort to market the use of T-bills that the Juncals allegedly owned or controlled as collateral for loans.

After his introduction to the Juncals, Macari claimed to various investors in this case that he purchased T-bills from the Juncals with a total face value in the hundreds of millions of dollars. Initially, Macari would offer these T-bills, for a fee, for use by the investors as collateral to be leveraged in one manner or another for funding of commercial loans. One method suggested by Macari was the pledging of the T-bills in exchange for a letter of credit (LOC), which LOC could then be used to obtain funding from a bank. However, because there was no proof of Macari's ownership/control of the T-bills, and therefore none that could be used by the victims to leverage a loan as promoted by Macari, Macari's and Manter's "clients" were unable to obtain the loans that they sought.

Expert testimony would reveal that, virtually without exception, proof of ownership of a T-bill would be reflected in an account statement for the bank or financial institution account where that T-bill is being held. Such account statement would reflect the face amount of the T-bill, the date issued, the maturity date, the CUSIP number, and, of course, the identity of the owner(s) of the account. Macari could not show such an account statement, however, for the simple reason that he never owned or otherwise had control of these T-bills.

To overcome that hurdle, Macari initially attempted to convince his investors of his ownership/control of the T-bills by providing the investors with "safe keeping receipts" (SKRs) purportedly issued by an escrow agent. These SKRs were not issued by any bank or other reputable and easily contacted business entity. Rather, the primary purported "escrow agent" and issuer of SKRs that Macari used was Milton Brothers, Ltd. (MBL) of Rome, Italy. The FBI's investigation has revealed that MBL is well-known to law enforcement in Italy as being engaged in various fraudulent financial activities. That investigation has also revealed that, in November 1999, MBL filed an application with the Department of Treasury, Bureau of Public Debt (BOPD), in which MBL claimed to be the lawful owners of certain T-bills that it had received from JAMAR Enterprises (JAMAR), Macari's corporation.

Included with that application was documentation signed by John Macari averring ownership of those same T-Bills by JAMAR and purporting to transfer them to MBL. Also included with that application was a sworn affidavit by an attorney,

William E. Corley, of Stuart, Florida, in which he certified that the T-bills that were the subject of MBL's application had previously been owned by Red Rock Dragon (RRD - a company owned by the Juncals), that RRD had assigned those T-bills to Price Capital Corporation (PCC - owned by Edward Price, a Macari business associate), and that PCC had assigned those T-bills to JAMAR. The BOPD rejected that application due to its awareness of allegedly fraudulent activities in which John Macari had previously engaged.

Those investors who attempted due diligence of Macari and the financing that he proposed, quickly encountered the ownership/control hurdle. Like anyone with access to a computer, those persons, or their legal counsel, were able to confirm the existence of those T-bills and CUSIP numbers through the Bloomberg web page; however, they were unable to confirm ownership or possession of the underlying T-bills. Most were nevertheless convinced of Macari's bona fides upon receipt of the SKR's.

In an effort to enhance the indicia of his ownership of the T-bills that were at the heart of his fraudulent scheme, Macari, in early 2000, opened a Treasury Direct account with the Treasury Department's BOPD in the name of Century Capital, Inc., one of his corporations. He then attempted to transfer several T-bills into that account by preparing and executing a U.S. Treasury Form PDF5179 that purported to transfer the T-bills from the Juncals to Century Capital, Inc. The defendant forged the signature of Dr. Jeanmarie Juncal on that form; however, even if Dr. Juncal had executed the form herself, such document could not have served as the basis for a transfer of the T-bills into Macari's account at BOPD inasmuch as the Juncals had no proof of ownership of those instruments.

