UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.   02-14084-MARRA/LYNCH

UNITED STATES OF AMERICA,

v.

JOHN MACARI,

              **Defendant.**
_____/

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION BY WAGNER INVESTMENT COMPANY, LLC SEEKING PREFERENCE OVER ALL OTHER VICTIMS FOR RECEIPT OF RESTITUTION IN THIS CASE**

THE UNITED STATES OF AMERICA, through the undersigned Assistant United States Attorney, responds in opposition to the motion and memorandum of law (Docket Entries 61 & 62), in which Wagner Investment Company seeks preferential treatment from this Court relative to all other victims in this case in the receipt of restitution. In support thereof, the government states as follows:

**I.    INTRODUCTION**

    1.    Defendant John Macari pled guilty in this case to one count of wire fraud as charged in an information. He did so pursuant to an agreement with the United States which agreement required that he cooperate with the United States in its continuing investigation in this case and in which he stipulated to having knowingly and intentionally engaged in a fraudulent scheme along with George Manter and others.

    2.    As the result of the fraudulent scheme perpetrated by Macari and Manter, approximately thirty victims thereof suffered net losses totaling $1,911,150. Of that amount, Macari

pocketed approximately $1,00,000.[1]

3.     On September 16, 2005, Macari appeared before this for sentencing in this cause. At that hearing, the United States presented testimony concerning further activities by Macari while awaiting sentencing involving his alleged claim of ownership of some of the same securities that he fraudulently claimed to own or control in this case. Based on that testimony, the United States sought to have this Court impose a sentence at the high end of the advisory United States Sentencing Guidelines range which had been determined by the United States Probation Office to be 18 to 24 months. This Court, while finding that the government had not presented proof by a preponderance of the evidence that Macari had engaged in additional criminal acts, noted that Macari's behavior had "a certain odor" to it suggesting that Macari had been less than honest in his post-conviction business activities. Nevertheless, this Court thereafter imposed a sentence **outside** of the advisory guideline range, that is, nine (9) months in prison, a three year term of supervised release, plus restitution. This Court set a hearing for December 9, 2005, for finalizing issues relating to restitution.

4.     Prior to the sentencing hearing on September 16, 2005, Macari stipulated to the sale of his personal residence and that the proceeds of that sale would be applied towards satisfaction of the restitution order to be entered by this Court at the restitution hearing on December 9, 2005. This Court accepted that stipulation and made the terms and conditions thereof part of its judgment and

---

[1] The gross amount that Macari and his co-conspirator, George Manter, realized as proceeds from the instant fraud was $3,164,950. Of that amount, the government's analysis shows that Manter paid $1,000,712 to Macari and $230,000 to John and Jeanmarie Juncal. The evidence also reveals that Manter refunded a total of $1,253,800 to a total of three investors, one of whom was refunded $990,000 of his $1,000,000 investment.

2

conviction order.

5. According to information obtained from Richard Lubin, Macari's attorney, Macari's residence was recently appraised at $750,000. Mr. Lubin has further advised the undersigned that the insurance carrier for the property has documented a total of $18,000 in damage to the residence from Hurricane Wilma.

6. The principals of Wagner Investment Company, LLC, are brothers Vincent and Joseph Wagner. In 1999, the Wagners invested $500,000 with George Manter based on the advice of Leonard Bestgen, a longtime friend of the Wagners. Bestgen met Manter through an intermediary named Stephen Martinez. Based on information received from Manter concerning a high yield investment program that he and John Macari were offering, Bestgen recommended to the Wagners that they secure a $500,000 placement in that investment program. They did so by wire transferring $500,000 to Manter's corporate account in Florida in December 1999. Contrary to Manter's claims to Bestgen, and numerous others, there was no investment program, high yield or otherwise. Rather, there was a fraudulent scheme involving, among others, George Manter and John Macari. Pursuant to that scheme, Manter and Macari agreed to share the proceeds of the fraud.

7. Wagner Investment Company now seeks not only to obtain restitution that it is due them in the amount of $500,000, something that the Victim Witness Protection Act certainly contemplates, but also to do so ahead of, and if necessary at the exclusion of, the other victims of the fraud in this case. The basis of the Wagners' demand is the fact that the funds transferred by them to Manter ended up in Macari's account, at least temporarily, funds that the Wagners contend Macari used as a down payment on the very house that is now the subject of the restitution proceedings.