As a jurisdictional matter, the government's evidence, in the form of official government records and testimony of James Kramer-Wilt, General Counsel of the Bureau of Public Debt, shows that the previously-described scheme to defraud was executed through various methods of communication by Macari and Manter, between themselves, and with the victims. One such method of communication was the use, either by or caused by Macari and/or Manter, of the telephone lines for voice and facsimile communications. In addition, on or about April 6, 2000, Macari mailed, or caused to be mailed, from Palm City, Florida, to the Federal Reserve Bank in Jacksonville, Florida, an application for a Treasury Direct Account in the name of Red Rock Dragons. Finally, in or about December 1999, the defendant caused to be mailed by a private interstate courier, from Rome, Italy, to Washington, D.C., USA, an application for a Treasury Direct Account in the name of Milton Brothers, Ltd.

In or about September 1999, defendant Macari and George Manter discussed a joint venture between JAMAR Enterprises, Inc., Macari's corporation, and International Banque Holding Corp., Manter's corporation, to induce participation

of various persons in a high yield investment program sponsored by Manter. According to the plan, defendant Macari would provide collateral in the form of T-bills for the investors' funds placed into a bank debenture trading program. According to Macari, the T-bills were being held by Milton Brothers, Ltd., an Italian corporation, which company had issued safe keeping receipts (SKRs) reflecting that Milton Brothers was holding the T-bills. Defendant Macari also represented that, for $50,000, he arranged for Milton Brothers to obtain endorsements of those SKRs from Deutsche Bank. Macari never produced such documents, however. On September 7, 1999, Macari and Manter executed an agreement for the sharing the proceeds of the joint venture. That agreement specified, among other things, as follows:

(i)     that Manter had contacts who were "capable of performing high yield investments;"

(ii)    that Macari had United States Treasury Bond CUSIP Nos. 912810DW5(B), 912810DW5(E), 912827X49(F), and 912827X49(G), each with a face value of $100,000,000 and "capable of collateralizing high yield investments;"

(iii)   that Macari would obtain "Safekeeping Receipts" and "Reserve T-bond letter from Milton Brothers, Ltd., and a Deutsche Bank confirmation

As the result of the efforts of Manter and Macari, several victims wrote checks or otherwise transferred funds to Manter's account at Planter's National Bank for placement in Macari's investment program. The total amount of those payments by the victims was $2,800,000. In turn, Manter transferred a portion of those funds to Macari, that is, $910,000, purportedly to obtain use of the T-bills as collateral for investor funds. At no time did Macari provide T-bills or any other legitimate or verifiable collateral for those investors' funds. Nor did Macari or Manter ever place any of these investors' funds into an investment program. None of these investors ever received any proceeds whatsoever from any so-called high yield investment program.

To date, a total of $1,200,000.00 of the victim's payments to Manter have been refunded to the victims. Thus, the net loss to the victims is $1,600,000.

As further evidence of defendant Macari's criminal intent in the instant offense, the USAO would offer evidence, pursuant to Federal Rule of Evidence 404(b) that, as early as 1997, Macari offered another William Cornell the use of these same T-bills as collateral for a high yield investment program. Cornell had previously been seeking funding through a Norwegian businessman named Christian Mohr and, in correspondence from Mohr had noted the reference to Macari at a U.S. phone

Page 8 of 11

number. He called that number to inquire of Macari about Mohr and, when Macari learned that Cornell was seeking funding, suggested that Cornell deal directly with him rather than with Mohr. Cornell ultimately chose to do that and agreed to pay Macari several hundred thousand dollars as a fee for the promised use of T-bills. Cornell thereafter paid Macari $90,000 of the amount due for that fee. When Cornell presented the assignment of T-bills that Macari provided to him as collateral for a loan, he was rejected by the various lending institutions with the explanation that proof of ownership of the T-bills, not merely of existence thereof, was required. Although Cornell demanded that Macari return the fee paid to Macari, to date, Macari has refused to do so.