3

8.     In the attempt to justify their request, the Wagners offer extensive analysis of the flow of funds from their bank account to that of George Manter's corporation, International Banque Holding Corp. to various accounts held by John Macari. That analysis appears to demonstrate that Macari used $224,280.49 towards the purchase and improvement of the house, funds that he obtained from Manter, which funds Manter had fraudulently obtained from the Wagners and other victims.

## II.   DISCUSSION

The Wagners have asked this Court, in essence, first, to make the list of victims in this case vertical rather than horizontal, and, second, to place them at the top of the vertical list of victims, not only to receive the first of the proceeds from the sale of Macari's residence but also to be fully reimbursed for their losses before any other victims receive restitution. They offer no legal authority or precedent for such request and this writer is aware of none. For that reason, and for those reasons set forth below, the Wagners' motion should be denied and they should be placed in parity with all other victims in this case.

The Victim Witness Protection Act (VWPA), as amended in 1996 by the Mandatory Victims Restitution Act (MVRA), provides a framework that enables victims of specified crimes to receive compensation from those persons convicted of committing those crimes. 18 U.S.C. §§ 3363, 3363A, 3364. The legislative history for the MVRA is quite illustrative of Congress' intent that the rights of all covered victims of a fraud such as the one in the instant case be treated fairly and in a manner consistent with due process requirements. As the Senate Judiciary committee explained:

> This provision [the MVRA] is intended by the committee to clarify that the issuance of a restitution order is an integral part of the sentencing process that is to be governed by the same, but no greater, procedural protections as the rest of the

4

> sentencing process.... the committee believes that this provision fully comports with the requirements of the due process clause of the fifth amendment.... [T]he act...ensures the protection of the victim's right to a fair determination of the restitution owed. *The committee believes this provision will ensure the streamlined administration of justice while at the same time protecting the rights of all individuals.*

s.Rep. No. 104-179, at 20-21 (1996), *reprinted in* 1996 U.S.C.C.A.N. 924, 933-34. (Emphasis added).

As Title 18, United States Code, Section 3664(f)(3)(A) explains,

> [a] restitution order may direct the defendant to make a single, lump-sum payment, partial payments at specified intervals, in-kind payments, or a combination of payments at specified intervals and in-kind payments.

Section 3664(I) also states that -

> [i]f the court finds that more than 1 victim has sustained a loss requiring restitution by a defendant, the court may provide for a different payment schedule for each victim based on the type and amount of each victim's loss and accounting for the economic circumstances of each victim.

Significantly, the MVRA does not specify that any particular type of victim is to be given priority over another victim. A number of courts have noted, however, that the Act gives the Courts the right to require *pro rata* reimbursement of victims or that the MVRA's provisions act to ensure that the victims of crime receive the pro-rata share of restitution funds to which they are entitled. *See, e.g., United States v. Zakhary,* 357 F.3d 186, 191 2d Cir. 2004); *United States v. Catoggio,* 326 F.3d 323, 328 (2d Cir.), *cert. denied,* 540 U.S. 939 (2003)). *See also, United States v. O'Connor,* 321 F.Supp.2d 722, 731 (EDVA 2004).

As the Wagners quite correctly point out to this Court, they are entitled to an order of mandatory restitution against Macari. In that regard, they stand on equal footing with all of the some 30 other victims in this case. Moreover, we agree with them that this Court has the discretion, under

5

Title 18, United States Code, Section 3664(I) to fashion a payment schedule for each individual victim based on the type and amount of each victim's loss while accounting for the economic circumstances of the individual victims. Where the government, on behalf of those other victims, must part ways with the Wagners, however, is the conclusion reached by them that the foregoing language would allow this Court to impose a payment schedule that would restore the Wagners to *status quo ante* while quite literally disenfranchising the remaining victims.

Rather, section 3664(I), we submit, allows the Court, in fashioning an equitable restitution order, to disburse to the victims the restitution amounts received from the defendant based upon relative loss. For example, in the case of a fraud involving three victims, victim one having been defrauded of $50,000, victim two of $30,000, and victim three of $20,000, the Court would be well within its discretion in ordering that each restitution installment payment by the defendant be divided and disbursed among the victims as follows: 50% to victim one, 30% to victim two, and 20% to victim three. Nothing in either that section or in the remainder of the MVRA or VWPA suggests that victim one should be paid his entire loss amount first merely because a portion of his defrauded funds can be traced to the purchase of a particular asset by the defendant.