12.     The USAO and the defendant agree that, although not binding on the probation office or the court, they will jointly recommend that the court make the following findings and conclusions as to the sentence to be imposed:

a.     <u>Applicable Guidelines Manual</u>:  The United States Sentencing Commission Guidelines Manual for 2000, *i.e.*, the Guidelines Manual incorporating amendments effective November 1, 2000, governs the defendant's sentencing in this case.

b.     <u>Applicable Guideline</u>.  Pursuant to Section 1B1.2(a) of the Sentencing Guidelines, Section 2B1.1 of the Sentencing Guidelines is the offense guideline applicable to the offenses of conviction.

c.     <u>Base Offense Level</u>. Pursuant to 2F1.1(b)(1)(M), 1B1.2(a), and 1B1.3 of the Sentencing Guidelines, the defendant's offense level is eighteen (18) based on a net loss to the victims in this case of more than $1,500,000 (but less than $2,500,000).

d.     <u>Adjustments/Departures</u>. Aside from the downward adjustment provided for in paragraph 7 of this Agreement, and except in the event that the USAO files

a motion pursuant to USSG §5K1.1, the parties agree that no upward or downward sentencing departures and no upward or downward sentencing adjustments are warranted in this case.

e.   Overall Adjusted Offense Level.  As a result of the foregoing, and assuming that the defendant meets all of the conditions set forth in paragraph 7, the applicable offense level for the offense committed by the defendant is fifteen (15).

f.   USAO's Recommendation As To Sentence. Assuming the defendant's compliance with each of the terms and conditions set forth herein, the USAO will recommend at sentencing that the defendant be sentenced to the minimum period of time set forth in the applicable Guideline range.  In addition, if the USAO files a motion pursuant to USSG §5K1.1, any downward departure recommended by the USAO as the result of that motion shall be in the form of a specified number of offense levels based upon the significance of defendant's cooperation.  The USAO agrees that it will not seek a fine in this case and will recommend to the Court that any of the defendant's assets that would be available to pay a fine and/or restitution be used first to pay restitution.

13.   The defendant hereby agrees that, based upon the net loss to the victims in this case, he will stipulate to a restitution order to be entered against him and George Manter for the amount of $1,600,000, less any amount not previously credited that the defendant sufficiently demonstrates has already been refunded to the persons whose funds were the source of those funds paid to Manter

funds paid to Manter or Macari. The defendant further acknowledges and agrees that he shall be held jointly and severally liable with Manter for the foregoing amount and that such amount shall be due and payable in accordance with the Court's restitution order entered as to defendant Macari.

14. The USAO agrees that it will endeavor and use best efforts in doing to obtain a global settlement with the United States Attorney's Offices in other federal districts in which the activities occurred relating to the scheme that is the basis for the crime to which he will plead guilty pursuant to this Agreement. The parties understand and agree, however, that the refusal of any such district to enter a global settlement will neither constitute a breach by the USAO of the terms and conditions of this Agreement nor serve as a basis for defendant Macari to withdraw from this Agreement.

15. The USAO agrees to recommend to the Court that, following his initial appearance in this case and pending imposition of sentence, the defendant remain free on a personal surety bond. 16. This is the entire agreement and understanding between the United States and the defendant. There are no other agreements, promises, representations, or understandings.

Date: 7/17/02            By: _____
                              John Macari
                              Defendant

Date: 7/7/02             By: _____
                              Rebekah J. Poston
                              Attorney for Defendant

Page 11 of 12

# APPENDIX   B



# ØKOKRIM
The Norwegian National Authority for Investigation and Prosecution
of Economic and Environmental Crime

US Attorney's Office
505 S.2nd St, Suite 200, Ft. Pierce 34950
Florida USA

Att: Jim McAdams

| Your reference | Our reference | Our date |
|---|---|---|
| | | 11.2.04 |

### Regarding interview of John Macari, West Palm Beach

On December 16 2003 John Macari was interviewed by ØKOKRIM- The Norwegian National Authority for Investigation and Prosecution of Economic and Environmental Crime in connection with a criminal case in Norway. Also present was the attorney for the defendant. The interview took place at the US Attorney's office in West Palm Beach.

Mr Macari had agreed to be interviewed by the prosecution and the defendant.

In our opinion Mr Macari for the most part was helpful during the interview.

His answers to the questions he was given did assist us in our case.

Best Regards

Arnt Angell
Chief Public Prosecutor

RECEIVED

FEB 2004