In this case, the facts attendant to the fraudulent scheme in question reveal that the proceeds of the fraud, which were acquired from the several victims over an extended period of time, were commingled in bank accounts under the control of George Manter and John Macari. Once commingled, those funds were used by the defendants to pay for a variety of personal expenditures, not to obtain placement of the investors in any investment program as promised to the investor/victims by Manter and Macari. Thus, those funds generally were depleted and removed from the Manter and/or Macari accounts reasonably quickly after being deposited there.

6

Specifically as to the $500,000 payment by the Wagners to Manter, the government's analysis reflects that those funds were deposited to George Manter's IBHC account at Union Planters Bank (UPB) on December 23, 1999. Thereafter, two checks from Manter dated September 7, 1999, and made payable to Jamar Enterprises, Inc. (Macari's corporation) in the amount of $400,000 and $100,000, respectively, cleared Macari's account on December 27, 1999. On that same day, United Planters Bank, where Manter had his account in the name of International Banque Holding Corp. issued three bank checks to Jamar in the amounts of $50,000, $50,000 and $400,000, respectively.

During the following seven months, Macari used the proceeds of those checks, among other things, to pay many thousands of dollars in personal debts, to make wire several transfers to Jean Marie Juncal (a co-conspirator), to purchase a $350,000 Certificate of Deposit, and to make a deposit towards the purchase of a house, and to pay attorneys fees and closing costs for the house purchase. He later used that CD as collateral to borrow $75,000, $70,000 of which he used to pay the remainder of the down payment on that house.

On July 14, 2000, Macari redeemed the CD for $309,381.98 (he had already withdrawn $50,000 from the CD in May 2000). Thereafter those proceeds were used to pay for a variety of personal purchases.

In their motion, the Wagners conclude as follows:

> In summary, Wagner's $500,000 can be directly traced to the house through these sources:
>
> a)   $99,263.94 paid to attorney John Avery and used for down payment, closing costs, attorney's fees and equity in purchase of the Macari house
>
> b)   $23,270.00 paid to a cabinet maker for cabinets in the Macari house;

7

  c) $101,746.55 paid to Macari's son, Stephen Macari, allegedly for improvements to the house.

These three sources total $224.280.49.

We do not quarrel with the foregoing figures; however, we, like the Wagners, are without information to either confirm or deny whether the funds paid to Macari's son were related to improvements to the house.

Nevertheless, even ignoring both the legal and equitable reasons why the Wagners' request for preference in restitution should be denied, their financial analysis is also faulty in that it fails to provide this Court with justification for ordering full restitution to them before any other victims receive a dime. Even taking their analysis, as set forth above, as correct, less than half of their investment with Manter was expended by Macari in connection with the purchase of his house.

In short, the Wagners have advanced no basis upon which they should receive any preference in restitution from the proceeds of the sale of Macari's house. Though the Wagners certainly invested more than most of the other victims of the scheme, they, like all of the other investors, did so for the same reason: to obtain what by any standards was a staggering return on the invested principal. That the Wagners were financially capable of sinking a relatively greater principal into the endeavor should not place them at the top of the heap in sharing the restitution ordered in this case.

As a practical matter, based upon the government's investigation into the finances of both Manter and Macari, it is unlikely that there will be substantial restitution paid in this case beyond what is realized from the sale of Macari's residence. The reality of the Wagners' request, if granted, would be that many of the remaining investors would recover very little of their respective losses.

## III. CONCLUSION

From a reading of the foregoing authority and discussion it follows quite easily that the MVRA requires that the Court treat all qualified victims equitably and, while having the discretion to fashion a restitution scheme based upon the individual victims involved, must do so without preference to one victim at the expense of another. Thus, the United States requests that this Court deny the motion of Wagner Investment Company for preference in the receipt of restitution in this case and that the Court impose an equitable and *pro rata* distribution among all of the victims in this case based on loss.

Respectfully submitted,

R ALEXANDER ACOSTA
UNITED STATES ATTORNEY

By: _____
James G. McAdams, III
Assistant United States Attorney
Florida Bar No. 0328839
505 S. 2nd Street, Suite 200
Fort Pierce, FL 34950
Telephone:   772-466-0899
Facsimile:   772-595-3606

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent by United States Mail this 21st day of November 2005 to:

David S. Chaiet, Esq.
4000 Hollywood Blvd., Suite 265 South
Hollywood, FL 33021

Vincent F. O'Flaherty
4700 Belleview, Suite 210
Kansas City, MO 64112

Richard Lubin, Esq.
1217 S. Flagler Drive
West Palm Beach, FL 33401

_____
James G. McAdams, III
Assistant United States Attorney